**ANDERSON & KARRENBERG**
Heather M. Sneddon (#9520)
Jared D. Scott (#15066)
50 West Broadway, Suite 700
Salt Lake City, UT 84101-2035
Telephone:  (801) 534-1700
hsneddon@aklawfirm.com
jscott@aklawfirm.com

**PITTA LLP**
Vincent F. Pitta (admitted *pro hac vice*) (NY #1048842)
120 Broadway, 28th Floor
New York, NY 10271
Tel: (212) 652-3836
vpitta@pittalaw.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole (NY # 2594356) (admitted *pro hac vice*)
Regina M. Calcaterra (NY # 2848695) (admitted *pro hac vice*)
Correy A. Kamin (NY # 5015151) (admitted *pro hac vice*)
Anita B. Kartalopoulos (NJ #025161982) (admitted *pro hac vice*)
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
gmn@whafh.com
calcaterra@whafh.com
kamin@whafh.com
abk@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Betsy Carol Manifold (CA #182450) (admitted *pro hac vice*)
750 B Street, Suite 2770
San Diego, CA  92101
Tel.: (619) 239-4599
manifold@whafh.com

*Attorneys for The New York Hotel Trades Council and Hotel Association of New York City, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **PATRICK LENTSCH,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**VISTA OUTDOOR INC.; MARK W. DEYOUNG, STEPHEN M. NOLAN;** and **KELLY T. GRINDLE**,<br><br>Defendants. | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil Action No. 1:17-cv-00012-DAK-EJF<br><br>Honorable Dale A. Kimball |

Lead Plaintiff The New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund ("Lead Plaintiff") by and through its attorneys, alleges the following against Defendants Vista Outdoor, Inc. ("Vista" or the "Company"), Mark W. DeYoung ("DeYoung"), Stephen M. Nolan ("Nolan"), and Kelly T. Grindle ("Grindle") (collectively, "Defendants") upon personal knowledge as to those allegations concerning Lead Plaintiff, and as to all other matters, upon the investigation of counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Vista with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Vista's public documents, investor presentations, conference calls and press releases; (c) information readily obtainable on the Internet; (d) interviews by investigators of several witnesses with personal knowledge of certain relevant facts; and (e) consultation with experts.

## SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of persons and entities that acquired Vista's securities between August 11, 2016 and January 13, 2017, inclusive (the "Class Period"), against Defendants, seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Vista designs, manufactures and markets consumer products in the outdoor sports and recreation markets. Vista operates in two segments: Shooting Sports and Outdoor Products.  Vista's Outdoor Products segment has three reporting units: Hunting & Shooting Accessories; Outdoor Recreation; and Sports Protection.  Vista's portfolio includes over 40 brands, including sporting ammunition and firearms, hunting and shooting accessories, outdoor accessories, outdoor sports optics, golf rangefinders, performance eyewear, hydration products

2

and stand up paddle boards.  During the Class Period, Vista products were sold through a variety of mass, specialty and independent retailers and wholesalers.[1]  Wal-Mart is Vista's largest customer, generating roughly 11% of the Company's overall sales. Vista also sells certain products directly to consumers through the relevant brand's website.

3.     The complaint arises out of Defendants' false statements and material omissions to the market beginning in August 2016 and ending in January 2017 which enabled Defendants to mislead the market as to the strength of Vista's financial condition.  In order to the inflate the price of Vista securities during the Class Period, Defendants caused the Company to overstate and falsely report its financial results, including goodwill, and failed to disclose material facts necessary to make the statements not misleading.

4.     At the heart of Defendants' fraud, but accompanied by other misconduct, is Defendants' failure to timely write down impaired goodwill in the Company's Hunting & Shooting Accessories reporting unit, which should have been taken by the quarter ended July 3, 2016, *or a full six months before it was in fact written down*.  Consequently, Defendants materially overstated goodwill by $450 million, which was accumulated primarily from two previous pre-Class Period acquisitions.  As explained below, Defendants' scheme concealed the need to *write off almost 50% of the recorded goodwill in Vista's Outdoor Products segment, which was ultimately done at the end of the Class Period by recognizing an astounding $449.2 million charge for goodwill impairment for Vista's Bushnell and BLACKHAWK! acquisitions*,

---

[1]     Vista's key retailers are: Bass Pro Shop (100 stores), Cabela's (85 stores), Dick's Sporting Goods (740 stores plus 75 Golf Galaxy Stores and 20 Field & Stream stores), Gander Mountain (164 stores), Recreational Equipment, Inc. (154 stores), Sportsman's Warehouse (70), Target (1,797) and Wal-Mart (3,927 stores).  Including Wal-Mart (11% of the Company's total revenues), the remaining top 10 customers represent 42% of the Company revenues.

part of the Hunting & Shooting Accessories reporting unit.  This impairment charge should have been recognized, at a minimum, no later than the end of Vista's first quarter for fiscal year 2017, ended July 3, 2016.[2] ***Indeed, the write-off would have wiped out 13% of Vista's total assets and 27% of total shareholder equity as of July 3, 2016***.

5.     On January 11, 2017, the market was shocked by the Company's announcement of an impairment charge in its Hunting & Shooting Accessories reporting unit (archery/hunting accessories, golf, optics, shooting accessories, and tactical products) ranging from $400 to $450 million.  According to one commentator, the impairment was likely to swing Vista ***from reporting $79 million in operating earnings in Q3 2017 to a $320 million operating loss***. Rich Smith, *Why Vista outdoor Inc. Stock Crashed 26% Today,* THE MONTLEY FOOL (Jan. 12, 2017 12:57 PM), http://www.fool.com/investing/2017/01/12/why-vista-outdoor-inc-stock-crashed-26-today.aspx. On this news, Vista shares fell $8.21, or 21.7%, on usually high trading volume.  The next day, Vista announced that Defendant Grindle, President of the Outdoor Products segment, was being replaced.  Vistas closing stock price on January 13, 2017 of $28.70 was almost 50% off its 52-week high of $53.91.

6.     Shortly thereafter, on January 31, 2017, the Company announced the retirement of Vista's Controller and Treasurer, Thomas Sexton.  Mr. Sexton had worked for Vista Outdoor and its predecessor companies since 1986.

7.     After announcing disappointing results for Q4 2017, ***with gross profit down 52% organically in the Outdoor Products segment***, Chief Executive Officer ("CEO") and Chairman DeYoung retired on July 10, 2017, effective immediately.  Despite Vista's Board of Directors

---

[2]     Vista's fiscal year ends on March 31.  For fiscal year 2017, the quarters ended on July 3, 2016 (Q1), October 2, 2016 (Q2), January 1, 2017 (Q3) and March 31, 2017 (Q4).

(the "Board's") earlier nomination and recommendation of Mr. DeYoung to be re-elected as a director at the Company's August 1, 2017 Annual Meeting, the Board advised shareholders that Mr. DeYoung would not serve as a director of the Company, and the nomination and recommendation were withdrawn.

8.      As to the calculation of goodwill, Defendants falsely assured the market in their SEC filings that "our assumptions about future revenues and expenses . . . [used in evaluating Vista's goodwill] are based on our plan, as reviewed by the Board of Directors."  However, Defendants' assumptions were knowingly unrealistic and unattainable, as corroborated by information obtained from several confidential witnesses and well-recognized and documented macroeconomic conditions.   By making baseless assumptions, Defendants were able to perpetuate their fraud.  Investors had no way of knowing that the Company's impairment tests were flawed and that Vista's financials deliberately overstated Vista's goodwill during the Class Period.

9.      Specifically, any assumptions used in performing the required annual goodwill impairment test in Q4 2016 (quarter ended March 31, 2016) materially changed in Q1 2017, as indicated by the circumstances described below and gave Defendants several reasons to know that assets in the Hunting & Shooting Accessories reporting unit were impaired:

(a)      the underlying forecasts were themselves unattainable and unachievable and based on inadequate internal controls to ensure the integrity of financial and accounting information;

(b)      the underlying prior and current results and prior performance indicated that "assumptions" were baseless and unattainable and not indicative of market conditions in the

underlying businesses;

(c)     the assumptions had no historical or ongoing basis in reality based on actual performance, but were manipulated to support goodwill;

(d)     historical gross profit margins were far below the margin assumptions used to test goodwill impairment just prior to the beginning of the Class Period; and

(e)     the then current and quarters immediately before and after the goodwill impairment tests for the Outdoor Products segment were performed demonstrated the gross over inflation of the Defendants' assumptions for the Hunting & Shooting Accessories reporting unit, yet Defendants still failed to admit the impairment or to promptly disclose to the market the impairment, the assumptions, or the valuation model used to conduct the test.   Indeed, the Defendants intentionally waited for eight months after the impairment test before even considering whether the Company's goodwill was impaired.

10.     During the Class Period, Vista achieved results by "pulling products" through its Hunting & Shooting Accessories unit at substantial discounts and by moving sales from subsequent periods into the prior period.  Despite critical retailer bankruptcies, reported softening in the retail environment by Vista's largest customers, industry consolidation, and a warm hunting season for the second straight year, all resulting in lower sales, greater discounts, and lower or negative gross margins, Defendants continued to assure investors that Vista was "on track" and would see "a strong back-half of the year" with "very strong cash flow generation." Despite acknowledging competitive threats to Vista's optics business (part of the Hunting & Shooting Accessories reporting unit) as early as November 2015, repeatedly recognizing declining revenues in optics, and the need to re-position optics pricing and market strategy

including new staffing and management, Defendants nonetheless remained "excited" about potential new product development.  These repeated assurances made throughout the Class Period all contributed to the concealment of Vista's goodwill impairment.

11.     Vista's investors, and the Lead Plaintiff here, had a reason to expect that Defendants utilized reasonable and supportable goodwill testing assumptions (including sales growth rate and gross margin percentages) based on legitimate internal projections (*i.e.* best expectations for future performance). Investors further had reason to believe that Defendants reevaluated those assumptions when warranted, as required by Generally Accepted Accounting Principles ("GAAP")[3] and as the Company had done historically, and created more realistic assumptions when needed, based on updated information.  Defendants did not disclose at any time during the Class Period that they did not follow this practice or did not periodically reevaluate the basis for previously used goodwill impairment test assumptions for each reporting unit, and in fact, affirmatively asserted that the assumptions were based on reasonable estimates as used in the underlying businesses.

12.     As set forth below, Vista's gross profit margins in the Hunting & Shooting Accessories reporting unit did not meet (or come close to) the assumptions used for several consecutive quarters both before and following Defendants' periodic goodwill testing of the Outdoor Products segment (and were below Defendants' guidance).  Despite this substantial change in financial circumstances including a softening retail market, inventory issues, lack of innovative new products and continual changes in management, Defendants nevertheless continued to maintain the assumptions previously utilized (as demonstrated by their failure to

---

[3]     GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practices at a particular time.

perform new tests and/or disclose new feasible assumptions).  Accordingly, Defendants misled the market by failing to disclose that the previous assumptions and, hence, the goodwill impairment analysis, were materially flawed.  This gave the market the false impression that the assumptions for each reporting unit within the Outdoor Products segment were still valid.  Since accounting standards (*i.e.* GAAP) require the Company to reevaluate its goodwill between annual tests under certain circumstances, by failing to do so, Defendants effectively continued to misrepresent to the market that the assumption previously used were still valid.  However, they were not valid because of Vista's inability to achieve the necessary margin percentages, due in part to unreliable forecasts, pulling in orders, inventory problems due to liquidations and bankruptcies of retail customers and substantial promotional activities such as discounting.

13.     Thus, Vista's Class Period financials, which were filed with the SEC and provided to the market and its lenders, were false and misleading because Defendants lead the market to believe there was a prospect of achieving the growth rates utilized in the goodwill impairment tests.  Thus, when Defendants disclosed at the end of the Class Period that they would take a $400 to $450 million goodwill impairment charge, revealing that the assumptions were baseless, the Company's stock dropped by $8.21 per share or 21.7%.  While some of the underlying financial information may have been public prior to this disclosure, ***the deficiencies with those assumptions were not disclosed.  When they were, the market reacted swiftly***.

14.     After the close of the Class Period, Vista stock plunged another 19% when the Company disclosed on February 9, 2017 that the impairment charge was at the high end of the range at $449 million.  The impact of the impairment charge translated to an adjusted net loss of $377 million or $6.44 per share.

15.     Defendants filed regular reports with the SEC.  Defendants certified pursuant to the Sarbanes-Oxley Act of 2002 that these financial reports were reviewed by them and did not contain any material misrepresentations or omissions.  These certifications that Vista's financial reporting was accurate and that the Company's internal controls were adequate, were knowingly or recklessly false when filed.  As discussed below, Vista's financial statements were not accurate.

16.     As a result of Defendants' positive (but false) statements about Vista, investors, including Lead Plaintiff, purchased Vista stock at artificially inflated levels and were damaged when the truth was revealed and the artificial inflation was removed from the stock price causing the stock price to decline.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j (b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this district at 262 N. University Avenue, Farmington, UT.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

21.     Lead Plaintiff purchased Vista stock during the Class Period, and suffered damages as a result of the Exchange Act violations and false and/or misleading statements and/or material omissions alleged herein.[4]

22.     Defendant Vista is a Delaware corporation headquartered in Farmington, Utah. Vista's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "VSTO."  Vista was formed in February 2015 when Alliant Techsystems Inc. ("ATK") spun off its Sporting Group business to ATK stockholders (the "Spin-off") as a newly formed company.[5]

23.     Defendant DeYoung was, at all relevant times, the Chairman and CEO of Vista, since Vista's creation in February 2015, until the Company announced his departure on July 10, 2017.  Prior to the Spin-off, Mr. DeYoung served as President and CEO of Orbital ATK from February 2010 to February 2015.

24.     Defendant Nolan has served as Senior Vice President and Chief Financial Officer ("CFO") of Vista since February 2015.  From 2006 to February 2015 (prior to the Spin-

---

[4]     A copy of the Lead Plaintiff's certification and chart of Vista share purchases during the Class Period is attached as Exhibit 2 to the Declaration of Gregory M. Nespole in Support of the Motion of The New York Hotel Trades Council and Hotel Association of New York City, Inc.'s Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel.  *See* Dkt. 15 (filed March 27, 2017).
[5]     The Spin-off was immediately followed by the merger of ATK's Aerospace and Defense Groups with Orbital Sciences Corporation and thereafter ATK was renamed Orbital ATK, Inc. ("Orbital ATK").

off), Mr. Nolan held a number of leadership positions at ATK Orbital.  For example, from 2010 to 2013, he was Orbital ATK's Vice President of Strategy and Business Development and, beginning in July 2013 until the Spin-off, Mr. Nolan was Senior Vice President of Orbital ATK's Strategy and Business Development.  As CFO of Vista during the Class Period, Mr. Nolan signed all of the Quarterly Reports on Form 10-Q discussed below "pursuant to the requirements of the Securities Exchange Act of 1934."

25.     Defendant Grindle was the President of the Outdoor Products segment of Vista for approximately one year, from January 2016 when he was hired until the Company announced his immediate departure on January 13, 2017.

26.     Defendants DeYoung, Nolan and Grindle (collectively the "Individual Defendants"), because of their positions with Vista, possessed the power and authority to control the contents of Vista's reports to the SEC, press releases and presentations to securities analyst, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## EXECUTIVE COMPENSATION AND CHANGES

27.     The Individual Defendants' compensation consisted of cash (salary and bonus),

stock awards, options awards and other incentive plan compensation depending on the Company reaching specific financial goals.   As the chart below reflects, the Individual Defendants' guaranteed "base salary" was only about 10% of Mr. DeYoung's total compensation and about 14% of Mr. Nolan's total compensation.   As discussed in Paragraph 29 below, Mr. Grindle's "base salary" was about 40% of his potential compensation and was similar to the compensation package of Robert Keller ("Keller") President of the Shooting Sports Segment outlined in the chart below.   Reaching the relevant financial goals for fiscal years 2016 and 2017 (and thereby earning bonuses at a substantial multiple to their base compensation) was largely dependent on Vista's ability to enter into an expanded credit facility, issue and then register and exchange senior notes, and continue its acquisition program of outdoor product companies.   *See infra* ¶¶ 33-41, 65-74.   The Individual Defendants made false and misleading statements to shareholders and the market during the Class Period, including disseminating false financial statements, which deliberately overstated Vista's goodwill by $450 million, in order to achieve certain financial goals for their own personal benefit.   *See infra* ¶¶ 75-118.

28.   Below is a summary from the Company's Definitive Proxy Statement[6] which summarizes the Individual Defendants' executive compensation for fiscal years 2015 to 2017.

---

[6] *See* Vista Outdoor Inc., Definitive Proxy Statement (Schedule 14-A) (June 17, 2017).

## SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year (1) | Salary ($) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mark W. DeYoung Chairman and Chief Executive Officer | FY17 | $1,081,500 | $   — | $3,032,751 | $699,994 | $   — | $ 372,586 | $ 131,806 | $ 5,318,637 |
| | FY16 | $1,050,000 | $   — | $3,004,653 | $699,997 | $ 1,629,600 | $ 253,595 | $ 141,317 | $ 6,779,162 |
| | FY15 | $1,064,687 | $   — | $8,016,992 | $699,999 | $ 1,810,507 | $ 1,297,973 | $ 355,432 | $13,245,590 |
| Stephen M. Nolan Senior Vice President and Chief Financial Officer | FY17 | $ 500,000 | $   — | $ 713,976 | $164,797 | $   — | $ 34,458 | $ 51,353 | $ 1,464,584 |
| | FY16 | $ 470,000 | $268,125 | $ 686,770 | $159,999 | $ 474,136 | $ 39,902 | $ 60,079 | $ 2,159,011 |
| | FY15 | $ 376,686 | $368,125 | $1,116,657 | $131,592 | $ 477,567 | $ 88,126 | $ 76,262 | $ 2,635,015 |
| Robert J. Keller President, Shooting Sports | FY17 | $ 338,942 | $   — | $ 498,019 | $ 77,241 | $   — | $   — | $ 372,654 | $ 1,286,856 |

**Notes:**
(1) The years reported are the Company's fiscal years ended March 31, 2017, March 31, 2016 and March 31, 2015.

(2) Fair Market Value as calculated by Vista in the 2017 Definitive Proxy Statement.

29.     As of January 4, 2016, Defendant Grindle was appointed President, Outdoor Products and the title of David White ("White"), another Vista executive, was changed to President, Shooting Sports.  According to the Company's SEC filings, Mr. Grindle received an annual base salary of $375,000, *annual incentive compensation to earn up to 80% of his annual base salary*, and a long term incentive award of $150,000.  Mr. Grindle also received a signing bonus of $300,000 in restricted stock units to vest in two equal installments provided he was employed by the Company at the time of the vesting dates.  According to the Company, the

offer to Mr. Grindle did not "provide for any payments or benefits in the event of termination."[7]

30.     Three months later, Vista announced that Mr. Keller had been appointed President, Shooting Sports, as of May 9, 2016.  Mr. White, the then current President, Shooting Sports, would retire as of May 20, 2016.  According to the Company's SEC filings, Mr. Keller received an annual base salary of $375,000, ***annual incentive compensation to earn up to 100% of his annual base salary***, and a long term incentive award of $150,000.  Mr. Keller would receive his fiscal year 2017 long term incentive equity award of $281,250 aggregate grant date value on May 9, 2016.  The long term performance award was 50% shares, 30% restricted stock units, and 20% stock options.  According to the Company, the offer to Mr. Keller did not "provide for any payments or benefits in the event of termination."

31.     In connection with Mr. DeYoung's abrupt July 2017 retirement, Vista paid Mr. DeYoung: (i) a lump-sum cash payment in an amount equal to his current base salary ($1,081,500); (ii) a *pro rata* portion of his annual bonus; (iii) accelerated vesting of his outstanding restricted stock, restricted stock unit and stock option awards; (iv) a *pro rata* portion of his performance-based long-term incentive awards; and (v) access to other Company benefits.  According to the Company's Definitive Proxy Statement filed with SEC on June 17, 2017, the value of these payments on termination was over $3 million.

## CONFIDENTIAL WITNESSES

32.     Lead Plaintiff's allegations are supported by, among other things, the information provided by confidential witnesses.  These witnesses include former Vista (including its predecessor company) employees who provided facts based on their personal experience,

---

[7]     Vista Outdoor Inc., Current Report (Form 8-K) (Dec. 17, 2015).

which includes a variety of different vantage points, within Vista:

(a)     Confidential Witness ("CW") 1 was a senior executive at ATK Sporting Group from February 2013 to February 2015 and he was responsible for business management, including participating in the preparation of a valuation model for Bushnell prior to the acquisition and knowledge of Bushnell's performance after its acquisition by ATK.

(b)     CW 2 was an interim senior executive in the Outdoor Products segment from April 2016 until June 2016, and reported directly to Defendant Grindle.  Based on this position, CW 2 had personal knowledge with regard to the sales and marketing of certain products within the Outdoor Products segment; the forecast, budget and plan for certain products; and the softening marketplace with retailers such as Sports Authority going out of business.

(c)     CW 3 was based in Norfolk, Virginia and worked as a Vista Outdoor/ATK/BLACKHAWK! Accounts Receivable/Credit Manager from 2006 to March 2015. CW 3 reported to the Credit Director, was part of a team that integrated the inventory of ammunitions and accessories into one common operating system, and handled pricing until June 2014.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Vista operates in two segments: Shooting Sports and Outdoor Products.  The $400-$450 million impairment announced on January 11, 2017 was taken in the Hunting & Shooting Accessories reporting unit, part of the Company's Outdoor Products segment.  The Hunting & Shooting Accessories reporting unit includes the Company's optics, hunting and

shooting accessories and tactical accessories products.

34.     During the past six years, Vista acquired the following companies:

(i)     in March 2009, Vista acquired Eagle Industries for $63 million;

(ii)    on April 9, 2010, Vista acquired Blackhawk Industries Product Group Unlimited LLC ("BLACKHAWK!") for $172.3 million, now part of the Outdoor Products segment;

(iii)   on June 21, 2013, Vista acquired Savage Arms for $315 million, now part of the Shooting Sports segment;

(iv)    on November 1, 2013, Vista acquired Bushnell Holdings Group ("Bushnell") for $985 million, now part of the Outdoor Products segment;

(v)     on July 20, 2015, Vista acquired Jimmy Stykes for $40 million, now part of the Outdoor Products segment;

(vi)    on August 3, 2015, Vista acquired CamelBak for $412.5 million, now part of the Outdoor Products segment;

(vii)   on April 1, 2016, Vista acquired BRG Sports Inc.'s Actions Sports division ("Action Sports"), which includes the brands Bell and Giro, as well as BlackBurn, CoPilot, Krash and Raskulz for $400 million, now part of the Outdoor Product segment; and

(viii)  on September 1, 2016, Vista acquired Camp Chef for $60 million, now part of the Outdoor Products segment.

35.     The following chart identifies the reporting unit for each of aforementioned acquisitions within the Outdoor Products segment:[8]

---

[8]     Includes acquisitions before the Spin-off.



Vista's Outdoor Products Segment Organization Chart

**Notes**:

1. *A $450 million impairment announced by Vista occurred in the Hunting & Shooting Accessories reporting unit.
2. The [date] and ( ) above indicate the acquisition date and price paid by Vista or its predecessor for the entity.

36.     As reflected in the chart above, the Hunting & Shooting Accessories reporting

unit was formed through the acquisitions of Eagle, BLACKHAWK! and Bushnell.  These

acquisitions were made when Mr. Sexton, Vista's Vice President, Controller and Treasurer

during the Class Period, served as the Corporate Controller, Interim Chief Financial Officer and

Treasurer of ATK (Vista's predecessor).  At the time of ATK Orbital's BLACKHAWK! and

Bushnell acquisitions, Defendant DeYoung was President and CEO of Orbital ATK and Defendant Nolan was first Vice President and then Senior Vice President of Orbital ATK's Strategy and Business Development Group.  Both DeYoung and Nolan were familiar with and had direct responsibility for the operations and financial results of these businesses.

### BLACKHAWK! ACQUISITION AND DISCOUNTING

37.      BLACKHAWK! was originally privately owned by Mike Noella, a former U.S. Navy Seal, who created a global company.  BLACKHAWK! manufactures tactical gear such as holsters, magazine pouches, and illumination tools.  According to CW 3 (an ATK Accounts Receivable and Credit Manager from 2010 to March 2015), who handled pricing for BLACKHAWK! products, ATK began to immediately offer deep discounts on BLACKHAWK! Products.  As a result, sometimes there were "no margins on it" or "negative gross margins." From 2009 to June 2014, according to CW 3, discounts for BLACKHAWK! holsters and magazine pouches gradually increased from 65 to 80 percent off Manufacturer's Suggested Retail Price ("MSRP") with Wal-Mart.  BLACKHAWK! was part of the Hunting & Shooting Accessories unit.

38.      The largest contribution to the Hunting & Shooting Accessories reporting unit is Bushnell, with an acquisition cost of $985 million (net of cash acquired).  Bushnell designs, markets and distributes sports optics, outdoor accessories and eyewear products.  Vista reported that the Bushnell purchase price allocation included $524 million in goodwill.[9]  For the quarter ended June 29, 2014, ATK (Vista's predecessor) recorded $124 million in sales and $5.3 million in income.  At the time of the acquisition, according to analysts, Bushnell was expected to

---

[9]      *See* Vista Outdoor Inc., Annual Report (Form 10-K) (May 29, 2015).

generate sales of roughly $600 million annually and had been growing at a rate of 7% over the previous three years.[10]

39.     According to SEC filings, the breakdown of the purchase price allocation for Bushnell is presented below:

| | | |
|---|---|---|
| Purchase Price net of cash acquired: | | |
| Cash Paid | | $ 985,000 |
| Cash Paid for additional working capital | | 4,185 |
| **Total purchase price** | | **$ 989,185** |
| Fair value of assets acquired: | | |
| Net receivables | $ 111,036 | |
| Net inventories | 153,748 | |
| Tradename, technology, and customer relationship intangibles | 364,843 | |
| Property, Plant, and Equipment | 25,080 | |
| Other assets | 9,820 | |
| Total assets | 664,527 | |
| Fair value of liabilities assumed: | | |
| Accounts Payable | 80,092 | |
| Deferred tax liabilities | 72,349 | |
| Other liabilities | 28,746 | |
| Total liabilities | $ 181,187 | |
| **Net assets acquired** | | **$ 483,340** |
| **Preliminary goodwill** | | **$ 505,845** |

40.     According to CW 1 (a senior executive in the ATK Sporting Group with personal knowledge of the Bushnell acquisition), the internal valuation model for the Bushnell acquisition was $870 million, but the ATK Orbital Board went up an additional $110 million to a price of $980 million.  At the time of the acquisition, in the summer of 2014, according to CW 1, the firearms and related accessory market was starting to normalize or decline from a very high

---

[10]     *See* Greg Konrad, CFA, *Vista Outdoor Inc.: Marking Down the Accessories Portfolio*, JEFFRIES COMPANY NOTE, Jan. 13, 2017.

peak demand period that followed the Sandy Hook tragedy in December 2012.  Thus, by February 2015, according to CW 1, ATK Sporting Group had a decline in sales of approximately $200 million year-over-year.  The combination of having paid a hefty premium for the Bushnell acquisition with this well-known and recognized trend (a declining or normalizing market correction which continued throughout calendar years 2015 and 2016) created a clear indication of impairment and, by itself, required that an impairment test be performed no later than Q1 2017 (quarter ended July 3, 2016).

41.      Defendants DeYoung and Nolan were well aware of the issues associated with the Bushnell acquisition.  Both Defendants worked in management positions at ATK (before the Vista Spin-off) at the time of the acquisition.  DeYoung observed that "the Bushnell organization before we acquired it, with its previous ownership had failed to discriminate, define, and distribute the optics portfolio properly" so beginning in February 2015 Vista "rationalized the brands into channels of distribution where they belong."  (Investor Day Transcript ("Tr.") at 42, Nov. 17, 2016).  Defendant Nolan noted that "some of the companies we'd acquired several years ago from private equity [referring to Bushnell and BLACKHAWK!] had let certain of their innovation capabilities atrophy." (Roth Capital Partner Conference (Bloomberg) Tr. at 4, March 14, 2017).

## VISTA'S FINANCIAL PERFORMANCE AND GOODWILL DISCLOSURES

42.      In the Company's Annual Report on SEC Form 10-K for fiscal year 2016 (ended March 31, 2016) (the "2016 Annual Report"), the Company reported goodwill by segment and noted the following changes in the carrying amount of goodwill by segment from March 31, 2014 to March 31, 2016 as follows:

| | | | | | |
|---|---:|---|---:|---|---:|
| Balance at March 31, 2014 | $ | 246,487 | $ | 600,647 | $ | 847,134 |
| Impairment | | (41,020) | | — | | (41,020 |
| Effect of foreign currency exchange rates | | (947) | | (23,004) | | (23,951 |
| Balance at March 31, 2015 | | 204,520 | | 577,643 | | 782,163 |
| Acquisitions | | — | | 238,824 | | 238,824 |
| Effect of foreign currency exchange rates | | 371 | | 2,093 | | 2,464 |
| Balance at March 31, 2016 | $ | 204,891 | $ | 818,560 | $ | 1,023,451 |

43.     The Company's Annual Report on SEC Form 10-K for fiscal year ended March 31, 2015 (the "2015 Annual Report"), filed a year earlier with the SEC,  raised a concern with regard to the Outdoor Products segment (then identified as the "Accessories reporting unit") and its goodwill balance at March 31, 2015 of approximately $573 million.  The 2015 Annual Report stated:

"The Accessories reporting Unit had an estimated fair value that exceeded its carrying value by approximately 5%. This reporting unit had approximately $573,000 of goodwill recorded at March 31, 2015. *A majority of the goodwill recorded within this reporting unit, approximately $495,000, relates to goodwill acquired in the fiscal 2014 acquisition of Bushnell. We would not expect to see significant excess within this reporting unit given that we determined the fair value of the vast majority of this goodwill within the last two years.* The fair value of the Accessories reporting unit was determined using both an income and market approach. The value estimated using a discounted cash flow model requires us to make significant estimates regarding future revenues and expenses, projected capital expenditures, changes in working capital and the appropriate discount rate and is weighted against the estimated value derived from the guideline company market approach method. We used a discount rate of 10.5% and a 3% terminal growth rate. The market approach method estimates the price reasonably expected to be realized from the sale of the company using comparable company multiples and a control premium of 25%. *Should the market correction last longer or be deeper than expected or if new product developments do not succeed, or the discount rate were to increase by more than 100 basis points, it is possible that the estimated fair value of this reporting unit could fall below its carrying value, and there could be an indication of impairment which would require us to perform a test for impairment.*"

21

> Within the Accessories reporting unit, one tradename had an estimated fair value that exceeded its carrying value by approximately 1%. This tradename had a carrying value of approximately $95,100 at March 31, 2015. The fair value of the tradename was determined using the relief of royalty method. The value estimated requires us to make significant estimates regarding future revenues, estimated royalty rates and the appropriate discount rate. We used a discount rate of 10.5%, royalty rate of 3%, and a 3% terminal growth rate. Should the market correction last longer or be deeper than expected or if new product developments do not succeed, or the discount rate were to increase or the royalty were to decrease by more than 25 basis points, it is possible that the estimated fair value of the tradename could fall below its carrying value, which could result in an impairment."

*See* Vista Outdoor Inc., Annual Report (SEC Form 10-K) (May 29, 2015).

44.     In reviewing the goodwill balances for the Outdoor Products segment disclosed in the 2016 Annual Report, based on the Company's prior disclosures in the 2015 Annual Report, the Outdoor Products segment's $577 million goodwill balance as of March 31, 2015 consisted of $495 million attributable to Bushnell and the remainder attributable to BLACKHAWK! (formerly identified as the Accessories reporting unit in the 2015 Annual Report).  The 2016 Annual Report identified the "Acquisitions" increase in the Outdoor Products segment goodwill balance as of March 31, 2016 as related to the preliminary purchase price allocation for the CamelBak and Jimmy Stykes acquisitions.  As a result, the breakdown for the Outdoor Products segment's goodwill balance as of March 31, 2016 is: $238 million attributable to the Outdoor Recreation reporting unit (CamelBak and Jimmy Stykes acquisitions) and $577 million attributable to Bushnell ($495 million) and Black Hawk ($82 million).  There is no goodwill balance attributable to the Sports Protection reporting unit because Action Sports was acquired in April 2016, after March 31, 2016, and a new reporting unit was formed based on this acquisition.

22

45.     *Accordingly, as early as March 2015, Defendants were aware that the former Accessories reporting unit identified as the Hunting & Shooting Accessories reporting unit during the Class Period, had no significant fair value excess (approximately 5%) and one trade name only exceeded its carrying value by approximately 1%.*   According to the 2015 Annual Report, if a market correction was deeper, new products did not succeed, or discounts increased, "there could be an indication of impairment" and it would require an impairment test.   As discussed below at ¶¶ 46-64, all of these indications were apparent in the next year and no later than Q1 2017 (quarter ended July 3, 2016), Vista however, failed to conduct an impairment test as required and indicated by its own cautionary disclosures.

## FINANCIAL RESULTS AND MARKET CONDITIONS INDCIATE IMPAIRMENT

46.     Beginning in FY 2016 and dramatically increasing in Q1 2017 (quarter ended July 3, 2016) (highlighted below), there was a clear indication of the exact impairments described in the 2015 Annual Report.   The chart below tracks the decreases in the organic results in the Outdoor Products segment (which contains the Hunting & Shooting Accessories reporting unit during the Class Period) beginning as early as Q2 2016 (quarter ended October 4, 2015).

**ORGANIC RESULTS FOR VISTA'S OUTDOOR PRODUCT SEGMENT**
**(HUNTING & SHOOTING ACCESSORY REPORT UNIT)**

| Period | Organic Sales | % Change Prior Period | Organic Gross Profit | % Change Prior Period |
|---|---|---|---|---|
| Q2 2016 | $189M | 3% increase | $48M | *Down 2%* |
| Q3 2016 | $195M | *Down 2%* | $47M | *Down 14%* |
| Q4 2016 | $174M | 2% increase | $47M | Flat |
| FY 2016 | $742M | 1% increase | $195M | *Down 3%* |
| **Q1 2017** | **$153M** | ***Down 16%*** | **$38.5M** | ***Down 27%*** |
| Q2 2017 | $214M | Flat | $51.8M | *Down 9.6%* |
| 6 Months Ended 10/2/2016 | $367.7M | *Down 7%* | $90.3M | *Down 18%* |
| Q3 2017 | $200.6M | *Down 15%* | $46M | *Down 26.1%* |
| 9 Months Ended 1/1/2017 | $568M | *Down 10%* | $137M | *Down 21%* |

47.     The deteriorating conditions in the Outdoor Products segment especially in the Hunting & Shooting Accessories reporting unit was evident throughout FY 2016.  For example, in Q2 2016 (quarter ended October 4, 2015), Defendants DeYoung and Nolan spoke to analysts on the Company's November 15, 2015 Earnings Call.  Although organic sales in the Outdoor Products segment increased slightly (3%) both sequentially and year to year, *organic gross profit was down 2% due to inventory related charges and lower margin product.*  The slight organic sales increase for the second quarter in other products was *offset by lower sales in tactical products and archery and hunting accessories*.  Defendant Nolan also noted in the earnings call that some of Vista's key retailers had discussed the impact of poor weather conditions on earnings.  According to Nolan, "we have to tell you that weather does contribute and did contribute to a slow back half of our second quarter and it could slow down the third quarter,

which are in right now depending on how people respond and how the hunting season picks up." Nolan concluded: "*it has not been a favorable fall.*"

48.     A year later, during the Class Period, analysts would still ask the Company, when investors could "start to see the optics business [Bushnell] do better[.]"[11]   Defendant DeYoung admitted that in November 2015, "*I said, I was concerned about optics and I was concerned about the innovation there" and "we've told you that we had some threats, competitive threats that were impacting our optic business" and "we're going to have to work on that*." *Id*.  Again, a year later, DeYoung would blame, in part, the weather (a warm hunting season), as well as the Bushnell organization and its previous ownership who "had failed to discriminate, define, and distribute the optics portfolio properly."  *Id*. at 42.  All of these conditions were known by Defendants before the Class Period began and still existed at the start of the Class period.

49.     On the February 11, 2016 Earnings Call held to discuss the Company's results in the Q3 2016 (quarter ended January 3, 2016), *both DeYoung and Nolan repeatedly acknowledged the decline in the Outdoor Products segment, noting that organic sales were down 2% and organic gross profit was down a dramatic 14%.*  The decrease in organic sales in the Outdoor Products segment for the quarter was attributed in part to *lower sales in tactical products, partially offset by increased promotional activity (or discounting).  The 14% decline in organic gross profit in Outdoor Products was attributed to unfavorable foreign exchange impacts, decrease in revenue, and unfavorable product mix.*  Nolan also noted the impact of "overall weakness at retail and the warm fall weather, both of which lead to *a higher level of*

---

[11]        *See* Investor Day Presentation Tr. at 41, Nov. 17, 2016.

*promotional activity for certain products*, which is continuing into the fourth quarter."

50.     On February 18, 2016, *The Financial Times* reported that Wal-Mart, Vista's largest customer, suffered its worst sales performance in 35 years.[12]   Wal-Mart accounts for roughly 11% of Vista's revenues; Vista even has offices in Bentonville, Arkansas (where Wal-Mart's headquarters are located) in order to support its customer relationship with Wal-Mart. *See* Investor Day Tr. at 8.   ***Wal-Mart reported its first annual sales decline since 1980, underlining the stiff retail challenges it faces***.   ***Wal-Mart reduced its sales growth outlook for the fiscal year to flat from 3-4% growth, reflecting in part a loss of revenue from its 269 store closures.***

51.     In Q4 2016 (quarter ended March 31, 2016), the Company announced several management changes, bringing several Vista outsiders into executive positions:  Defendant Grindle to lead the Outdoor Products segment; Robert Keller to act as President of the Shooting Sports segment; and David Allen to serve as Senior Vice President of Sales.  Mr. Keller replaced David White, who retired after 40 years with Vista and its predecessors.

52.     On April 28, 2016, another of Vista's top 10 retail customers, ***Cabela's, posted weaker than expected sales in its latest quarter as same-store sales fell 4.3%***.   Cabela's was founded in Sidney, Nebraska in 1961.  Hunting equipment accounts for approximately 45% of Cabela's sales. According to Cabela's CEO Tommy Miller, "[r]evenue trends we experienced in the fourth quarter of 2015 continued into the first quarter of 2016."[13]   Overall, Cabela's posted a

---

[12]     *See* Lindsay Whip, *Wal-Mart Suffers Worst Sales Performance in 35 Years*, FINANCIAL TIMES (Feb. 18, 2016), https://www.ft.com/content/cbcb3f9e-d640-11e5-8887-98e7feb46f27.

[13]     *See* Ezequiel Minaya, *Cabela's same-store sales slide,* MARKETWATCH (April 28, 2016, 9:27 AM), http://www.marketwatch.com/story/cabelas-same-store-sales-slide-2016-04-28.

profit of $22 million ($0.33 per share), down from $26.8 million ($0.37) a year earlier.

53.     In April 2016, the reporting units within the Outdoor Products segment discussed the softening retail market with Defendant Grindle, then President of Outdoor Products.  According to CW 2, a senior executive in the Outdoor Products segment, "It was expressed in vivid detail by channel about what the opportunities or lack of opportunities or the risk are, if you will across the globe and how as things continued to soften even more, *we were going to struggle [to] hit any of the targets or the budget that was put in place for us*."  According to CW 2, when forecasted numbers for the year were created, Vista senior management raised them and *"threw it all into Q4 (2016) which made the fourth quarter completely unattainable."*  Before CW 2 left in June 2016, CW 2 told Grindle that the plan numbers were *"not achievable at all"* as it was more than "doubling our business for that quarter" and we were "in trouble" in the marketplace in June 2016 "so there was no way we can do that."  According to CW 2, Grindle acknowledged that it was a problem.

54.     On the May 12, 2016 Earnings Call, Defendants DeYoung and Nolan discussed the Company's results for the 2016 fiscal year and for the fourth quarter ended March 31, 2016.  In the Outdoor Products segment, organic sales were up slightly (2%) over the prior year quarter but essentially flat for the fiscal year 2016 (up 1%).  *According to Nolan, sales increased in shooting products offset by a decline in tactical products sales.*  However, organically, *gross profit was flat over the prior year quarter and down 3% for the year.  Any benefit from organic sales increase was offset by "unfavorable product mix and increased sales programs during the quarter."*

55.     Shortly after the Company's May 12, 2016 Earnings Call, according to a May

19, 2016 *MarketWatch* report, Dick's Sporting Goods, another of Vista's top 10 retail customers, ***"offered a downbeat assessment for the remainder of the year as it contends with closeout sales from rivals*."[14]** "With chief rival The Sports Authority, Inc. liquidating its stores through the summer, ***Dick's forecasts that earnings and same-store sales will decline in the coming months. It estimates that 20 million square feet of sporting goods will be liquated in the coming months*** between Sports Authority and other channels." *See* Sara Germano, *Dick's Sporting Goods' profit falls 10%,* MARKETWATCH (May 19, 2016, 3:35 PM), www.marketwatch.com/story/dicks-sporting-goods-profit-falls-10-2016-05-19-154853539.

Colorado based Sports Authority filed for Chapter 11 bankruptcy in March 2016 and was liquidating more than 400 stores after plans to reorganize failed.  According to Dick's Chief Executive Edward Stack, quoted in the *MarketWatch* report*,* ***"We just think there's a possibility that the market could be a little tired when we get toward the end of the year. Id. Dick's forecast also expected same-store sales to decline 4% to 1%.***

56.    According to the Company's 2016 Annual Report, filed with the SEC on May 27, 2016, under "Accounting for Goodwill," Vista tests goodwill "on the first day of our fourth fiscal quarter or upon of the occurrence of events or changes in circumstances that indicate that the asset might be impaired."  The 2016 Annual Report states that the goodwill impairment review looks at operating segments or components of an operating segment and "based on this analysis, [Vista] identified four reporting units, as of the fiscal 2016 testing date." *Id.* at 50. The four reporting units are not identified.  In calculating the discounted cash flow utilized in the

---

[14]    In its November 17, 2016 Investor Day Presentation materials, Vista used Dick's as a case study in customer relationships and leveraging the relationship to increase distribution.  *See* Investor Day Presentation Tr. at 30.   Dick's selected Vista brands include Bushnell.

goodwill assessment, the "assumptions about future revenues and expenses, capital expenditures, and changes in working capital" were based on the Company's "plan, as reviewed by the Board of Directors." *Id.* Incredibly, despite lower gross margins, decreased sales, competitive threats, a lack of innovative new products, and continual organizational changes in the Hunting & Shooting Accessories reporting unit (especially Bushnell) as discussed above in ¶¶ 46-57, according to the 2016 Annual Report, "the results [of the] fiscal year 2016 goodwill impairment test indicated that the estimated fair value of the reporting units tested exceeded their carrying value by more than 10%." *Id.* at 52.

57.     The decline in the hunting and shooting accessory market continued throughout the summer of 2016.  In 2016, Gander Mountain, whose hunting and shooting category made up 53.5 percent of its $1.32 billion in sales, had 160 store locations.    In early 2017, Gander Mountain sought Chapter 11 bankruptcy protection, but according to an affidavit filed by Tim Becker, appointed the chief restructuring officer as of January 9, 2017, ***Gander Mountain had increased promotional activities in the summer of 2016 to clear slow moving inventory***.[15]  Mr. Becker described the market challenges faced by Gander Mountain as "shifting sales from traditional brick and mortar retailers to a host of online retailers" as well as "competition from a combination of other sporting goods retailers."   Mr. Becker further stated, "In response to these competitive pressures, ***many such retailers have adopted persistent and aggressive promotional selling strategies that deeply discount the prices for a wide range of products, forcing retailers to match such promotional activity in order to retain customer traffic, thus diluting the profitability of the debtor's sales***." *Id.*

---

[15]     *See Gander Mountain Details Liquidity Crisis*, SGB MEDIA, https://sgbonline.com/gander-mountain-details-liquidity-crisis (last visited Sept. 14, 2017).

## IMPAIRMENT TESTS

58.     At the heart of Defendants' fraud, but accompanied by other misconduct, is Defendants' failure to timely test and write-down impaired goodwill, which should have been written down no later than the quarter ended July 3, 2016, or at least *six months before it was in fact written down*.  Defendants materially overstated goodwill, which was accumulated from Bushnell and BLACKHAWK!.  As described in more detail below, Defendants' scheme concealed the need to write off almost 50% of the recorded goodwill, which was ultimately done at the end of the Class Period by recognizing a $449.2 million impairment to its Hunting & Shooting Accessories reporting unit.  This consisted of a $353.9 million impairment to goodwill and a $95.3 million impairment to identifiable intangible assets.  These impairment charges should have been recognized no later than the beginning of the Class Period – August 11, 2016.

59.     The accounting rules pertaining to goodwill impairment are outlined in Accounting Standards Codification Topic 350, Intangibles - Goodwill and Other ("Topic 350").[16]  In general, goodwill shall not be amortized, but rather tested at least annually for impairment *or as indicated by the occurrence of events or changes in circumstances that indicate assets might be impaired at the reporting unit level*.  Under ASC 350, impairment of goodwill is "the condition that exists when the carrying amount of goodwill exceeds its implied fair value."  In September 2011, the FASB released an update to goodwill impairment testing standards (via Accounting Standards Update ("ASU") number 2011-08) whereby a qualitative

---

[16]     In January 2017, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update 2017-04 ("ASU 2017-04" or the "Update"), that sought to simplify the accounting for goodwill impairments by eliminating Step 2 (discussed above) from the goodwill impairment test.  *See* Joseph C. Hassan, CFA, ASA, *Goodwill Impairment Testing: An Overview*, MPI BUSINESS VALUATION & ADVISORY.

assessment (*i.e.*, the "Step 0 Test") is now allowed as a precursor to the traditional two-step quantitative process. The Step 0 Test effectively modifies Accounting Standards Codification ("ASC") 350-20-35, Goodwill – Subsequent Measurement. In general, the Step 0 Test allows an entity to first assess qualitative factors to determine whether it is more likely than not (*i.e.*, more than 50%) that the fair value of a reporting unit is less than its carrying value. In order to make this evaluation, the FASB outlines relevant examples and circumstances to consider, including, but not limited to:

- *General macroeconomic conditions such as a deterioration in general economic conditions*; limitations on accessing capital; *fluctuations in foreign exchange rates;* or other developments in equity and credit markets
- *Industry and market conditions such as a deterioration in the environment in which an entity operates; an increased competitive environment*; a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers); *a change in the market for an entity's products or services*; or a regulatory or political development
- *Changes in cost factors* such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows
- *Overall financial performance* (for both actual and expected performance)
- Entity and reporting unit specific events such as *changes in management, key personnel*, strategy, or customers; contemplation of bankruptcy; litigation; or a *change in the composition or carrying amount of net assets;* and
- If applicable, a sustained decrease in share price (in both absolute terms and relative to peers).

60.     As discussed above at ¶¶ 37-59, all of these circumstances existed at the beginning of the Class Period and warranted a determination that it was more likely than not that the fair value of the Hunting & Shooting Accessories reporting unit was less than its carrying amount, which meant that Vista should have undertaken a goodwill test no later than at the end of Q1 2017 (quarter ended July 3, 2017).

61.     In its SEC filings, Vista states that the Company tests goodwill and indefinite lived intangible assets for impairment on the first day of the fourth fiscal quarter *or upon the*

*occurrence of events or changes in circumstances that indicate that the asset might be impaired*.  As a discrete stand-alone business, reporting units (such as the Hunting & Shooting Accessories reporting unit) are separately tested for goodwill because it constitutes a business for which discrete financial information is available, and for which segment management regularly reviews the operating results.

62.     For goodwill tests (as here) performed prior to January 1, 2017, Vista used a two-step process.  In the first step, the Company determined the estimated fair value of each reporting unit and compared it to the carrying value of the reporting unit, including goodwill. If the carrying amount of a reporting unit were higher than its estimated fair value, an indication of impairment existed and the second step would need to be performed in order to determine the amount of the impairment. In the second step, the Company determined the implied fair value of the reporting unit's goodwill, which was determined by allocating the fair value of the reporting unit in a manner similar to a purchase price allocation. The implied fair value was compared to the carrying amount, and if the carrying amount of the reporting unit's goodwill exceeded the implied fair value of its goodwill, an impairment loss would need to be recognized for the excess.

63.     According to the 2017 Annual Report, the Company waited over six months and finally recorded a $353.9 million impairment of goodwill related to the Hunting & Shooting Accessories reporting unit during the quarter ended January 1, 2017.  It also recorded a $94.2 million impairment related to indefinite lived tradenames within the Hunting & Shooting Accessories reporting unit, predominately with the BLACKHAWK! tradename

64.     In the interim testing, the Company assumed a terminal growth rate of 3%.  The

cash flows were discounted using a separate rate for each reporting unit, which ranged from 7.5% to 8.5%. *The results indicated that it was more likely than not that the fair value of the reporting units were less than the book value.*  After the impairment was recorded, the Hunting & Shooting Accessories reporting unit had an estimated fair value that exceeded its carrying value by approximately 11% and had only approximately $106 million of goodwill recorded at March 31, 2017.

## CRITICAL NOTE REGISTRATION AND CREDIT FACILITIES FOR ACQUISITION FINANCING

### SENIOR NOTE OFFERING

65.     On August 11, 2015, according to SEC filings, Vista completed a private offering of $350 million in 5.875% Senior Notes due 2023, an increase of $50 million from the previously announced amount (the "Notes").  According to the Company's Current Report on SEC Form 8-K (dated August 11, 2015), "[t]he Notes will be fully and unconditionally guaranteed jointly and severally by the Company's existing and future domestic subsidiaries that guarantee indebtedness under the Company's senior credit facilities or that guarantee certain other indebtedness of the Company or any Guarantor in an aggregate principal amount of $50.0 million (the 'Guarantees')."[17]

66.     Subject to a number of exceptions, the Note Indenture Agreement also limited the Company's ability to, among other things, incur additional indebtedness, make investments, and repurchase capital stock. In connection with the issuance of the aforementioned Notes, the Company and Guarantors entered into a registration of rights agreement dated August 11, 2015 with the initial purchaser of the Notes (the "Registration of Rights Agreement").  Pursuant to the

---

[17]     *See* Vista Outdoor Inc., Current Report (Form 8-K) (Aug. 11, 2015).

Registration of Rights Agreement, the Company and Guarantors are required to, among other things, ***use their commercially reasonable best efforts to effect a registered exchange of the Notes and the Guarantees for registered notes and guarantees with identical terms (with some exceptions) no later than November 8, 2016.*[18]** *If the Company failed to consummate the exchange offer and a shelf registration, then the Company will be subject to an additional and increasing interest rate over time.*

67.     On April 1, 2016, in connection with the Action Sports acquisition, Vista completed a refinancing of its existing senior secured credit facilities (consisting of $400 million revolving credit facility and $350 million term loan) ("Existing Credit Facilities") by entering into new senior secured credit facilities ("New Credit Facilities").  The New Credit Facilities consisted of a $400 million revolving credit facility and a $640 million term loan A facility.

68.     To effectuate the refinancing, Vista entered into a New Credit Agreement, dated as of April 1, 2016 ("New Credit Agreement"), which amended and restated Vista's existing Credit Agreement dated December 19, 2014 ("Credit Agreement").  The Amended Credit Agreement amends and restates the Existing Credit Facilities under the Credit Agreement by replacing them with the New Credit Facilities.  ***The New Credit Agreement provided for mandatory prepayments of loans outstanding under the New Credit Agreement under certain circumstances, such as maintaining a Consolidated Leverage Ratio of not more than 3.5 to 1.0 and a Consolidated Interest Coverage Ration of at least 3.0 to 1.0.***

69.     The definitions of "Consolidated Interest Coverage Ratio" and "Consolidated Leverage Ratio" in the New Credit Agreement are as follows:

---

[18]     *Id.*

"**_Consolidated Interest Coverage Ratio_**" means, as of any date of determination, the ratio of (a) Consolidated EBITDA **_for the period of the four prior fiscal quarters ending on such date_** to (b) Consolidated Interest Charges to the extent paid in cash during such period; <u>provided</u> that Consolidated EBITDA and Consolidated Interest Charges for such four fiscal quarter period or other applicable period shall be determined on a *pro forma* basis with respect to any Subject Disposition or any Acquisition (together with any related transactions, including the incurrence, assumption, refinancing or repayment of any Indebtedness) as if such Disposition or Acquisition had occurred in the first day of such period.

"**_Consolidated Leverage Ratio_**" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness as of such date <u>less</u> unrestricted cash and Cash Equivalents of the Borrower and its Domestic Subsidiaries in an amount not to exceed $75,000,000 (<u>provided</u> that any such cash deposited in accounts located outside the United States shall be net of the Borrower's reasonable estimate of any repatriation taxes or costs) to (b) Consolidated EBITDA for the most recent four fiscal quarter period ended as of the last fiscal period for which financial statements were required to have been delivered pursuant to <u>Section 6.01</u>; <u>provided</u> that Consolidated EBITDA and Consolidated Funded Indebtedness for such four fiscal quarter period or other applicable period shall be determined on a pro forma basis with respect to any Subject Disposition or any Acquisition (together with any related transactions, including the incurrence, assumption, refinancing or repayment of any Indebtedness) as if such Disposition or Acquisition had occurred in the first day of such period.

Vista Outdoor Inc., Amended and Restated Credit Agreement (April 1, 2016) (emphasis added).

70.     The New Credit Agreement also required that audited financial statements be provided at the end of each fiscal year as well as unaudited quarterly financial statements as follows:

6.01   <u>Financial Statements</u>. Deliver to the Administrative Agent (which will promptly furnish such information to the Lenders):

(b)  as soon as available, but in any event within **_45 days after the end of each of the first three fiscal quarters of each fiscal year_** of the Borrower (commencing with the first fiscal quarter ended after the Restatement Closing Date), **_an unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at_**

*the end of such fiscal quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended*, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and *certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP*, subject only to normal year-end audit adjustments and the absence of footnotes.

*Id. at 97.*

71.     Substantially all domestic tangible and intangible assets of Vista and its subsidiaries were pledged as collateral to secure the obligations under the New Credit Facilities including all of Bushnell's assets.  Shortly thereafter, on April 4, 2016, Vista acquired Action Sports for $400 million, through cash on hand, drawings on the New Credit Facilities for $300 million.

72.     As of the quarter ended July 3, 2016, Vista had $722 million of indebtedness under the New Credit Agreement as defined above.

73.     After the Class Period ended in January 2017, on May 9, 2017, after only one additional quarter of reported results once the impairment charge was announced, Vista entered into a First Amendment to its New Credit Agreement ("Amended New Credit Agreement").  *The primary purpose of the Amended New Credit Agreement was to increase the acceptable Consolidated Leverage Ratio from 3.5:1 to 4.75:1 as well as increase both the rates and the commitment fee.*[19]  The renegotiation of the Consolidated Leverage Ratio in the Amended New

---

[19]     *See* Vista Outdoor Inc., AMENDED AND RESTATED CREDIT AGREEMENT (April 1, 2016) at 3.5:1 compare to Vista Outdoor Inc., FIRST AMENDED AND RESTATED CREDIT AGREEMENT (May 19, 2017) at 4.75:1.

Credit Agreement *reflects the cumulative impact of the $450 million impairment charge (which should have been announced no later than July 3, 2016)* on the Company's aforementioned leverage ratio covenants in its New Credit Agreement.  As noted above in ¶ 69, the calculation of the Consolidated Leverage Ratio is based upon a rolling four-quarter analysis.  Therefore, the cumulative impact of most financial changes would take approximately three consecutive quarters to impact the ratios.  Here, the impairment charge forced the renegotiation of and substantial increase in the leverage ratio covenants *after only one quarter of reported results.*

74.     Although Vista announced, at the time of the impairment in January 2016, that the Company was not in default under its New Credit Agreement, the quarterly calculation of the Company's Consolidated Leverage Ratio (based upon a rolling four-quarter analysis) was based on the same false and misleading financial statements provided to Vista shareholders (as described below).  By delaying the impairment charge for at least six months, the negative cumulative financial impact on the leverage ratios in the New Credit Agreement was also delayed and avoided placing Vista in violation of its leverage covenants during the Class Period allowing Vista to satisfy the requirements of the Registration Rights Agreement at the start of the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

75.     The Class Period begins on August 11, 2016, when the Company issued a press release entitled "Vista Outdoor Announces FY17 First Quarter Operating Results."  Therein, the Company, in relevant part, stated:

**Farmington, Utah, August 11, 2016** -Vista Outdoor Inc. (NYSE: VSTO) today reported operating results for the first quarter of its Fiscal Year 2017 (FY17), which ended on July 3, 2016.

"Vista Outdoor continues to execute on its growth strategy," said Vista Outdoor Chairman and Chief Executive Officer Mark DeYoung. "Early in the quarter, Vista Outdoor completed the acquisition of Action Sports, which has enhanced our market offerings in cycling, snow sports and power sports, and the integration is on track. Including recent acquisitions, both sales and gross profit increased 23 percent over the prior-year period. We, like other consumer products companies, experienced a soft retail environment in the first quarter. Additionally, we were impacted by a shift in consumer spending from accessories to firearms platforms outside our portfolio, and the timing of international orders from the first quarter to later in our fiscal year. ***We expect a recovery in the second half of the fiscal year due to sell through of new products, increased international sales the continued improvement in the retail environment, and seasonal upside in the shooting sports market.***"

**For the First Quarter Ended July 3, 2016:**

- Sales were $630 million, up 23 percent from the prior-year quarter, including $134 million from the recent acquisitions, and ***down 4 percent on an organic basis***.
- Gross profit was $171 million, up 23 percent from the prior -year quarter. The increase includes $42 million of gross profit from the recent acquisitions, ***partially offset by a 7 percent decrease in organic gross profit.***
- ***Fully diluted earnings per share (EPS) were $0.48,*** *compared to $0.53 in the prior-year quarter. Adjusted EPS was $0.48, compared to $0.54 in the prior- year quarter*.
- Cash flow use for operating activities was $22 million compared to a use of $42 million in the prior-year period. Year-to-date free cash flow use was $4 1 million, compared to a use of $52 million in the prior-year period.

"***With expected improved performance in the second half of the year, the company reaffirms its financial guidance in fiscal year 2017, as we anticipate an improved retail landscape and a return to spending on hunting and shooting accessories to complement the growing firearms installed base***," said Vista Outdoor Chief Financial Officer Stephen Nolan.

"We will also continue to leverage the strength of our portfolio, including new capabilities and talent from recent acquisitions, to improve performance and achieve execution excellence."

### Reaffirmed Outlook for Fiscal Year 2017

***Vista Outdoor reaffirms FY 17 financial guidance:***

- Sales in a range of $2.72 billion to $2.78 billion.

- Interest expense of approximately $45 million.

- Tax rate of approximately 37 percent.

- ***Adjusted EPS in a range of $2.65 to $2.85.***

- Capital expenditures of approximately $90 million.

- ***Free cash flow in a range of $130 million to $160 million.***

76.    On August 12, 2016, the Company filed its Quarterly Report on Form 10-Q with the SEC for the quarterly period ended July 3, 2016 ("First Quarter Report").  The First Quarter Report was signed by Defendant Nolan and reaffirmed the financial results announced in the press release published on August 11, 2016.  ***In the condensed consolidated balance sheets, under assets, for March 31, 2016, goodwill was $1.023 billion and net intangible assets was $650 million.  For July 3, 2016, goodwill increased to $1.2 billion and net intangible assets increased to $794 million.  Goodwill represented over 35% of Vista's total assets of $3.4 billion***.  In the Notes to the Condensed Consolidated Financial Statements, the Basis of Presentation states that ***"[m]anagement is responsible for the condensed consolidated financial statements included in this document, which are unaudited but, in the opinion of management, include all adjustment necessary for a fair presentation of our financial position***

*as July 3, 2016.*" [20]

77.     The First Quarter Report also reviewed the acquisitions of Actions Sports (April 2016), CamelBak Products (August 2015) and Jimmy Stykes (July 2015).  With regard to the acquisition of Jimmy Stykes (a business in the Outdoor Products segment), the First Quarter Report noted that additional contingent consideration was payable if incremental profitability milestones were met.  ***However, as of July 3, 2016, the future contingent consideration was reduced as a result of not achieving the first growth milestone***.  In discussing the Outdoor Products sales, the Company noted that increased sales were driven by the aforementioned acquisitions ($134 million) ***and offset by decreases in shooting accessories, optics and tactical products (all products in the Hunting & Shooting Accessories reporting unit***).  The increase in gross profit for the Outdoor Product segment was primarily driven by the aforementioned acquisitions and ***partially offset by the decrease in sales volumes and lower product mix across the remaining product lines (again, the products in the Hunting & Shooting Accessories reporting unit).***

78.     In the Outdoor Products segment, the First Quarter Report reported that Goodwill and Net Intangible Assets in Outdoor Products increased by $183 million, attributable to the Action Spots acquisition, from $818 million (as of March 31, 2016).  ***Goodwill as of July 3, 2016 was reported as $999 million (which included a $2.4 million offset for unfavorable foreign exchange rates).  The Notes also discuss critical accounting policies which includes "accounting for goodwill and indefinite lived intangibles," noting "[t]he accounting policies used in preparing our interim fiscal 2017 consolidated financial statements are the same as***

---

[20]     *See* Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Aug. 12, 2016).

*those described in our Annual Report on Form 10-K*." [21]

79.    On August 11, 2016, Defendants DeYoung and Nolan held an Earnings Conference Call with analysts to discuss Vista's First Quarter results. *DeYoung described the first quarter results as "a little bit of a perfect storm" in the Outdoor Products segment based on "liquidations from retailers that carried a lot of outdoor products, a soft retail environment and an overshadowed focus on share of wallet going to guns." This 'perfect storm' resulted in organic sales in Outdoor Products being down 16% from the same quarter in the previous year and gross margin being down 27% from the same quarter in the prior year*. In this context, "organic" refers to results excluding the recent acquisitions described above and describes Bushnell and BLACKHAWK! in the Hunting & Shooting Accessories reporting unit.

80.    As to the impact of bankruptcies, Nolan conceded that "several of the bankruptcies which occurred in the last six months in the outdoor rec space were prominently featured," that some of the Company's organic business *"participated in" such bankruptcies, and "it is certainly relevant" where there is a significant destocking in retail as the inventory of those retailers was liquidated and "that certainly placed significant downward pressure in several categories throughout the first quarter."* DeYoung also noted that destocking was not behind the Company and would continue through the second quarter.

81.    Despite this "perfect storm" of disastrous results for Hunting & Shooting Accessories reporting unit, DeYoung and Nolan nonetheless <u>reaffirmed their guidance for FY 2017 based on an expected recovery later in the year driven by an improving retail environment</u>. According to DeYoung, "I believe the future is bright for Vista Outdoor. We're excited about

---

[21]    *See* Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Aug. 12, 2016).

delivering against our visions for the portfolio and the company." DeYoung  stated, "*In conclusion, I must tell you I'm confident in our company's strategy and the initiatives that we put into place to deliver long-term shareholder value*."

82.     Not surprisingly, market reaction to Vista's "perfect storm" was mixed.  Analyst Gautam Khanna with Cowen and Company still rated the stock as "Market Perform."   In an August 11, 2016 analyst report entitled "Very Slow Start" Mr. Khanna noted:   "Q1 sales/EPS were a big miss, *reflecting retail channel softness*.  Investors may/should be skeptical VSTO's FY 17 reiterated guidance, which requires a steep H2 ramp."  According to Mr. Khanna, Vista "now guides to a 'recovery' in H2 driven by new products, catch-ups of international sales and improvement in the retail environment." [22]

83.     Analyst Dave King, CFA, for Roth Capital Partners however reiterated his "BUY" guidance based on Vista's "*strong management team*" and "prospects for increased spending on related ammunition" but noted the Company's acknowledgement of *negative "shorter-term changes in optical market share.*" [23]   Jeffries analyst, Greg Konrad, CFA, also reiterated his "BUY" rating but noted the 16% sales decline on an organic basis due to lower volumes for shooting accessories, optics and tactical products.  The Jeffries "Company Note" noted that "guidance implies a steep sequential revenue rise for the rest of the year" and "believed that topline weakness is temporary and growth should improve." [24]

84.     Concurrent with the First Quarter Report, the Company also filed a Current

---

[22]      *See* Gautam Khanna, *Very Slow Start*, COWEN AND COMPANY, Aug. 11, 2016.

[23]      *See* Dave King, CFA, *VSTO: A Meaningful 1Q17 Miss*, ROTH CAPITAL PARTNERS COMPANY NOTE, Aug. 11, 2017.

[24]      *See* Greg Konrad, CFA, *Vista Outdoor Inc.: Weak Quarter, but Positive Outlook Unchanged*, JEFFRIES COMPANY NOTE, Aug. 11, 2016.

Report on SEC Form 8-K (dated August 11, 2016) ("August 11, 2016 8-K") in order to provide "Supplemental Guarantor Information".[25]   ***This supplemental financial information updated the audited and combined financial statements in the 2016 Annual Report to include guarantor information in Note 19, Condensed Consolidating Financial Statements***.   This supplemental guarantor information included Bushnell's audited Financial Statements from the acquisition.   "Due to the significance of the acquisition the audited consolidated statements of operations, comprehensive loss and cash flows of Bushnell Group Holdings, Inc. for the ten months ended October 31, 2013, and the notes thereto, are filed as Exhibit 99.2 hereto and incorporated herein by reference." *Id*. at 2.

85.     After the Supplemental Guarantor Information was filed with the SEC (supplementing the Company's consolidated financial statements), on the same date (August 11, 2016), in connection with the previously discussed Note Indenture Agreement and pursuant to the Registration Rights Agreement, Vista filed a Registration Statement on Form S-4 ("S-4") with the SEC to exchange the outstanding unregistered notes for new notes (the "Exchange Notes').[26]   The Notes and the Exchange Notes were fully and unconditionally guaranteed by certain 100% owned subsidiaries of Vista Outdoor ("Subsidiary Guarantors").   ***The Subsidiary Guarantors included, among others, all of the Bushnell entities (Bushnell Group Holdings, Inc., Bushnell Holdings, Inc. and Bushnell, Inc.).  The S-4 incorporated by reference the 2016 Annual Report for its Consolidated Financial Information, which included the updated Current Report referenced above.***

86.     The ability of Vista to satisfy the covenants and restrictions in the Note

---

[25]     *See* Vista Outdoor Inc., Current Report (Form 8-K) (Aug. 11, 2016).
[26]     *See* Vista Outdoor Inc., Registration Statement (Form S-4) (Aug. 11, 2016).

Indenture Agreement and to comply with the related Registration Rights Agreement by filing the aforementioned S-4 *before November 8, 2016* were substantially dependent on the value of Vista's total assets – specifically, the $524 million in goodwill from the Bushnell acquisition. Having supplemented and updated its 2016 Annual Report, specifically with respect to the Guarantor Information, and knowing that since Bushnell's acquisition *changes in circumstances in the reporting unit indicated that the asset might be impaired,* Defendants had a duty to review and update this information.  Defendants also had the same duty to review and update the financial information contained in the S-4.

## FALSE AND MISLEADING STATEMENTS

87.    The above underlined statements identified in ¶¶ 75-86 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects because:

(a)    Defendants overstated the financial condition of Vista in Q1 FY 2017 (quarter ended July 3, 2016) by  failing to disclose and recognize the goodwill impairment;

(b)    Vista's goodwill values were overstated, which permitted the Defendants to portray Vista's financial condition as stronger than it actually was;

(c)    Vista's internal plans were unattainable and Vista was not demonstrating improvement in sales and gross margins within the Hunting & Shooting Accessories reporting unit;

(d)    Defendants omitted material information about Vista's true financial condition its SEC filings (First Quarter Report and August 11, 2016 Form 8-K);

(e)    the Company failed to timely write-down impaired goodwill in its Hunting

44

& Shooting Accessories reporting unit during Q1 2017, resulting in materially inflated financial statements in its SEC filings;

(f)     the underlying assumptions used by Defendants including expected sales and gross profit margins, were over-inflated, had no reasonable basis, and were not the best information available;

(g)     the estimates used in the annual goodwill impairment as test "assumptions" were not reasonable in light of the underlying softening of the retail environment, bankruptcies, on-going promotional activities, Vista's decreasing revenue and gross margins in early 2016 and the Company's top 10 retailers anticipating declining sales in 2016;

(h)     Defendants' statements concerning revenue growth and earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

(i)     due to material problems with excess inventory in the Hunting & Shooting Accessories reporting unit, some of which Vista had no ready market for, Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

(j)     Defendants falsely certified that Vista had adequate internal controls.

88.     Each of the positive statements alleged above about Vista's business made during the Class Period was false and misleading when made and failed to disclose, *inter alia*, the following adverse information which was the known only to Defendants due to their access to internal operational and financial data:

(a)     The Company's goodwill related to certain acquisitions (Bushnell and

BLACKHAWK!) was overstated as much as $450 million from the beginning of the Class Period;

(b)     Defendants' gross margin assumptions were artificially inflated in the goodwill impairment based on actual results prior to and during Q1 2017 (quarter ended July 3, 2016);

(c)     Because purported increased sales and higher gross margins were part of the assumptions necessary to test goodwill impairment, the test was distorted;

(d)     Defendants were not improving the actual performance of the Hunting & Shooting Accessories reporting unit;

(e)     The forecasts and guidance created and utilized by Vista's management were unreliable and known to be unreliable; and

(f)     The Company's underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the annual goodwill impairment test to be materially distorted.

89.     To investors, Defendants made it appear that Vista's strategy was a success. Vista was engaging in one acquisition after another, showing growth, and a seemingly strategic advantage in the outdoor products market.  What investors did not know was the high volume of unsold inventory, slowing demand, and increasing promotional activities were eroding Vista's profitability in its Outdoor Product segment, and more specifically in the Hunting & Shooting Accessories reporting unit.  Thus, the Company's financial results were artificially inflated.

90.     No later than the quarter ended July 3, 2016, the Company and the Individual Defendants, knew or should have known that a triggering event had occurred with respect to its

Outdoor Products sales and gross margins in its Hunting & Shooting Accessories reporting unit, which should have led to an impairment test.

91.     According to the First Quarter Report, Outdoor Products sales were $287 million for the quarter ended July 3, 2016 and $182 million for the quarter ended July 5, 2015, which resulted in a $104 million increase in sales or a 57.4% increase.  However, $134 million was attributable to acquisitions of Action Sports, CamelBak and Jimmy Stykes.  ***Thus, there was actually a 16% drop in organic sales in the Hunting & Shooting Accessories reporting unit due to liquidations, bankruptcies, and a softening retail environment, which should have been a triggering event for the Company resulting in an impairment test after five prior quarters of 'softness' in its hunting and shooting accessories businesses, increasing brand pressure from Bushnell's competitors, and multiple years of no innovation and mismanagement.***

92.     The Company should have performed the impairment test no later than the end of the quarter ended July 3, 2016 and the impairment loss should have been reported no later than the first quarter results in August 2016.

## DIFFICULT RETAIL ENIVRONMENT CONTINUES

93.     On August 17, 2016, Target, another retail outlet for Vista's Outdoor Products segment, announced that its second quarter earnings fell 9.7% to $680 million and lowered its sales estimates for the rest of the year, citing "a difficult retail environment."[27]  ***Sales were down 7.2% to $16.2 billion and sales at stores open at least one year, a key metric for retailers, fell 1.1%.  Target expected that year-over-year same-store sales would decline in the range of -2% to 0%, which would include fall and holiday shopping seasons – after forecasting growth of***

---

[27]     *See* Roger Yu, *Target tumbles 6.4% as sales drop, outlook cut*, USA TODAY (Oct. 26, 2016, 7:23 AM), https://www.usatoday.com/story/money/2016/08/17/target-second-quarter-earnings/88611818/.

*1.5% and 2.5%.*

94.     On October 26, 2016, Cabela's announced its first earnings report since announcing plans to merge with Bass Pro and *said that heightened markdowns caused earnings in its third quarter ended October 1, 2016 to fall by 26.8 percent*.  "During the third quarter, we successfully drove sales growth in several of our key merchandise categories through an aggressive promotional and markdown cadence; however, these promotional activities also resulted in a decrease in merchandise gross margins and were the primary contributor to the profitability shortfall."[28]   Merchandise gross margins decreased by 420 basis points in the quarter to 31.4% compared to 35.6% in the same quarter a year prior and the decrease was attributed to more aggressive pricing, increased discounts, merchandise mix, and efforts to right size the inventory levels.

## ANNOUNCEMENT OF SECOND QUARTER RESULTS

95.     On November 10, 2016, the Company issued a press release entitled "Vista Outdoor Announces FY17 Second Quarter Operating Results." Therein, the Company, in relevant part, stated:

> **Farmington, Utah, November 10, 2016** - Vista Outdoor Inc. (NYSE: VSTO) today reported operating results for the second quarter of its Fiscal Year 2017 (FY 17), which ended on October 2, 2016.
>
> "Vista Outdoor delivered solid second quarter results, including an increase of 24 percent in both sales and gross profit over the  prior-year period as a result of acquisitions and strong performance in our Shooting Sports segment," said Vista Outdoor Chairman and Chief Executive Officer Mark DeYoung. "Year over year, our Outdoor Products and Shooting Sports segments delivered organic sales growth for the quarter. During the quarter, we also welcomed Camp Chef to the Vista Outdoor family of brands. Camp Chef is a leading provider of outdoor

---

[28]     *See Cabela's Q3 Earnings Slump*, SGB MEDIA, https://sgbonline.com/cabelas-q3-earnings-slump/ (last visited Sept. 14, 2017).

cooking solutions and provides Vista Outdoor with a foothold in one of the camping market's most attractive categories."

**For the second quarter ended October 2, 2016:**

- Sales were $684 million, up 24 percent from the prior-year quarter, including $106 million from the recent acquisitions, and up 5 percent on an organic basis.

- ***Gross profit was $185 million, up 24 percent from the prior-year quarter. The increase includes $32 million of gross profit from the recent acquisitions, and a 3 percent increase in organic gross profit.***

- Operating expenses were $81 million, compared to $88 million in the prior- year quarter. The decrease primarily reflects an acquisition claim settlement gain related to the Bushnell acquisition, partially offset by additional expenses generated by the acquisitions, as well as previously announced ongoing investments in selling, marketing and R&D activities.

- ***Fully diluted earnings per share (EPS) were $1.22, compared to $0.52 in the prior-year quarter. Adjusted EPS was $0.74, compared to $0.63 in the prior- year quarter.***

- ***Cash flow provided by operating activities was $10 million compared to $17 million in the prior-year period. Year-to-date free cash flow use was $48 million, compared to free cash flow generation of $5 million in the prior-year period.***

"***We remain confident in our strategy, and we are reaffirming our FYI7 guidance***," said Vista Outdoor Chief Financial Officer Stephen Nolan. "Our second quarter results have improved over our reported first-quarter levels. ***We saw increased promotional activity in the Outdoor Products segment and, due to the ongoing challenging retail environment, this will likely continue in the second half of the fiscal year. The promotional activity also resulted in some acceleration of revenue from the third quarter into the second quarter***."

**Reaffirmed Outlook for Fiscal Year 2017**

***Vista Outdoor reaffirms FY financial guidance:***

- Sales in a range of $2.72 billion to $2.78 billion.
- Interest expense of approximately $45 million.
- Tax rate of approximately 37 percent.

- <u>Adjusted EPS in a range of $2.65 to $2.85.</u>
- Capital expenditures of approximately $90 million.

### *<u>Free cash flow in a range of $130 million to $160 million</u>.*

96.     On the same day, November 10, 2016, the Company filed its Quarterly Report on Form l0-Q with the SEC for the quarterly period ended October 2, 2016 ("Second Quarter Report"). The Second Quarter Report was signed by Defendant Nolan, and reaffirmed the financial results announced in the press release published the same day.   <u>The Second Quarter Report increased *<u>the carrying amount of goodwill for the Outdoor Products segment by $192 million to $1 billion</u>* which was related to the acquisitions of Action Sports and Camp Chef and noted nominal accumulated impairment losses of $47 million and $41 million within the Outdoor Products and Shooting Sports segments respectively.</u>

97.     The Second Quarter Report also stated the "Basis of Presentation" for the interim financial statements.  "Our accounting policies are described in notes to the consolidated and combined financial statements in our Annual Report on Form 10-K for the fiscal year ended March 31, 2016."[29]   The Second Quarter Report noted that "*[m]<u>anagement is responsible for the condensed consolidated financial statements included in this document, which are unaudited but, in the opinion of management, include all adjustments necessary for a fair presentation of our financial position as of October 2, 2016 and March 31, 2016, our results of operations for the quarters and six month periods ended October 2, 2016 and October 4, 2015 and our cash flow for the six months ended October 2, 2016 and October 4, 2015</u>*." *Id.*

98.     On the same date, November 10, 2016, Defendants DeYoung and Nolan held a Q2 2017 Earnings Call (quarter ended October 2, 2016) for market analysts.   Mr. DeYoung

---

[29]     *See* Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2016).

noted that "we expect the soft retail environment to continue now for the balance of the fiscal year and therefore anticipate *continuing with focused promotional incentive* . . ." in the second half of the fiscal year.   He also commented that *"we have attracted and hired several new and extremely talented leaders to focus on our supply chain, our procurement processes, IT solutions, and more."*

99.     Also, on the November 10, 2016 Earnings Call, Defendant Nolan discussed the Company's financial results for the quarter and noted that the 24% increase in gross profit for the second quarter compared to the same quarter in the prior year was due to "our acquisitions as well as increased gross profit in the Shooting Sports segment" but this *"increase was partially offset by a decline in the organic Outdoor Product segment."*   **Organically, according to Nolan, second quarter sales in the Outdoor Products segment was essentially flat (up 1%) from the prior year quarter**.   The slight increase in organic sales was driven by increased sales in several products "*partially offset by a decrease in optics and increased promotional activities across the segment."   However, organic gross profit in the segment was down 10% primarily as a result of increased promotional activity*.

100.     Defendant Nolan also noted that the *second quarter included $20 million of sales (approximately 6% of the total sales) pulled forward from the third quarter*.   Without this "pull-through of sales from the third quarter to the second quarter, sales would have been down approximately 5% from the prior year quarter."   "We do still see a *challenging retail environment in the second half*, including continued elevated promotional activity, which will result in margin performance for both our segments in the back half of fiscal 2017 at a level similar to what we delivered in the second quarter."   With organic gross profit down by 10% in

51

the second quarter in the Outdoor Products segment, Vista now anticipated, at a minimum, ***that organic gross profit would be down by 10% for the rest of 2016***.

101.    <u>Nonetheless, at the Company level, according to Defendant Nolan, "**we remain confident in our ongoing strategy and we have reaffirmed our fiscal 2017 guidance**."    In discussing the "promotional environment," Defendant DeYoung assured analysts that the Company had "a strategy and approach to continue to fight in that [retail] market, to maintain and grow market share, and deliver our back half of the year."</u>

102.    Shortly after the November 10, 2017 Earnings Call, Vista held its first "Investor Day" on November 17, 2016.  Defendant DeYoung introduced Mr. Sexton as "awesome" and "does such a fantastic job in our financial organization."  Investor Day Presentation Tr. at 4. DeYoung explained that Vista had ***also "added talent in terms of just our analysis and capability to do proper budgeting and planning and analytical work"*** (*id*.) to work with Mr. Sexton.   DeYoung assured investors that "<u>***the fundamentals of the business are awesome and our growth perspective is going to be great and our price, I believe, is undervalued.***" *Id.* at 31. As to financial performance, Defendant Nolan noted that "***we always see a strong back-half of the year"*** *(id.* at 25) **and "we're certainly on track to deliver guidance for the year as we said last week." Id.  Nolan also noted "we're still guiding for very strong cash flow generation this year**</u>" which is "<u>a testament to the underlying strength of our business</u>." *Id.* at 26.

103.    Market reaction to the Company's public statements was positive.  Although Cowen Analyst Gautam Khanna noted the 9% drop in organic gross profit due to increased promotional activity and lower optic sales as reported by Vista, on November 10, 2016, Cowen reiterated its "Market Perform" rating in reliance on management-affirmed "loaded" guidance

for the FY 2017.[30]

104.     Similarly, on November 20, 2016, Roth Capital Partners, noting no change in guidance by the Company's management, reiterated its "BUY" rating.   Jeffries analyst Greg Konrad, CFA issued a November 10, 2016 "Flash Note" which reiterated its "BUY" recommendation, noting that Vista reaffirmed guidance for FY 2017.   Nonetheless, the Jeffries Flash Note noted a decline in the Outdoor Products organic gross margins due to promotional activities.   "Organically, Outdoor products margins contracted 250 basis points to 24.2%."[31]

105.     At the November 17, 2016, Investor Day presentation by senior management, in addressing the Outdoor Products segment, Defendant Grindle noted that "I would emphasize *__growth opportunity in the optics side of the business where we've invested and focused on__* *__growing that business as well as BLACKHAWK! as a brand which I have highlighted some__* *__opportunities there, but I think there's really growth across the portfolio and I just highlight__* *__those__*." Investor Day Presentation Tr. at 31.

106.     In discussing the Outdoor Products segment, DeYoung noted:  "*__bankruptcies__* *__and other macro issues that are happening in the external market which are impacting our__* *__ability to do the kind of things we think we could do organically.__*"  *Id.* at 32.   DeYoung was asked: is there "data out there that kind of supports that there is a bit of tail to some of your core businesses?"   DeYoung responded: "so as consumers were buying handguns and MSRs with their disposable income, it was negatively impacting accessories in Kelly's group" but "you may see that begin to shift to where people get a little more comfortable on the firearm side, *__which__*

---

[30]     *See* Gautam Khanna, *Catching Up In Q2*, COWEN AND COMPANY, Nov. 10, 2016.
[31]     *See* Greg Konrad, CFA, *Vista Outdoor Inc., Quicktake: Solid Execution and Growth in a Promotional Environment*, JEFFRIES COMPANY FLASH NOTE, Nov. 10, 2016.

*should free up an opportunity from share of wallet to come back to the optics and the accessories and some of the other products that we sell"* (*id.* at 35) **with a potential lag of six to 12 months to shift to accessories**.

107.    In the November 17, 2016 Investor Day presentation, the Outdoor Products segment used Dick's Sporting Goods as a case study for the Company's customer relationships and noted that  Bushnell is a 'selected brand presence' for Dick's.  At the question and answer session with Vista senior management, one questioner noted that Dick's was cautious for the next quarter due to warm weather and a delayed hunting season and asked DeYoung "can you give us the sense of confidence that your quarter is not going to be a complete, not a disaster?" Investor Day Presentation Tr. at 39.  ***DeYoung responded that the Company was "aware of DICK'S concern" and "not worried" and that Vista paid "a bit in margins" in the Outdoor Products segment "to be able to drive some the volume that we drove, and drive some revenue through."***   DeYoung assured investors that the Company "would be able to still ***pull product through those channels*** in the face of warm hunting season" and that "***we feel that the guidance ranges that we've established are achievable."*** *Id.*

108.    Market optimism increased after the Company's Investor Day presentation.   On November 17, 2016, Jeffries' analyst, Greg Konrad, CFA, reiterated his "BUY" rating because "***headwinds that the company has faced over the past several quarters should abate***."[32]   Mr. Konrad also noted that, "We believe [Vista] has laid out a compelling strategy to drive topline growth, which includes stepped up focus on product development, capitalizing on expanding relationships with key retailers, and leveraging cross-selling opportunities." *Id.* A day later, on

---

[32]       *See* Greg Konrad, CFA, *Vista Outdoor Inc., Analyst Day Takeaways: Innovating Back to Mid-Single Digit Organic Growth*, JEFFRIES COMPANY NOTE, Nov. 17, 2016.

November 18, 2016, reviewing Investor Day Highlights, Roth Capital Partners reiterated its "BUY" rating "to reflect Vista's leading market share and strong management team." [33]   Roth Capital Partners also noted future "*growth should stem from a revamped Optics strategy and organization." Id.*

109.   On November 30, 2016, *after the so-called triggering event for the impairment test in the Hunting & Shooting Accessories reporting unit*, Defendant Nolan still spoke at the Bank of America Merrill Lynch America Leveraged Finance Conference.   Defendant Nolan surprisingly reiterated the Company's guidance for FY 2017 and noted that "*the current quarter in which we are sitting, is typically a high quarter for the Company, driven partly by the hunting season, which leads to increased sales of accessories . . .*" According to Nolan,  "On the outdoor products side, *we are in a relatively heavy promotional environment, which has impacted gross margin a little bit for that segment of business*, but the gross margin in the shooting sports remain quite strong." *See* Thomson Reuters Street Events Tr. at 5, Nov. 30, 2016.

## FALSE AND MISLEADING STATEMENTS

110.   The above underlined statements identified in ¶¶ 95-109 were materially false and/or misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects because:

(a)   Defendants overstated the financial condition of Vista by failing to disclose and recognize the goodwill impairment;

(b)   Gross margins were not improving or performing according to the Company's unattainable and baseless assumptions;

---

[33]   *See* Dave King, CFA, *VSTO: Investor Day Highlights*, ROTH CAPITAL PARTNERS COMPANY NOTE, Nov. 18, 2016.

(c)     Vista's goodwill was overstated which permitted Defendants to portray Vista's financial condition as stronger than it actually was;

(d)     Vista was not "on track" to achieve the quarter or fiscal year guidance provided to investors;

(e)     Future near-term growth in the optics was not attainable;

(f)     Material promotions and pulling inventory through the Company's distribution channels were not improving overall sales, gross margins, or product performance;

(g)     the Company failed to timely write-down impaired goodwill in its Hunting & Shooting Accessories reporting unit during this quarter resulting in materially inflated financial statements during the Class Period;

(h)     the underlying assumptions used by Defendants including expected sales and gross profit margins, were over-inflated and had no reasonable basis after six quarters of softness in the Company's hunting and shooting accessories businesses, extremely warm autumn weather for two years, increasing brand pressure from Bushnell's competitors, and multiple years of no innovation and mismanagement;

(i)     the estimates used in the goodwill impairment as test "assumptions" were not reasonable in light of the following:   underlying softening of the retail environment; bankruptcies; acknowledged on-going and increasing promotional activities; need to pull later quarter sales into earlier quarters; Company's unreasonable over-dependency on later quarter sales; decreasing company revenue and gross margins in early 2016; and Vista's Top 10 retail customers predicting declining sales of the end of 2016;

(j)     Defendants' statements concerning revenue growth, gross margins and

56

earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

(k)     due to material problems with excess inventory in the Hunting & Shooting Accessories reporting unit, some of which Vista had no ready market, Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

(l)     Defendants falsely certified that Vista had adequate internal controls.

111.     Each of the positive statements alleged above about Vista business made during the Class Period was false and misleading when made and failed to disclose, *inter alia*, the following adverse information which was the known only to Defendants due to their access to internal operational and financial data:

(a)     The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $450 million from the beginning of the Class Period;

(b)     The assumed increased sales and gross margin assumptions used to test goodwill impairment were distorted;

(c)     Defendants knew that demand had not been strengthened in the Hunting & Shooting Accessories reporting unit but created the appearance of sales by pulling in orders from future quarters;

(d)     The forecasts and guidance created and utilized by Vista's management were unreliable and known to be unreliable;

(e)     The Company's underlying assumptions about sales and gross margins no

longer had a reasonable basis in fact and therefore caused the annual goodwill impairment test to be materially distorted; and

> (f)  Macroeconomic and industry issues such as bankruptcies, softening retail market, reduced consumer spending on hunting and shooting accessories, and industry consolidation impacted both Bushnell and BLACKHAWK! products in the Hunting & Shooting Accessories reporting unit.

112.  To investors, Defendants made it appear that Vista's strategy was a "success" and "awesome."  Vista was engaging in one acquisition after another, showing growth, and a seemingly strategic advantage in the outdoor products market.  What investors did not know was that the high volume of unsold hunting accessories inventory, lack of demand, lack of innovative or new products, continual management charges and mismanagement, consolidation, liquidation and bankruptcies in retail market were eroding Vista's profitability in its Outdoor Product segment, specifically in the Hunting & Shooting Accessories reporting unit.  Thus, the Company's financial results were artificially inflated.

## DISCLOSURES AT THE END OF THE CLASS PERIOD

113.  On January 11, 2017, the Company issued a press release entitled "Vista Outdoor Announces Expected Non-Cash Intangible Asset Impairment Charge."  Therein, the Company disclosed:

> **Farmington, Utah**, January 11, 2017 - Vista Outdoor Inc. ("Vista Outdoor" or the "Company") (NYSE: VSTO), announced today that it expects to record a material, non-cash  intangible asset impairment  charge  in  its Hunting and Shooting Accessories reporting unit (archery/hunting accessories, golf, optics, shooting accessories, and tactical products) in the third quarter of its Fiscal Year 2017 (FY17). The Company does not expect the impairment charge to have any impact on future operations, affect its liquidity, affect cash flows from operating

58

activities, or affect compliance with the financial covenants set forth in its debt instruments.

In accordance with Accounting Standards Codification (ASC) 350 "Intangibles Goodwill and Other," the Company is required to test its goodwill and other indefinite-lived intangible assets for impairment annually or when a triggering event has occurred that would indicate that it is more likely than not that the fair value of the reporting unit is less than the book value, including goodwill and intangibles. ***In Vista Outdoor's assessment, a triggering event for the Company's Outdoor Products segment occurred during the third quarter of FY17 due to an acceleration of the trends seen during the first and second quarters, which included a softening retail environment and increased promotional activity.*** ***These factors required the Company to begin the impairment assessment for that segment's reporting units at that time, rather than waiting for the normal process that would ordinarily be completed in conjunction with the preparation of the Company's FY17 annual financial statements***. Vista Outdoor's Shooting Sports segment will be tested during the normal process and management is confident there will not be an impairment in the segment's Ammunition and Firearms reporting units.

Based on the initial assessment conducted using a measurement date of November 28, 2016, there was no indication of any impairment of Vista Outdoor's intangible assets associated with either the Company's Outdoor Recreation (camping, hydration, and watersports) or Sports Protection (cycling and winter sports accessories) reporting units; ***however, the assessment did indicate that the above mentioned impairment may have occurred in the Company's Hunting and Shooting Accessories reporting unit***. While the analysis to finalize the actual amount of the impairment charge has not yet been completed, ***Vista Outdoor believes that there is sufficient evidence for the Company to conclude that this impairment occurred***.

During the Company's FY17 second quarter earnings call and its subsequent 2016 Investor Day, Vista Outdoor disclosed it has experienced both revenue and gross margin declines that were driven by a variety of factors. These factors include a challenging retail environment that resulted in a deeper discounting of its accessories products, as well as a shift in the consumers' share of wallet from hunting and shooting accessories products to certain firearms platforms outside the Company's firearms offerings. These sales and gross margin trends accelerate during the Company's recently completed third quarter to the point where this impairment charge is necessary to comply with accounting standards. Although Vista Outdoor is in the process of finalizing the actual amount of the impairment, the Company's preliminary analysis indicates the impairment charge will be in the range of $400 million to $450 million. The Company expects that the analysis

supporting the impairment will be completed in time to allow for its recording in the third quarter of FYI7.

"We believe this non-cash impairment charge is a result of challenging market conditions, which worsened as the third quarter progressed, and required discounting of product for Vista Outdoor to remain competitive," said Vista Outdoor Chief Financial Officer Stephen Nolan. "We still expect long-term growth in all of our reporting units, including Hunting and Shooting Accessories. We remain committed to, and confident in, our growth strategy and we are optimistic about our businesses and our future opportunities."

Due to the ongoing analysis, management will be unable to provide further details on the impairment charge, the impact of current market conditions on business performance, and annual guidance until the Company's regularly scheduled third quarter earnings call on February 9, 2017.

114.    On this news, shares of Vista fell $8.21 per share, or 21.7%, to close at $29.58 per share on January 12, 2017, on unusually high trading volume.

115.    Concurrent with the announcement, on January 12, 2016, Roth Capital Partners downgraded its rating to "Neutral" from "BUY."

116.    Then, on January 13, 2017, Vista disclosed that Kelly Grindle was being replaced by Dave Allen as President of the Company's Outdoor Products segment:

**Farmington, Utah, January 13, 2017** - Vista Outdoor Inc. (NYSE: VSTO), a leading global designer, manufacturer and marketer of consumer products in the outdoor sports and recreation markets, has named Dave Allen as President of its Outdoor Products segment, which includes Hunting and Shooting Accessories, Outdoor Recreation, and Sports Protection. As segment president, Allen will have responsibility for segment-level financial performance, strategic planning, innovation and new products, brand management and marketing, product line management, sourcing and supply chain management, capital expenditures and R&D investment and returns, and talent management.

Allen joined Vista Outdoor as Senior Vice President (SVP), Sales in 2016. He has over 23 years of experience in consumer products and has strong experience in the outdoor industry. Allen previously served as the President of Coleman USA for the Jarden Corporation, and he has held domestic and international leadership positions with Alberto Culver and Unilever.

"Dave's strategic leadership capabilities, experience leading a large P&L, and a solid track record in both sales and marketing, have prepared him for this role," said Vista Outdoor Chairman and CEO Mark DeYoung. "Dave's performance, skills and relationships have established him as a well-respected leader within Vista Outdoor and the outdoor recreation industry. Given his demonstrated focus on strategic planning, accountability, delivering results, and creating shareholder value , he is the right person to lead the Outdoor Products segment and deliver improved performance and future growth."

Allen replaces Kelly Grindle, who has left Vista Outdoor to pursue other opportunities.

"I want to thank Kelly for his efforts and wish him well," said DeYoung.

117.   On this news, shares of Vista fell $0.88 per share, to close at $28.70 per share on January 13, 2017, on unusually high trading volume.

118.   Although the aforementioned January 11, 2017 Company press release stated that "a triggering event for the Company's Outdoor Products segment occurred during the third quarter of FY17," Defendant Nolan indicated otherwise at the March 14, 2017 Roth Capital Partner Conference.  First, Defendant Nolan noted a "retail malaise in the Outdoor Products channel that has been exacerbated by some events *in the last 12 months, such as the Sports Authority liquidation sale*," where consumers would buy products at a 50% discount from another retailer.  *See* Roth Capital Partners Conference (Bloomberg) Tr. at 4, March 14, 2017. However, the Sports Authority liquidation started in March 2016, and continued through the summer of 2016, so this event was not a triggering event in November 2016.  Defendant Nolan then conceded that the sudden triggering event in November 2016 occurred in the Shooting Sports segment, and not Outdoor Products:

So we had *a challenging year on a lot of our Outdoor Product segment over the last year,* but Shooting Sports was doing very well, and even after the election, Shooting Sports continued to do well right up and *around Thanksgiving when we*

*hit a bump in the road, and we and all of our competitors in Shooting Sports saw a significant decline in the market at that point in time*.

Therefore, the Company's January 11, 2017 statement of a November 28, 2016 triggering event resulting in the impairment test in Hunting & Shooting Accessories was false and misleading as the "sudden decline" occurred in the Shooting Sports segment, not the Outdoor Products segment.

## POST CLASS PERIOD

119.    The bad news continued for Vista's stock price.  On March 13, 2017, the financial press noted that Vista stock plunged another 29.8% in February.[34]  Although "Vista stock was already reeling after the company disclosed it was expecting to incur a non-cash impairment charge of $400 million to $450 million in its fiscal third quarter of 2017, stemming from weakness in its hunting and shooting accessories segment," Vista stock "plunged another 19%" on February 9, 2017, "when it revealed that charge came in near the high end of that range, at $449 million."  *Id*.  Vista also confirmed that "growth was entirely driven by the company's acquisitions, most recently Action Sports and Camp Chef brands" and that, on an organic basis, revenue declined 5%.   "On the bottom line", based on GAAP, "that translated to an adjusted net loss of $77.7 million, or $6.44 per share." *Id*.  Adjusted for this charge and other one- time items, Vista generated "net income of $36.4 million, or $0.62 per share, down from adjusted net income of $43.6 million, or $0.70 per share in the same year-ago period." *Id*.

## CLASS ACTION ALLEGATIONS

120.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

---

[34]     *See* Steve Symington, *Why Vista Outdoor, Inc. Stock Plunged 29.8% in February*, THE MONTLEY FOOL (March 13, 2017, 8:00 AM).

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Vista's securities between August 11, 2016 and January 13, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants , the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

121.   Because Vista has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable. As of November 7, 2016, Vista had 58,809,385 shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class that are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Vista or its transfer agent and may be notified of the pendency of this action by mail or electronic mail, using the form of notice similar to that customarily used in securities class actions.

122.   Lead Plaintiff's claims are typical of the claims of the members of the Class as because Lead Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

123.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it

seeks to represent.

124.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

125.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated federal securities laws as a result of Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and misrepresented material facts about the business, operations, and prospects of Vista;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether the market prices of Vista's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(e)    whether the members of the Class have sustained damages as a result of

64

the decline in the value of Vista's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## UNDISCLOSED ADVERSE FACTS

126.     The market for Vista's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Vista's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired Vista's securities relying upon the integrity of the market price of the Company's securities and market information relating to Vista, and have been damaged thereby.

127.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Vista's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Vista's business, operations, and prospects as alleged herein.

128.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Vista's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects,

thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

129.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

130.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Vista securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.   Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

131.     At all times, the material misrepresentations and omissions particularized in this Complaint, directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of false and misleading statements about Vista's business, revenues, earnings, goodwill value, and success of various acquisitions.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vista and its business, and financial statements, thus causing the Company's securities to be overvalued and artificially inflated at all

relevant times.   Among other things, Defendants led the market to believe that there was a prospect of achieving growth rates utilized in the goodwill impairment tests.  When Defendants disclosed at the end of the Class Period that they would have to take over a $450 million impairment charge, revealing that the assumptions used in the goodwill impairment tests were baseless and not achievable, the stock dropped immediately by almost 50%.    Neither the assumptions nor the deficiencies with those assumptions were disclosed until that time.  When they were finally disclosed, the market reacted quickly and the stock dropped as a result.  In other words, when the truth about Defendants' wrongful acts, including their delayed announcement of a material goodwill impairment charge, were revealed, the artificial inflation of the stock price which Defendants caused during the Class Period, was removed.   Thus, Defendants materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thereby causing the damages complained of herein.

132.    During the Class Period, Lead Plaintiff and the Class purchased Vista's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

133.    As Lead Plaintiff alleges, Defendants acted with scienter in that Defendants knew that the public documents and statements issued and disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would

be issued or disseminated to the investing public; and knowingly or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth herein, in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Vista, their control over, and/or receipt and/or modification of Vista's allegedly materially misleading misstatements and/or their association with the Company made them privy to confidential proprietary information concerning Vista, participated in the fraudulent scheme alleged herein.

134.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in the Complaint could not have been perpetrated over the alleged period of time, as occurred here, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

135.    In the Hunting & Shooting Accessories reporting unit, Defendants knew and reported to the public that inventory was being pulled through the distribution channels with substantial promotional discounts; however, only the Defendants knew the impact of such conduct and discounts on the future sales, revenue and gross margins and the related goodwill impairment.  Defendants were also well aware that the retail environment was softening and that key clients were putting substantial pressure on the Company for continued and increasing discounts, materially impacting gross margins with regard to hunting and shooting accessories. Within this reporting unit, Defendants were also aware of the following: (i) lack of innovative new products; (ii) repeated changes in senior management within the reporting unit and segment; (iii) mismanagement difficulties prior to and after the Bushnell acquisition; and (iv)  reduced

sales and lower gross margins going forward.

136.     Defendants DeYoung and Nolan were well aware of the issues associated with the Bushnell acquisition.   Both Defendants worked at ATK (before the Vista Spin-off) in management positions at the time of the acquisition.   DeYoung observed that "the Bushnell organization before we acquired it, with its previous ownership had failed to discriminate, define, and distribute the optics portfolio properly" so Vista "rationalized the brands into channels of distribution where they belong." *See* Investor Day Presentation Tr. at 42.   Defendant Nolan noted that "some of the companies [that] we'd acquired several years ago from private equity [referring to Bushnell] had let certain of their innovation capabilities atrophy."  *See* Roth Capital Partner Conference (Bloomberg) Tr. at 4.

137.     Lead Plaintiff's allegations herein concerning Defendants' materially false and misleading statements and omissions and Defendants' scienter are based upon, in part, interviews with numerous witnesses, including former employees of Vista.   These witnesses provided information regarding various methods employed by Defendants in furtherance of their scheme to defraud Vista investors.  These witnesses[35] include:

        (a)     CW 1 was a senior executive at ATK Sporting Group from February 2013 to February 2015 and was responsible for business management, including participating in the preparation of a valuation model for   Bushnell prior to the acquisition and knowledge of Bushnell's performance after its acquisition by ATK.

        (b)     CW 2 was an interim senior executive in Vista's Outdoor Products segment from April 2016 until June 2016 and reported directly to Defendant Grindle.  Based on

---

[35]     To protect their identities, each confidential witness is identified in the masculine regardless of his or her actual gender.

this position, CW 2 had personal knowledge with regard to the sales and marketing of certain products within the Outdoor Products segment, the forecast, budget and plan for certain products; and the softening marketplace with retailers such as Sports Authority going out of business.

(c)     CW 3 was based in Norfolk, Virginia and worked as a Vista Outdoor/ATK/BLACKHAWK! Accounts Receivable/Credit Manager from 2006 to March 2015. CW 3 reported to the Credit Director, was part of a team that integrated the inventory of ammunitions and accessories into one common operating system, and handled pricing until June 2014.

138.     The Individual Defendants' compensation consisted of cash (salary and bonus), stock awards, options awards and other incentive plan compensation, which nearly doubled, if the Company reached specific financial goals. The Individual Defendants, by making unrealistic and unachievable plans and deliberately overstating Vista's goodwill during the Class Period, entered into a New Credit Agreement, an expanded credit facility, and exchanged senior notes under the Notes Registration Agreement – all with the intent to maintain their aggressive acquisition strategy and to acquire Camp Chef in order reach these financial goals for their own personal benefit.

139.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Vista were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Director meetings and

committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts had not been disclosed to, and were being concealed from the, the investing public.

140.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, marketing and present and future business prospects and access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations).  The Individual Defendants also had access to conversations and connections with other corporate officers and employees, attendance at management and Board of Director meetings including reports and other information provided to them.

141.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false and misleading and incomplete information conveyed in the Company's public filings, press releases and other publications alleged are the collective actions of the Individual Defendants identified above.  Each of the officers of Vista, by virtue of their high-level positions with the Company (named CEO, CFO and President) directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition.  These Defendants were involved in drafting, producing and reviewing and/or disseminating the false and misleading statements and information alleged, were aware, or

71

recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

142.    As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

143.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications complained of and were aware of, or recklessly disregarded, the misstatements contained therein and omissions there-from.  Because of their Board membership and/or executive and managerial positions with Vista, each of the Individual Defendants had access to adverse undisclosed information about Vista's financial condition and performance and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about Vista and its business issued by the Company materially false and misleading.

144.    The Individual Defendants, because of their positions of control and authority, as officers and/or directors of the Company, were able to and did control the contents of the various

SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases issued and is, therefore, primarily liable for the representation contained therein. Each of the Defendants is liable as a participant in the fraudulent scheme and course of business that operated as a fraud or deceit on the purchasers of Vista securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (a) deceived the investing public regarding Vista's business, operations, management, and the intrinsic value of Vista; and (b) caused Lead Plaintiff and other members of the Class to purchase Vista securities at artificially inflated prices.

<u>**APPLICABILITY OF PRESUMPTION OF RELIANCE**</u>

**(FRAUD-ON-THE-MARKET DOCTRINE)**

145.    The market for Vista's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Vista's securities traded at artificially inflated prices during the Class Period. On August 11, 2016, the Company's stock price closed at a Class Period high of $42.75 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Vista's securities and market information relating to Vista, and have been damaged thereby.

146.    During the Class Period, the artificial inflation of Vista's stock was caused by

73

the material misrepresentations and/or omissions detailed in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Vista's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Vista and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

147.     At all relevant times, the market for Vista's securities was an efficient market for the following reasons, among others:

(a)     Vista stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Vista filed periodic public reports with the SEC and/or the NYSE;

(c)     Vista regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

74

(d)     Vista was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly-available and entered the public marketplace.

148.     As a result of the foregoing, the market for Vista's securities promptly digested current information regarding Vista from all publicly-available sources and reflected such information in Vista's stock price. Under these circumstances, all purchasers of Vista's securities during the Class Period suffered similar injury through their purchase of Vista's securities at artificially inflated prices and a presumption of reliance applies.

149.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects - information that Defendants were obligated to disclose - positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

150.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

75

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vista who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule l0b-5 Promulgated Thereunder Against All Defendants

151.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Vista's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

153.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

76

untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vista's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

154.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Vista's financial well- being and prospects, as specified herein.

155.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vista's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Vista and its business operations and future prospects in light of the circumstances under which  they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course or business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

156.    Each of the Individual Defendant's primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives

and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members or the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

157.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vista's financial well-being and prospects from the investing public and suppot1ing the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

158.    As a result of the dissemination of the materially false and/or misleading

information and/or failure to disclose material facts, as set forth above, the market price of Vista's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Vista's securities during the Class Period at artificially high prices and were damaged thereby.

159.    At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Vista was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Vista securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

160.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of The Exchange Act Against the Individual Defendants**

162.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

163.     Individual Defendants acted as controlling persons of Vista within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

164.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

165.     As set forth above, Vista and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: September 22, 2017      **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**


*/s/ Betsy C. Manifold*
Betsy C. Manifold
Gregory M. Nespole
Regina M. Calcaterra
Correy A. Kamin
Anita B. Kartalopoulos


**ANDERSON & KARRENBERG, P.C.**
Heather M. Sneddon
Jared D. Scott


**PITTA LLP**
Vincent F. Pitta

***Attorneys for The New York Hotel Trades Council and Hotel Association of New York City, Inc.***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 22, 2017, I electronically filed the foregoing and all related documents with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

        /s/ *Jared D. Scott*
        Jared D. Scott