**ANDERSON & KARRENBERG**
Heather M. Sneddon (#9520)
Jared D. Scott (#15066)
50 West Broadway, Suite 700
Salt Lake City, UT 84101-2035
Telephone: (801) 534-1700
hsneddon@aklawfirm.com
jscott@aklawfirm.com

**PITTA LLP**
Vincent F. Pitta (admitted *pro hac vice)* (NY #1048842)
120 Broadway, 28th Floor
New York, NY 10271
Tel: (212) 652-3836
vpitta@pittalaw.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole (NY # 2594356) (admitted *pro hac vice*)
Regina M. Calcaterra (NY # 2848695) (admitted *pro hac vice*)
Correy A. Kamin (NY # 5015151) (admitted *pro hac vice*)
Anita B. Kartalopoulos (NJ #025161982) (admitted *pro hac vice*)
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
gmn@whafh.com
calcaterra@whafh.com
kamin@whafh.com
abk@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Betsy Carol Manifold (CA #182450) (admitted *pro hac vice*)
750 B Street, Suite 2770
San Diego, CA 92101
Tel.: (619) 239-4599
manifold@whafh.com

***Attorneys for The New York Hotel Trades Council and Hotel Association of New York City, Inc.***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **PATRICK LENTSCH,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**VISTA OUTDOOR INC.; MARK W. DEYOUNG, STEPHEN M. NOLAN;** and **KELLY T. GRINDLE,**<br><br>Defendants. | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil Action No. 1:17-cv-00012-DAK-EJF<br><br>Honorable Dale A. Kimball |

Lead Plaintiff The New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund ("Lead Plaintiff"), by and through its attorneys, alleges the following

against Defendants Vista Outdoor, Inc. ("Vista" or the "Company"), Mark W. DeYoung ("DeYoung"), Stephen M. Nolan ("Nolan"), and Kelly T. Grindle ("Grindle") (collectively, "Defendants") upon personal knowledge as to those allegations concerning Lead Plaintiff, and as to all other matters, upon the investigation of counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Vista with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Vista's public documents, investor presentations, conference calls and press releases; (c) information readily obtainable on the Internet; (d) interviews by investigators of several witnesses with personal knowledge of certain relevant facts; and (e) consultation with experts.

## I. SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of persons and entities that acquired Vista's securities between August 11, 2016 and November 9, 2017, inclusive (the "Class Period"), against Defendants, seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Vista designs, manufactures and markets consumer products in the outdoor sports and recreation markets. Vista operates in two segments: Shooting Sports and Outdoor Products. The Outdoor Products segment has three reporting units: (i) Hunting & Shooting Accessories; (ii) Outdoor Recreation; and (iii) Sports Protection. Vista's portfolio includes over 40 brands, selling products including, but not limited to, sporting ammunition and firearms, hunting and shooting accessories, outdoor accessories, outdoor sports optics, golf rangefinders, performance eyewear, hydration products and stand-up paddle boards.

3. During the Class Period, Vista products were sold through a variety of mass, specialty and independent retailers and wholesalers, as well as directly to consumers through

brand websites.[1] Wal-Mart is Vista's largest customer and generated roughly 11% to 15% of the Company's overall sales during the Class Period. In 2016 and 2017, Wal-Mart also represented between 15% and 18% of Vista's total trade receivables balance.

4. The complaint arises out of Defendants' false statements and material omissions to the market, beginning in August 2016 and ending in November 2017, which enabled Defendants to mislead the market as to the strength of Vista's financial condition. In order to inflate the price of Vista securities during the Class Period, Defendants caused the Company to overstate and falsely report its financial results – particularly goodwill – and failed to disclose material facts necessary to make the statements not misleading.

5. At the heart of Defendants' fraud, but accompanied by other misconduct, is Defendants' failure to timely write down impaired goodwill in the Company's Hunting & Shooting Accessories and Sports Protection reporting units. These impairment charges should have been taken by the quarter ended July 3, 2016, ***or a full six months before goodwill was first even partially written down***. Consequently, Defendants materially overstated goodwill by over $600 million, which was accumulated primarily from two pre-Class Period acquisitions. As explained below, Defendants' scheme concealed the need to write off ***almost 80% of the recorded goodwill in Vista's Outdoor Products segment.*** No write-down was taken until January 2017, when the Company recognized an ***astounding $449.2 million charge.*** The full extent of the impairment was not recognized and thus fully disclosed to investors until November 2017 when the Company recognized an ***additional $155 million in goodwill impairment, for a***

[1] During the Class Period, Vista's key retailers were: Amazon, Bass Pro Shop (100 stores), Big Rock Sports, Cabela's (85 stores), Dick's Sporting Goods (740 stores plus 75 Golf Galaxy Stores and 20 Field & Stream stores), Gander Mountain (164 stores), Recreational Equipment, Inc. (154 stores), Sportsman's Warehouse (70), Sports South, Target (1,797) and Wal-Mart (3,927 stores). Together, these customers represent approximately 40% of the Company's revenues. During the Class Period, Bass Pro Shops, Cabela's, Dick's Sporting Goods and Target each generated approximately 4% of Vista's revenue.

***total impairment charge of over $600 million*** based upon Vista's Bushnell and BLACKHAWK! acquisitions. The $600 million impairment charge should have been recognized, at a minimum, no later than the end of Vista's first quarter for fiscal year 2017, ended July 3, 2016.[2] ***Had the impairment to goodwill been properly recognized at that time, the write-off would have wiped out almost 18% of Vista's total assets and 36% of total shareholder equity as of July 3, 2016***.

6. Specifically, on January 11, 2017, the Company stunned the market by finally admitting that it needed to recognize an impairment charge in its Hunting & Shooting Accessories reporting unit (archery/hunting accessories, golf, optics, shooting accessories, and tactical products) ranging from $400 to $450 million. According to one commentator, the impairment was likely to swing Vista ***from reporting $79 million in operating earnings in Q3 2017 to reporting a $320 million operating loss***.[3]

7. On this news, on January 12, 2017, Vista shares fell $8.21, or 21.7%, losing $464 million in market capitalization on usually high trading volume (approximately 11 million shares traded). The next day, Vista announced that Defendant Grindle, President of the Outdoor Products segment, had been replaced. Vista's closing stock price of $28.70 on January 13, 2017 was almost 50% off its 52-week high of $53.91.

8. Shortly thereafter, on January 31, 2017, the Company announced the retirement of Vista's Controller and Treasurer, Thomas Sexton. Mr. Sexton had worked for Vista Outdoor and its predecessor companies since 1986.

9. After announcing disappointing results for Q4 2017, ***with gross profit down 52%***

---

[2] Vista's fiscal year ends on March 31. For fiscal year 2017, the quarters ended on July 3, 2016 (Q1), October 2, 2016 (Q2), January 1, 2017 (Q3) and March 31, 2017 (Q4). For fiscal year 2018, the quarters ended July 2, 2017 (Q1) and October 1, 2017 (Q2).

[3] Rich Smith, *Why Vista Outdoor Inc. Stock Crashed 26% Today*, THE MOTLEY FOOL (Jan. 12, 2017 12:57 PM), http://www.fool.com/investing/2017/01/12/why-vista-outdoor-inc-stock-crashed-26-today.aspx (emphasis added). Unless otherwise indicated, emphasis is always added.

***organically in the Outdoor Products segment***, Defendant Mark DeYoung, Vista's Chief Executive Officer ("CEO") and Chairman, suddenly "retired" on July 10, 2017, effective immediately. Despite Vista's Board of Directors (the "Board") earlier nominating Mr. DeYoung and recommending that shareholders re-elect him as a director at the Company's forthcoming August 1, 2017 Annual Meeting, the Board advised shareholders that Mr. DeYoung would not serve as a director of the Company, and withdrew its nomination and recommendation. Michael Callahan ("Callahan") was appointed interim CEO in place of Mr. DeYoung.

10. On November 9, 2017, the market was shocked by the Company's announcement of ***yet another impairment charge*** in the amount of $152 million generally related to Bushnell products, the subject of the earlier January 2017 partial impairment charge. Of this $152 million impairment charge, $77 million was in Vista's Hunting & Shooting Accessories reporting unit and a related impairment of Bushnell eyewear products in the Sports Protection business amounted to $75 million.

11. Based on the Company's announcement, which was delivered ***before the market even opened, Vista stock dropped by 23%, from $18.23 to $13.25, a record low, losing market capitalization of over $290 million. Vista stock dropped a staggering 41% from a recent high of $22.39,*** just three weeks earlier on October 25, 2017. ***The impairment caused Vista to report an earnings loss of $139 million for Q2 2018 (quarter ended October 1, 2017), instead of an earnings gain of $25 million.***

12. At the same time, Vista announced the appointment of Chris Metz, its third CEO in less than one year, and still another re-structuring of its executive ranks. Vista also announced its intention to sell Bushnell's Bolle, Serengeti and Cebe brands in the Sports Protection business, the business unit subject to the goodwill impairment announced on the same date. The

Company also announced that, as part of the Company's executive restructuring, Shooting Sports President Bob Keller would leave the Company as of November 17, 2017.

13. As to the calculation of goodwill, Defendants falsely assured the market in their SEC filings that "our assumptions about future revenues and expenses . . . [used in evaluating Vista's goodwill] are based on our plan, as reviewed by the Board of Directors." However, as detailed herein, Defendants' assumptions were knowingly unrealistic and unattainable, as corroborated by (i) information obtained from several confidential witnesses, (ii) well-recognized and documented macroeconomic conditions, (iii) new and increasing discounting activities resulting in decreased revenues and cash flow, (iv) loss of stock market capitalization, and (v) continual hiring and firing of key executives based on unattainable plan targets approved by the Board. By making baseless assumptions, Defendants were able to perpetuate their fraud. Investors had no way of knowing that the Company's impairment tests were flawed and that Vista's financials deliberately overstated Vista's goodwill during the Class Period.

14. Specifically, any assumptions used in performing the required annual goodwill impairment test in Q4 2016 (quarter ended March 31, 2016) materially changed in Q1 2017, as indicated by the events and changes in circumstances described below, and gave Defendants every indication that the assets in both the Hunting & Shooting Accessories and Sports Protection reporting units were impaired:

(a) the underlying forecasts were themselves unattainable and unachievable and based on inadequate internal controls to ensure the integrity of financial and accounting information;

(b) the underlying prior and current results and prior performance indicated that "assumptions" were baseless and unattainable and not indicative of market conditions in the

underlying businesses;

(c) the assumptions had no historical or ongoing basis in reality based on actual performance, but were manipulated to support goodwill;

(d) historical gross profit margins were far below the margin assumptions used to test goodwill impairment just prior to the beginning of the Class Period; and

(e) the quarters before and after the goodwill impairment tests for the Outdoor Products segment were performed demonstrated the gross over-inflation of the Defendants' assumptions for the Hunting & Shooting Accessories and Sports Protection reporting units, including exceedingly high channel inventories, lack of product demand, lack of new product development and success, continual changes in key management positions and deteriorating retail and wholesale market conditions. Nevertheless, Defendants still failed to admit the impairment or to promptly disclose to the market the impairment, the assumptions, or the valuation model used to conduct the test. Indeed, the Defendants intentionally waited for ***eight months*** after its annual impairment test in March 2016 before even considering whether the Company's goodwill was impaired.

15. Again, even the allegedly updated financial assumptions used in performing the interim goodwill impairment test in Q3 2017 (quarter ended January 1, 2016) for the Hunting and Shooting Accessories and Sports Protection reporting units were still outdated, unattainable and unrealistic in light of market conditions and continued reduction in revenues and cash flow. These events and changes in circumstances continued to worsen throughout Q3 2017, as described below. These known conditions contrary to the unrealistic assumptions used by Defendants gave Defendants several reasons to know that assets in the Hunting & Shooting Accessories and Sports Protection units either remained impaired or were impaired even after the

January 2017 impairment announcement:

(a) underlying forecasts continued to be unattainable and unachievable based on inadequate internal controls to ensure the integrity of financial and accounting information;

(b) the underlying prior and current results and prior performance continued to indicate that "assumptions" were baseless and unattainable and not indicative of market conditions in the underlying businesses;

(c) the assumptions had no historical or ongoing basis in reality based on actual performance over the prior quarters and known macroeconomic conditions, but were manipulated to support goodwill;

(d) historical profit margins, revenue and demand continued to fall far below the margin assumptions used to test goodwill impairment just prior to the beginning of the Class Period and used to test goodwill impairment in Q3 2017 (quarter ended January 1, 2017);

(e) the quarters immediately before and after the goodwill impairment tests for the Outdoor Products segment were performed demonstrated the gross over-inflation, even ***after*** the announced impairment in January 2017, of Defendants' assumptions for the Outdoor Products segment including the Hunting & Accessories and Sports Protection reporting units, which included exceedingly high channel inventories that could only be sold at substantial discounts, lack of demand for old products, lack of new product success, continual changes in key management positions, and deteriorating market conditions; and

(f) despite the continuing impairment, Defendants repeatedly failed to admit the full extent of the impairment or to promptly disclose to the market the full impairment, the assumptions, or the valuation model used to conduct the tests. Indeed, Defendants intentionally waited another ***ten months*** after the January 2017 impairment tests (which failed to adequately

consider the full extent of the impairment of the Company's goodwill) to conduct yet another interim impairment test in October 2017, which ultimately determined the full extent of the over $600 million in goodwill impairment.

16. During the Class Period, Vista achieved results by "pulling products" through its Hunting & Shooting Accessories and Sports Protection reporting units at substantial discounts (or as one confidential witness stated "at any price" because "price did not matter") and by moving sales from subsequent periods into the prior period. Despite critical retailer bankruptcies, reported softening in the retail environment by Vista's largest customers, industry consolidation, and a warm hunting season for the second straight year – all resulting in lower demand and sales, greater discounts, lower or negative gross margins and a reduced cash flow – Defendants continued to assure investors that Vista was "on track" and would see "a strong back-half of the year" with "very strong cash flow generation" in FY 2017.

17. Once the January 2017 impairment was announced, despite falling sales with increased discounting in the Bushnell and BLACKHAWK! brands, Vista told the market that the Company "was not sitting on the edge of impairment" and continued "to drive improvements in our execution and innovation in our product lines." Despite acknowledging competitive threats to Vista's optics business (part of the Hunting & Shooting Accessories reporting unit) as early as November 2015, repeatedly recognizing declining revenues in optics, and noting the need to re-position optics pricing and market strategy (including new staffing and management), Defendants nonetheless remained "excited" about potential new product development, which amounted, according to one confidential witness, to unsuccessfully changing the Bushnell logo three times. These repeated assurances of new products and product innovative in both Bushnell and BLACKHAWK! product lines made throughout the Class Period all contributed to the

concealment of Vista's goodwill impairment.

18. Vista's investors, and the Lead Plaintiff here, had a reason to expect that Defendants utilized reasonable and supportable goodwill testing assumptions (including sales growth rate and gross margin percentages) based on legitimate internal projections (*i.e.* best expectations for future performance). Investors further had reason to believe both that Defendants reevaluated those assumptions when warranted, as required by Generally Accepted Accounting Principles ("GAAP")[4] and as the Company had done historically, and that the Company created more realistic assumptions, based on updated information, when needed. Defendants did not disclose at any time during the Class Period that they did not follow this practice or did not periodically reevaluate the basis for previously used goodwill impairment test assumptions for each reporting unit. In fact, Defendants affirmatively asserted that their assumptions were based on reasonable estimates as used in the underlying businesses.

19. As set forth below, Vista's gross profit margins in the Hunting & Shooting Accessories and Sports Protection reporting units did not meet (or even come close to) the assumptions used for several consecutive quarters both before and following Defendants' periodic goodwill testing of the Outdoor Products segment including the January 2017 impairment announcement. Despite this substantial change in financial circumstances including a softening retail market, inventory issues, lack of innovative new products, and continual changes in management, Defendants nevertheless maintained the assumptions previously utilized (as demonstrated by their failure to perform new tests and/or disclose new feasible assumptions), including the assumptions previously used to calculate the January 2017 impairment.

20. Accordingly, Defendants misled the market by failing to disclose that the previous

[4] GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practices at a particular time.

assumptions – including the January 2017 impairment tests and, hence, the goodwill impairment analysis – were materially flawed. This gave the market the false impression that the assumptions for each reporting unit within the Outdoor Products segment were still valid. Since accounting standards (*i.e.* GAAP) require the Company to reevaluate its goodwill between annual tests under certain circumstances, by failing to properly do so, Defendants effectively continued to misrepresent to the market that the assumptions previously used were still valid. They were not valid, however, because of Vista's inability to achieve the necessary margin percentages due in part to an outdated product mix, unreliable forecasts, lack of new products, pulling in orders, inventory and trade receivables problems due to liquidations and bankruptcies of retail customers, and the need for substantial and continual discounting.

21. Thus, Vista's Class Period financials, which were filed with the SEC and provided to the market and the Company's lenders, were false and misleading because Defendants led the market to believe there was a prospect of achieving the growth rates utilized in the goodwill impairment tests. Thus, when Defendants disclosed in January 2017 that they would take a $400 to $450 million goodwill impairment charge, revealing that the assumptions were baseless, the Company's stock dropped by $8.21 per share or 21.7%. On November 9, when the Company shocked the market by announcing yet another $152 impairment charge in its Hunting & Shooting Accessories and Sport Protection reporting units, the market reacted even more swiftly. Before the market even opened, Vista stock had already dropped by 23%, from $18.23 to $13.25, ultimately dropping a staggering 41% from a recent high of $22.39, just three weeks earlier on October 25, 2017. While some of the underlying financial information may have been public prior to this disclosure, ***the deficiencies with those assumptions were not disclosed. When they were, the market reacted swiftly***.

22. The November 9, 2017 ***impairment charge translated to an adjusted net loss of $139 million or $2.01 per share. The total impairment charge of just over $600 million amounted to a staggering net loss of $516 million or an earnings loss per share of $7.45.*** Vista's stock price never recovered and currently trades, as of December 29, 2017, at $14.57.

23. Defendants filed regular reports with the SEC. Defendants certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that these financial reports were reviewed by them and did not contain any material misrepresentations or omissions. These certifications that Vista's financial reporting was accurate, and that the Company's internal controls were adequate, were knowingly or recklessly false when filed. As discussed below, Vista's financial statements were not accurate.

24. As a result of Defendants' positive (but false) statements about Vista, investors, including Lead Plaintiff, purchased Vista stock at artificially inflated levels and were damaged when the truth was revealed and the artificial inflation was removed from the stock price causing the stock price to decline.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j (b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts

charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district at 262 N. University Avenue, Farmington, UT.

28. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III. PARTIES

29. Lead Plaintiff purchased Vista stock during the Class Period, and suffered damages as a result of the Exchange Act violations and false and/or misleading statements and/or material omissions alleged herein.[5]

30. Defendant Vista is a Delaware corporation headquartered in Farmington, Utah. Vista's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "VSTO." Vista was formed in February 2015 when Alliant Techsystems Inc. ("ATK") spun off its Sporting Group business to ATK stockholders (the "Spin-off") as a newly formed company.[6]

31. Defendant DeYoung was the Chairman and CEO of Vista, since Vista's creation in February 2015, until the Company announced his abrupt departure on July 10, 2017. Prior to the Spin-off, Mr. DeYoung served as President and CEO of Orbital ATK from February 2010 to February 2015. As CEO and Chairman, DeYoung signed all of the Annual Reports on Form 10-

---

[5] A copy of the Lead Plaintiff's certification and chart of Vista share purchases during the Class Period is attached as Exhibit 2 to the Declaration of Gregory M. Nespole in Support of the Motion of The New York Hotel Trades Council and Hotel Association of New York City, Inc.'s Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel. *See* Dkt. 15 (filed Mar. 27, 2017).

[6] The Spin-off was immediately followed by the merger of ATK's Aerospace and Defense Groups with Orbital Sciences Corporation and thereafter ATK was renamed Orbital ATK, Inc. ("Orbital ATK").

K pursuant to the federal securities laws as discussed below. For the fiscal year ended March 31, 2017 (FY 2017), according to SEC filings, Mr. DeYoung had a guaranteed "base salary" of $1,081,500 ***with annual cash incentives to earn up to 240% of base salary respectively based on the Company's financial results.***

32. Defendant Nolan has served as Senior Vice President and Chief Financial Officer ("CFO") of Vista since February 2015, until the Company announced his abrupt departure on December 19, 2017, effective February 1, 2018. From 2006 to February 2015 (prior to the Spin-off), Mr. Nolan held a number of leadership positions at Orbital ATK. For example, from 2010 to 2013, he was Orbital ATK's Vice President of Strategy and Business Development and, beginning in July 2013 until the Spin-off, Mr. Nolan was Senior Vice President of Orbital ATK's Strategy and Business Development. As CFO of Vista during the Class Period, Mr. Nolan signed all of the Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K discussed below "pursuant to the requirements of the Securities Exchange Act of 1934." For the fiscal year ended March 31, 2017 (FY 2017), according to SEC filings, Mr. Nolan had a "guaranteed" base salary of $500,000, ***with annual cash incentives to earn up to 150% of base salary respectively based on the Company's financial results.***

33. Defendant Grindle was the President of the Outdoor Products segment of Vista for approximately one year, from January 2016 when he was hired until the Company announced his immediate departure on January 13, 2017. Mr. Grindle had a guaranteed annual base salary of $375,000, ***annual incentive compensation to earn up to 80% of his annual base salary***, and a long term incentive award of $150,000.

34. Defendants DeYoung, Nolan and Grindle (collectively the "Individual Defendants"), because of their positions with Vista, possessed the power and authority to control

the contents of Vista's reports to the SEC, press releases and presentations to securities analyst, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

35. During the Class Period, Defendants set unrealistic financial goals in order to deliberately overstate Vista's goodwill and intangibles and allow the Company to enter into an expanded credit facility, maintain specific debt leverage ratios, issue and then register and exchange senior notes, and continue its stock repurchase program, and acquisition program of outdoor product companies. *See infra* ¶¶ 58-72. For the Individual Defendants during the Class Period, earning bonuses at a substantial multiple to their base compensation was also dependent on Vista's achieving the unrealistic financial goals. As a result, the Individual Defendants made false and misleading statements to shareholders and the market during the Class Period, including disseminating false financial statements, which deliberately overstated Vista's goodwill and intangibles, in order to also manipulate these financial goals for their own personal benefit.

## IV. VISTA'S RESTRUCTURING AND REVOLVING DOOR OF KEY EXECUTIVES

36. Before and throughout the Class Period, as detailed below, Vista repeatedly made material and significant executive and reorganization changes relating to sales, marketing and

product development. These repeated changes in circumstances alone, leading to control weaknesses, along with other facts, should have triggered a need for impairment testing in the Hunting & Shooting Accessories and Sports Protection reporting units. *See infra* ¶¶ 47-57.

37. Because the prior Bushnell organization "failed to discriminate, define, and distribute the optics portfolio properly" beginning in February 2015, Vista "rationalized the brands into channels of distribution where they belong."[7] According to Confidential Witness 7, all of the Bushnell leaders that had "manned the ship for so many years" were let go in or about March 2015, including key executive Bill Gyori, Bushnell's long-time and successful Vice President of Marketing.

38. On January 4, 2016, before the Class Period started, the Company announced several management changes, bringing in several Vista outsiders into executive positions, rather than promoting from within. Defendant Grindle was appointed President, Outdoor Products and David White ("White"), another Vista executive, became President, Shooting Sports. Four months later, Vista announced that Mr. Robert J. Keller had been appointed President, Shooting Sports, as of May 9, 2016. Mr. White, the then current President, Shooting Sports, after 40 years with Vista, would retire as of May 20, 2016.[8]

39. During the Class Period, on January 13, 2017, after less than a year in his position, Mr. Grindle was abruptly terminated and Dave Allen was named President, Outdoor Products. Mr. Allen had only joined Vista in May of 2016 and had worked as the Company's Senior Vice

---

[7] Investor Day Transcript ("Tr.") (Nov. 17, 2016) at 42.

[8] According to the Company's SEC filings, Mr. Keller received an annual base salary of $375,000, ***annual incentive compensation to earn up to 100% of his annual base salary***, and a long term incentive award of $150,000. Mr. Keller would receive his fiscal year 2017 long term incentive equity award of $281,250 aggregate grant date value on May 9, 2016. The long term performance award was 50% shares, 30% restricted stock units, and 20% stock options. According to the Company, the offer to Mr. Keller did not "provide for any payments or benefits in the event of termination."

President of Sales for about seven months. Mr. Allen was offered an annual base salary of $440,000, a target annual cash incentive compensation of 65% of his base salary, a long term equity incentive of 110% his base salary, and a lump sum on November 7, 2019 based on continued employment.

40. Shortly thereafter, on January 31, 2017, the Company announced the retirement of Vista's Controller and Treasurer, Thomas Sexton. Mr. Sexton had worked for Vista Outdoor and its predecessor companies since 1986. This was the third major reorganization within only 18 months.

41. On February 9, 2017, DeYoung announced a complete restructuring of Bushnell's optic business ("rebuilt the team," "new lines," and "new capabilities"), now headed by a newly appointed segment President.[9] A few months later, during the May 11, 2017 Earnings Call, DeYoung announced ***yet another strategic change*** within the Company with the appointment of a new dedicated Corporate Vice President for e-commerce to drive growth across direct to consumer channels.[10] DeYoung also advised analysts that, during the fourth quarter, the Company had "reduced its headcount to align with demand."[11]

42. In July 2017, Vista announced that Mr. De Young had "resigned." In connection with Mr. DeYoung's abrupt July 2017 resignation, Vista paid Mr. DeYoung: (i) a lump-sum cash payment in an amount equal to his current base salary ($1,081,500); (ii) a *pro rata* portion of his annual bonus; (iii) accelerated vesting of his outstanding restricted stock, restricted stock unit and stock option awards; (iv) a *pro rata* portion of his performance-based long-term incentive awards; and (v) access to other Company benefits. According to the Company's Definitive

---

[9] *Id*. at 8.

[10] Bloomberg Tr. (5/11/2017) at 2.

[11] *Id*.

Proxy Statement filed with the SEC on June 17, 2017, the value of these payments on termination was over $3 million.

43. In August 2017, Michael Callahan was appointed Vista's interim CEO. After one quarter with Callahan as interim CEO, Vista finally announced the impairment of the remaining goodwill and intangibles values related to its Bushnell and BLACKHAWK! products. On October 9, 2017, Christopher T. Metz was then appointed Vista's CEO, the third CEO to serve the Company in less than one year. According to Vista's November 9, 2017 press release, CEO transition costs were approximately $8.7 million, or about $0.10 per share. During the quarter ended October 1, 2017, "benefits for retiring executives" alone increased Company's expenses by $5.9 million.[12]

44. On November 17, 2017, shortly after the end of the Class Period, in yet another re-evaluation of the Company's organizational structure for sales, marketing and product development, Mr. Kellar, then President, Shooting Sports, abruptly left the Company and Dave Allen was promoted to Group President, Outdoor Products. The position of President, Shooting Sports, was eliminated. On November 20, 2017, Jason Vanderbrink, then Senior Vice President of Sales, was promoted to President, Ammunition and Albert Kasper, a long time Vista executive, was promoted to President, Firearms.

45. On December 19, 2017, Vista and CFO Nolan "agreed" that Mr. Nolan would leave the Company, effective February 1, 2018. According to the Company's SEC Form 8-K:

> In connection with Mr. Nolan's departure, the Company expects to enter into a Waiver and General Release Agreement with Mr. Nolan (the "Agreement") on the Departure Date. In exchange for his waiver of claims against the Company, the Agreement will provide for the payment by the Company to Mr. Nolan of certain benefits provided for in the Company's Executive Severance Plan and other executive compensation-related arrangements, including 1) a lump-sum cash

[12] Vista Outdoor, Inc., Quarterly Report (10 Q) for quarterly period ended October 1, 2017 (Nov. 6, 2017)

severance payment equal to one year of Mr. Nolan's current base salary ($515,000); 2) a pro-rata portion of his annual bonus (based on the Company's actual performance for the entire fiscal year); 3) accelerated vesting of his outstanding time-based restricted stock unit and stock option awards that would have vested had he remained employed by the Company for 12 months following his Departure Date; 4) a pro rata portion of his performance-based long-term incentive awards that would have vested on the next vesting date based on actual performance; and 5) an additional lump sum of $15,000 to defray health care costs.[13]

## V. CONFIDENTIAL WITNESSES

46. Lead Plaintiff's allegations are supported by, among other things, information provided by confidential witnesses. These witnesses include former employees of Vista (including its predecessor company), who provided facts based on their personal experience, which includes a variety of different vantage points within Vista:

(a) Confidential Witness ("CW") 1 was a senior executive at ATK Sporting Group from February 2013 to February 2015 and he was responsible for business management, including participating in the preparation of a valuation model for Bushnell prior to the acquisition. CW1 also has knowledge of Bushnell's performance after its acquisition by ATK.

(b) CW 2 was an interim senior executive in the Outdoor Products segment from April 2016 until June 2016, and reported directly to Defendant Grindle. Based on this position, CW 2 had personal knowledge with regard to the sales and marketing of certain products within the Outdoor Products segment, the forecast, budget and plan for certain products, and the softening marketplace with retailers such as Sports Authority going out of business.

(c) CW 3 was based in Norfolk, Virginia and worked as a Vista Outdoor/ATK/BLACKHAWK! Accounts Receivable/Credit Manager from 2006 to March 2015. CW 3 reported to the Credit Director, was part of a team that integrated the inventory of

[13] *See* Vista Outdoor Inc., Current Report (Form 8-K) (Dec. 22, 2017).

ammunitions and accessories into one common operating system, and handled pricing until June 2014.

(d) CW 4 was based in Overland Park, Kansas and worked as a Vista Marketing Manager from April 2016 until the end of May 2017. CW 4 reported to a Senior Sales Manager in Vista Outdoor. CW 4 had knowledge of a directive from Jason Vanderbrink, Senior Vice President of Sales "to sell anything" and that "price does not matter." At that time, Mr. Vanderbrink reported to Mr. DeYoung.

(e) CW 5 was based in Overland Park, Kansas and worked as a Vista Outdoor Eyewear Marketing Manager for Bushnell eyewear brands from June 2015 until late March 2017 and oversaw marketing initiatives for Bolle, Serengeti and Cebe brands in the United States. CW 5 reported to the Company's Director of Sales and Marketing for North America. CW 5 had knowledge with regard to inventory issues and the inability of the eyewear business to achieve its plan numbers from the fourth quarter of 2016 until March 2017.

(f) CW 6 was based in Overland Park, Kansas and worked as a Vista Outdoor BLACKHAWK! Assistant Product Manager from July 2015 until January 2017 and then as a Vista Outdoor Sales Service Specialists for Bushnell eyewear from January 2017 until August 2017. CW 6 is knowledgeable with regard to the performance of BLACKHAWK! and its failure to meet plan numbers during the Class Period and is knowledgeable about lay-offs that occurred in March, June/July and September 2017.

(g) CW 7 was based in Overland Park, Kansas and worked as a Vista Outdoor Executive Assistant and reported to Grindle, President, Outdoor Products, until he left in January 2017. CW 7 then reported to Allen, as the new President, Outdoor Products, until October 2017. CW 7 is familiar with changes in leadership and lack of leadership structure within the Hunting

& Shooting Accessories reporting unit.

(h) CW 8 was based in Kansas City, Missouri and worked as a Vista Outdoor Sales Specialist between January 2017 and June 2017. Prior to January 2017, CW 8 was based in Overland Park, Kansas and worked as a Vista Outdoor Military and Law Enforcement Sales Coordinator from January 2013 until January 2017. CW 8 is familiar with the market for BLACKHAWK! products during the Class Period.

## VI. EVENTS AND CHANGES IN CIRCUMSTANCES PRE-CLASS PERIOD

### A. Background: Vista Corporate Structure and Acquisitions

47. Vista operates in two segments: Shooting Sports and Outdoor Products. The impairments were taken in the Hunting & Shooting Accessories and Sports Protection reporting units, both part of the Company's Outdoor Products segment. The Hunting & Shooting Accessories reporting unit includes the Company's optics, hunting and shooting accessories, and tactical accessories products. The Sports Protection reporting unit includes protective helmets and certain Bushnell fashion and protective eyewear brands.

48. During the past six years, Vista acquired the following companies:

(i) in March 2009, Vista acquired Eagle Industries for $63 million;

(ii) on April 9, 2010, Vista acquired Blackhawk Industries Product Group Unlimited LLC ("BLACKHAWK!") for $172.3 million, now part of the Outdoor Products segment;

(iii) on June 21, 2013, Vista acquired Savage Arms for $315 million, now part of the Shooting Sports segment;

(iv) on November 1, 2013, Vista acquired Bushnell Holdings Group ("Bushnell") for $985 million, now part of the Outdoor Products segment;

(v) on July 20, 2015, Vista acquired Jimmy Stykes for $40 million, now part of the Outdoor Products segment;

(vi) on August 3, 2015, Vista acquired CamelBak for $412.5 million, now part of the Outdoor Products segment;

(vii) on April 1, 2016, Vista acquired BRG Sports Inc.'s Actions Sports division ("Action Sports"), which includes the brands Bell and Giro, as well as BlackBurn, CoPilot, Krash and Raskulz for $400 million, now part of the Outdoor Product segment; and

(viii) on September 1, 2016, Vista acquired Camp Chef for $60 million, now part of the Outdoor Products segment.

49. The following chart identifies the reporting unit for each of aforementioned acquisitions within the Outdoor Products segment:[14]

[14] Includes acquisitions before the Spin-off.




**<u>Notes</u>**:
1.*A $525 and $74 million impairment announced by Vista occurred in the Hunting & Shooting Accessories reporting unit.
2.**A $75 million impairment announced by Vista occurred in Sports Protection with regard to the Bushnell brands.
3. The [date] and ( ) above indicate the acquisition date and price paid by Vista or its predecessor for the entity.

50. As reflected in the chart above, the Hunting & Shooting Accessories reporting unit was formed through the acquisitions of Eagle, BLACKHAWK! and Bushnell. The Sports Protection reporting unit was formed by the acquisition of BRG Sports, Inc's Action Sports division combined with certain Bushnell eyewear brands (Bolle/Serengeti/Cebe). The BLACKHAWK! and Bushnell acquisitions were made when Mr. Sexton, Vista's Vice President, Controller and Treasurer during the Class Period, served as the Corporate Controller, Interim

Chief Financial Officer and Treasurer of ATK (Vista's predecessor). At the time of Orbital ATK's BLACKHAWK! and Bushnell acquisitions, Defendant DeYoung was President and CEO of Orbital ATK and Defendant Nolan was first Vice President and then Senior Vice President of Orbital ATK's Strategy and Business Development Group. Both DeYoung and Nolan were familiar with and had direct responsibility for the operations and financial results of these businesses.

### B. BLACKHAWK!: Deep Discounting

51. BLACKHAWK! was originally privately owned by Mike Noella, a former U.S. Navy Seal, who created a global company. BLACKHAWK! manufactures tactical gear such as holsters, magazine pouches, and illumination tools. BLACKHAWK! is part of Vista's Hunting & Shooting Accessories unit. According to CW 3 (an ATK Accounts Receivable and Credit Manager from 2010 until March 2015 who handled pricing for BLACKHAWK! products), immediately after the acquisition, ATK began to offer deep discounts on BLACKHAWK! products. As a result, sometimes there were "no margins on it" or "negative gross margins." From 2009 to June 2014, according to CW 3, discounts for BLACKHAWK! holsters and magazine pouches gradually increased from 65 to 80 percent off the Manufacturer's Suggested Retail Price ("MSRP") with Wal-Mart.

52. According to CW 6, the launch of BLACKHAWK! apparel line in July 2016 was not successful and, by the start of the Class Period, was not "making plan numbers" and continued not to "make plan numbers" during the Class Period.

### C. Bushnell: Lack of Innovative New Products, Substantial Discounting, and Declining Sales and Gross Margins

53. The largest contribution to the Hunting & Shooting Accessories reporting unit is Bushnell, with an acquisition cost of $985 million (net of cash acquired). Bushnell designs,

markets and distributes sports optics, outdoor accessories and eyewear products. Vista reported that the Bushnell purchase price allocation included $524 million in goodwill.[15] For the quarter ended June 29, 2014, ATK (Vista's predecessor) recorded $124 million in sales and $5.3 million in income. At the time of the acquisition, according to analysts, Bushnell was expected to generate sales of roughly $600 million annually and had been growing at a rate of 7% over the previous three years.[16]

54. According to SEC filings, the breakdown of the purchase price allocation for Bushnell is presented below:

| | | |
|---|---|---|
| Purchase Price net of cash acquired: | | |
| Cash Paid | | $ 985,000 |
| Cash Paid for additional working capital | | 4,185 |
| **Total purchase price** | | **$ 989,185** |
| Fair value of assets acquired: | | |
| Net receivables | $ 111,036 | |
| Net inventories | 153,748 | |
| Tradename, technology, and customer relationship intangibles | 364,843 | |
| Property, Plant, and Equipment | 25,080 | |
| Other assets | 9,820 | |
| Total assets | 664,527 | |
| Fair value of liabilities assumed: | | |
| Accounts Payable | 80,092 | |
| Deferred tax liabilities | 72,349 | |
| Other liabilities | 28,746 | |
| Total liabilities | $ 181,187 | |
| **Net assets acquired** | | **$ 483,340** |
| **Preliminary goodwill** | | **$ 505,845** |

[15] *See* Vista Outdoor Inc., Annual Report (Form 10-K) (May 29, 2015).

[16] *See* Greg Konrad, CFA, *Vista Outdoor Inc.: Marking Down the Accessories Portfolio*, JEFFRIES COMPANY NOTE, Jan. 13, 2017.

55. According to CW 1 (a senior executive in the ATK Sporting Group with personal knowledge of the Bushnell acquisition), the internal valuation model for the Bushnell acquisition was $870 million, but the Orbital ATK Board (Vista) increased its offered price by an additional $110 million to a price of $980 million. At the time of the acquisition, in the summer of 2014, according to CW 1, the firearms and related accessory market was starting to normalize or decline from a very high peak demand period that followed the Sandy Hook tragedy in December 2012. Thus, by February 2015, according to CW 1, ATK Sporting Group had a decline in sales of approximately $200 million year-over-year. The combination of having paid a hefty premium for the Bushnell acquisition coupled with this well-known and recognized trend (a declining or normalizing market correction, which continued throughout calendar years 2015 and 2016) created a clear indication of impairment and, by itself, required that an impairment test be performed no later than Q1 2017 (quarter ended July 3, 2016).

56. Defendants DeYoung and Nolan were well aware of the issues associated with the Bushnell acquisition. Both Defendants worked in management positions at ATK (before the Vista Spin-off) at the time of the acquisition. DeYoung observed that "the Bushnell organization before we acquired it, with its previous ownership had failed to discriminate, define, and distribute the optics portfolio properly" so beginning in February 2015 Vista "rationalized the brands into channels of distribution where they belong."[17] This "reorganization" moved the Bushnell eyewear brands (Serengeti, Bolle, Cebe) into the Sports Protection reporting unit. Defendant Nolan noted that "some of the companies we'd acquired several years ago from private equity [referring to Bushnell and BLACKHAWK! had let certain of their innovation

[17] Investor Day Transcript ("Tr.") at 42, Nov. 17, 2016.

capabilities atrophy."[18]

57. According to CW 5, since the start of the Class Period in August 2016, Vista had been trying without success to sell the Serengeti brand because of its failure to achieve predicted sales figures. On November 9, 2017, at the end of the Class Period, Vista finally publicly announced its intention to sell the Bolle, Seregenti and Cebe eyewear brands in the Sports Protection reporting unit, brands all acquired as part of the Bushnell acquisition in 2013. Vista concluded in its November 9, 2017 press release that these fashion, prescription and safety eyewear brands were "not core to our business."

**D. <u>Critical Debt Financing and Credit Facilities</u>**

**1. The Senior Note Offering**

58. On August 11, 2015, according to SEC filings, Vista completed a private offering of $350 million in 5.875% Senior Notes due 2023, an increase of $50 million from the previously announced amount (the "Notes"). Interest on the Notes is payable semi-annually on April 1 and October 1 of each year beginning April 1, 2016. According to the Company's Current Report on SEC Form 8-K (dated August 11, 2015), "[t]he Notes will be fully and unconditionally guaranteed jointly and severally by the Company's existing and future domestic subsidiaries that guarantee indebtedness under the Company's senior credit facilities or that guarantee certain other indebtedness of the Company or any Guarantor in an aggregate principal amount of $50.0 million (the 'Guarantees')."[19]

59. Subject to a number of exceptions, the Note Indenture Agreement also limited the Company's ability to, among other things, incur additional indebtedness, make investments, and repurchase capital stock. In connection with the issuance of the aforementioned Notes, the

[18] Roth Capital Partner Conference (Bloomberg) Tr. at 4, Mar. 14, 2017.

[19] *See* Vista Outdoor Inc., Current Report (Form 8-K) (Aug. 11, 2015).

Company and Guarantors entered into a registration of rights agreement dated August 11, 2015 with the initial purchaser of the Notes (the "Registration of Rights Agreement"). Pursuant to the Registration of Rights Agreement, the Company and Guarantors are required to, among other things, ***use their commercially reasonable best efforts to effect a registered exchange of the Notes and the Guarantees for registered notes and guarantees with identical terms (with some exceptions) no later than November 8, 2016.***[20] ***If the Company failed to consummate the exchange offer and a shelf registration, then the Company will be subject to an additional and increasing interest rate over time.***

### 2. Vista's Credit Facilities: Critical Consolidated Leverage Ratios

#### *i. New Credit Agreement*

60. On April 1, 2016, in connection with the Action Sports acquisition mentioned above, Vista completed a refinancing of its existing senior secured credit facilities (consisting of $400 million revolving credit facility and $350 million term loan) ("Existing Credit Facilities") by entering into new senior secured credit facilities ("New Credit Facilities"). The New Credit Facilities consisted of a $400 million Revolving Credit Facility and a $640 million Term Loan A facility.

61. To effectuate the refinancing, Vista entered into a New Credit Agreement, dated as of April 1, 2016 ("New Credit Agreement"), which amended and restated Vista's existing Credit Agreement dated December 19, 2014 ("Credit Agreement"). The Amended Credit Agreement amends and restates the Existing Credit Facilities under the Credit Agreement by replacing them with the New Credit Facilities. ***The New Credit Agreement provided for mandatory prepayments of loans outstanding under the New Credit Agreement under certain***

---

[20] *Id.*

***circumstances, such as maintaining a Consolidated Leverage Ratio of not more than 3.5 to 1.0 and a Consolidated Interest Coverage Ration of at least 3.0 to 1.0.***

62. The definitions of "Consolidated Interest Coverage Ratio" and "Consolidated Leverage Ratio" in the New Credit Agreement are as follows:

> "***Consolidated Interest Coverage Ratio***" means, as of any date of determination, the ratio of (a) Consolidated EBITDA ***for the period of the four prior fiscal quarters ending on such date*** to (b) Consolidated Interest Charges to the extent paid in cash during such period; provided that Consolidated EBITDA and Consolidated Interest Charges for such four fiscal quarter period or other applicable period shall be determined on a *pro forma* basis with respect to any Subject Disposition or any Acquisition (together with any related transactions, including the incurrence, assumption, refinancing or repayment of any Indebtedness) as if such Disposition or Acquisition had occurred in the first day of such period.
>
> "***Consolidated Leverage Ratio***" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness as of such date less unrestricted cash and Cash Equivalents of the Borrower and its Domestic Subsidiaries in an amount not to exceed $75,000,000 (provided that any such cash deposited in accounts located outside the United States shall be net of the Borrower's reasonable estimate of any repatriation taxes or costs) to (b) Consolidated EBITDA for the most recent four fiscal quarter period ended as of the last fiscal period for which financial statements were required to have been delivered pursuant to Section 6.01; provided that Consolidated EBITDA and Consolidated Funded Indebtedness for such four fiscal quarter period or other applicable period shall be determined on a pro forma basis with respect to any Subject Disposition or any Acquisition (together with any related transactions, including the incurrence, assumption, refinancing or repayment of any Indebtedness) as if such Disposition or Acquisition had occurred in the first day of such period.[21]

63. The New Credit Agreement also required that audited financial statements be provided at the end of each fiscal year as well as unaudited quarterly financial statements as follows:

> 6.01 Financial Statements. Deliver to the Administrative Agent (which will promptly furnish such information to the Lenders):

[21] Vista Outdoor Inc., AMENDED AND RESTATED CREDIT AGREEMENT (Apr. 1, 2016) (emphasis added).

> (b) as soon as available, but in any event within ***45 days after the end of each of the first three fiscal quarters of each fiscal year*** of the Borrower (commencing with the first fiscal quarter ended after the Restatement Closing Date), ***an unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended***, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and ***certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP***, subject only to normal year-end audit adjustments and the absence of footnotes.[22]

64. Substantially all domestic tangible and intangible assets of Vista and its subsidiaries were pledged as collateral to secure the obligations under the New Credit Facilities – including all of Bushnell's assets. Shortly thereafter, on April 4, 2016, Vista acquired Action Sports for $400 million, through cash on hand, drawing on the New Credit Facilities for $300 million.

65. As of the quarter ended July 3, 2016, Vista had $722 million of indebtedness under the New Credit Agreement as defined above; and as of March 31, 2017, Vista had increased its indebtedness to $783 million under the New Credit Agreement. The Credit Amendment and Notes contain cross-default provisions so that non-compliance with the covenants within one debt agreement could cause a default under other debt agreements as well.

**ii. *Credit Amendment***

66. On May 9, 2017, based on only one additional quarter of reported results after the January 2017 partial impairment, Vista was forced into a First Amendment to its New Credit Agreement ("Credit Amendment"). ***The primary purpose of the Credit Amendment was to increase the acceptable Consolidated Leverage Ratio from 3.5:1 to 4.75:1 through the fiscal***

[22] *Id*. at 97.

***quarter ending December 31, 2018 as well as increase both the rates and the commitment fee.***[23] The renegotiation of the Consolidated Leverage Ratio in the Credit Amendment ***reflects the cumulative impact of the only partial $450 million impairment charge (which should have been over $600 million and should have been announced no later than July 3, 2016)*** on the Company's aforementioned leverage ratio covenants in its New Credit Amendment. As noted above in ¶ 62, the calculation of the Consolidated Leverage Ratio is based upon a rolling four-quarter analysis. Therefore, the cumulative impact of most financial changes would take approximately three consecutive quarters to impact the ratios. Here, the delayed impairment charge forced the renegotiation of and substantial increase in the leverage ratio covenants ***after only one quarter of reported results.***

67. The Credit Amendment provides that borrowings shall bear interest at a rate equal to either the sum of a base rate plus a margin or 0.50% to 1.50% (or a sum Eurodollar rate plus a margin), with either such margin depending on Vista's consolidated leverage ratio. The costs related to the Credit Amendment were approximately $1.8 million. According to the Company's Annual Report (10-K) for the year ended March 31, 2017 (the "2017 Annual Report"), ***the cash paid for interest on debt for fiscal 2017 (year ended March 31, 2017) was $42.4 million***.

68. The variable rates of interest depending on the Consolidated Leverage Ratio causes the Company's debt service costs to increase even if the amount borrowed remains the same. If such costs increase, then net income and cash flow correspondingly decrease. According to the 2017 Annual Report, "assuming $783 million of variable rate indebtedness (which was the amount outstanding as of April 1, 2017), a change of 1/8 of one percent in

[23] *See* Vista Outdoor Inc., AMENDED AND RESTATED CREDIT AGREEMENT (Apr. 1, 2016) at 3.5:1 compare to Vista Outdoor Inc., FIRST AMENDED AND RESTATED CREDIT AGREEMENT (May 19, 2017) at 4.75:1. Thereafter, the Credit Amendment set ***lower*** Consolidated Leverage Ratios beginning in March 31, 2019, back to 4.0 to 1.0 after December 29, 2019.

interest rates would result in $1.0 million change in annual estimated interest expense."[24]

69. As of October 1, 2017, Vista had a total indebtedness under the Credit Amendment of $707 million and paid $22.8 million in interest on the debt including commitment fees, an increase from the same period in the previous year due to a higher average interest rate.[25]

70. Although Vista announced, at the time of both the January and November 2017 impairment charges, that the Company was not in default under its credit agreements, the quarterly calculation of the Company's Consolidated Leverage Ratio (based upon a rolling four-quarter analysis) was based on the same false and misleading financial statements provided to Vista shareholders (as described below). As Vista's CFO conceded on the Q2 2018 Earnings Call, in the quarter ended October 1, 2017, when the remaining delayed $155 million impairment charge was taken, the Consolidated Leverage Ratio was 3.95 to 1 (referred to as the covenant calculation),[26] ***which would have certainly triggered a default under the New Credit Agreement as well as the Notes' cross default provisions if the full impairment charge had been taken as of July 3, 2016 at the start of the Class Period***. As of November 9, 2017, since the cumulative impact of most financial changes takes approximately three consecutive quarters to impact the ratios, the Company still expects the covenant calculation to rise.

71. Despite the aforementioned debt and credit limitations, before and during the Class Period, Defendants engaged in an aggressive stock purchase plan in order to support the stock price. As of May 11, 2017, Vista had spent $300 million repurchasing over 7.2 million shares of Vista stock in the open market.[27] As of November 6, 2017, Vista had 57 million shares

---

[24] 2017 Annual Report at 24.

[25] *See* Vista Outdoor, Quarterly Report (10-Q) (Nov. 9, 2017) at 16, 33.

[26] 11/9/17 Bloomberg Tr. at 8.

[27] In FY 2015, Vista acquired 162,000 shares of stock for $6.9 million. In FY 2016, the Company

of stock outstanding and the stock repurchase plan represented over 12% of the outstanding shares.

72. By delaying any impairment charge for at least six months and by delaying the full impairment charge of over $600 million for over a year, the negative cumulative financial impact on the leverage ratios in the Credit Amendment was also delayed. This deliberate and improper delay based on the Company's false financial statements achieved the following: (i) allowed Vista to avoid placing the Company in violation of its leverage covenants during the Class Period; (ii) allowed Vista to satisfy the requirements of the Registration Rights Agreement at the start of the Class Period; and (iii) allowed Vista to negotiate a Credit Amendment before a default and avoid potential cross defaults in nearly $1 billion in debt financing.

**E. Vista's Goodwill Disclosures: Concerns If "Market Correction" Lasts Longer, Becomes Deeper, or New Product Development Not Successful**

73. In the Company's Annual Report on SEC Form 10-K for fiscal year 2016 (ended March 31, 2016) (the "2016 Annual Report"), the Company reported goodwill by segment and noted the following changes in the carrying amount of goodwill by segment from March 31, 2014 to March 31, 2016 as follows:

| | | | |
|---|---|---|---|
| Balance at March 31, 2014 | $ 246,487 | $ 600,647 | $ 847,134 |
| Impairment | (41,020) | — | (41,020 |
| Effect of foreign currency exchange rates | (947) | (23,004) | (23,951 |
| Balance at March 31, 2015 | 204,520 | 577,643 | 782,163 |
| Acquisitions | — | 238,824 | 238,824 |
| Effect of foreign currency exchange rates | 371 | 2,093 | 2,464 |
| Balance at March 31, 2016 | $ 204,891 | $ 818,560 | $ 1,023,451 |

acquired 3,179,086 shares of stock for $142 million. *See* Vista Outdoor, Annual Report (10-k) (May 16, 2016) at 28 (Note (2)). In FY 2017, Vista acquired 3,876,634 shares of Vista stock for $151 million.

74. According to the 2016 Annual Report, Vista undertakes impairment testing as follows:

> We test goodwill and indefinite lived intangible assets for impairment on the first day of our fourth fiscal quarter ***or upon the occurrence of events or changes in circumstances that indicate that the asset might be impaired***. We have determined that the reporting units on a standalone basis for our goodwill impairment review are our operating segments, or components of an operating segment, that constitute a business for which discrete financial information is available, and for which segment management regularly reviews the operating results. We then evaluate these components to determine if they are similar and should be aggregated into one reporting unit for testing purposes. ***Based on this analysis, we have identified four reporting units, as of the fiscal 2016 testing date.***[28]

75. Accounting for goodwill also includes, according to the 2016 Annual Report, "***current and estimated economic trends and outlook" and that "if the current economic conditions were to deteriorate, or if [the Company] were to lose significant business, causing a reduction in estimated discounted cash flows, it is possible that the estimated fair value of certain reporting units or tradenames could fall below their carrying value resulting in the necessity to conduct additional impairment tests in future.***"[29]

76. The Company's Annual Report on SEC Form 10-K for fiscal year ended March 31, 2015 (the "2015 Annual Report"), filed with the SEC a year earlier, raised a concern with regard to the Outdoor Products segment (then identified as the "Accessories reporting unit") and its goodwill balance at March 31, 2015 of approximately $573 million. The 2015 Annual Report stated:

> The Accessories reporting Unit had an estimated fair value that exceeded its carrying value by approximately 5%. This reporting unit had approximately $573,000 of goodwill recorded at March 31, 2015. ***A majority of the goodwill***

---

[28] *See* Vista Outdoor Inc., Annual Report (SEC Form 10-K) (May 29, 2016), https://www.sec.gov/Archives/edgar/data/1616318/000161631816000100/vsto-3312016x10xk.htm at 35.

[29] *See* Vista Outdoor Inc., Annual Report (SEC Form 10-K) (May 29, 2016), https://www.sec.gov/Archives/edgar/data/1616318/000161631816000100/vsto-3312016x10xk.htm at 35.

> ***recorded within this reporting unit, approximately $495,000, relates to goodwill acquired in the fiscal 2014 acquisition of Bushnell. We would not expect to see significant excess within this reporting unit given that we determined the fair value of the vast majority of this goodwill within the last two years.*** The fair value of the Accessories reporting unit was determined using both an income and market approach. The value estimated using a discounted cash flow model requires us to make significant estimates regarding future revenues and expenses, projected capital expenditures, changes in working capital and the appropriate discount rate and is weighted against the estimated value derived from the guideline company market approach method. We used a discount rate of 10.5% and a 3% terminal growth rate. The market approach method estimates the price reasonably expected to be realized from the sale of the company using comparable company multiples and a control premium of 25%. ***Should the market correction last longer or be deeper than expected or if new product developments do not succeed, or the discount rate were to increase by more than 100 basis points, it is possible that the estimated fair value of this reporting unit could fall below its carrying value, and there could be an indication of impairment which would require us to perform a test for impairment.***
>
> ***Within the Accessories reporting unit, one tradename had an estimated fair value that exceeded its carrying value by approximately 1%. This tradename had a carrying value of approximately $95 million at March 31, 2015.*** According to the 2015 Annual Report, "Should the market correction last longer or be deeper than expected or if new product developments do not succeed, or the discount rate were to increase or the royalty were to decrease by more than 25 basis points, it is possible that the estimated fair value of the tradename could fall below its carrying value, which could result in an impairment.[30]

77. ***Accordingly, as early as March 2015, Defendants were aware that the former Accessories reporting unit*** (now the Hunting & Shooting Accessories reporting unit), along with the Bushnell eyewear brands in the new Sports Protection reporting unit, ***had no significant fair value excess (approximately 5%) and one trade name only exceeded its carrying value by approximately 1%.*** According to the 2015 Annual Report, if a market correction was deeper, new products did not succeed, or discounts increased, "there could be an indication of impairment" and it would require an impairment test. As discussed herein at ¶¶ 79-90, all of these indications were apparent in the next year and no later than Q1 2017 (quarter ended July 3,

[30] *See* Vista Outdoor Inc., Annual Report (SEC Form 10-K) (May 29, 2015).

2016). Vista, however, ***failed to conduct an impairment test as required and indicated by its own cautionary disclosures***.

78. Nonetheless, despite the aforementioned fair value calculations and concerns expressed in the 2015 Annual Report, a year later, the goodwill balances relating to the Bushnell and BLACKHAWK! acquisitions remain essentially unchanged in the 2016 Annual Report. The 2016 Annual Report identified the "Acquisitions" increase in the Outdoor Products segment goodwill balance as of March 31, 2016 as related to the preliminary purchase price allocation for the CamelBak and Jimmy Stykes acquisitions. As a result, the breakdown for the Outdoor Products segment's goodwill balance ***as of March 31, 2016*** is: $238 million attributable to the Outdoor Recreation reporting unit (CamelBak and Jimmy Stykes acquisitions) and ***$577 million attributable to Bushnell ($495 million) and Black Hawk ($82 million).*** There is no goodwill balance attributable to the Sports Protection reporting unit because Action Sports was acquired in April 2016, after March 31, 2016 goodwill balance, and a new reporting unit, the Sports Protection reporting unit, was formed based on this acquisition. The Bushnell eyewear brands were then moved to the newly created Sports Protection reporting unit as one of Vista's many corporate restructurings before and during the Class Period.

**F. <u>Financial Results and Market Conditions Indicate Impairment</u>**

79. In FY 2016, there was a clear indication of the exact impairments described in the 2015 Annual Report. The chart below tracks the decreases in the organic results in the Outdoor Products segment (which contains the Hunting & Shooting Accessories reporting unit during the Class Period) beginning as early as Q2 2016 (quarter ended October 4, 2015). At this time, the Hunting & Shooting Accessories reporting unit still included the Bushnell eyewear brands (*i.e.*, Cebe, Serengeti, and Bolle).

**ORGANIC RESULTS FOR VISTA'S OUTDOOR PRODUCT SEGMENT**
**(Hunting & Shooting Accessory Reporting Unit)**

| Period | Organic Sales | % Change Prior Period | Organic Gross Profit | % Change Prior Period |
|---|---|---|---|---|
| Q2 2016 | $189M | 3% increase | $48M | ***Down 2%*** |
| Q3 2016 | $195M | ***Down 2%*** | $47M | ***Down 14%*** |
| Q4 2016 | $174M | 2% increase | $47M | Flat |
| FY 2016 | $742M | 1% increase | $195M | ***Down 3%*** |

80. The deteriorating conditions in the Outdoor Products segment, especially in the Hunting & Shooting Accessories reporting unit, were evident throughout FY 2016. For example, in Q2 2016 (quarter ended October 4, 2015), Defendants DeYoung and Nolan spoke to analysts on the Company's November 15, 2015 Earnings Call. Although organic sales in the Outdoor Products segment increased slightly (3%) both sequentially and year to year, ***organic gross profit was down 2% due to inventory related charges and lower margin product.*** The slight organic sales increase for the second quarter in other products was ***offset by lower sales in tactical products and archery and hunting accessories***.

81. Defendant Nolan also noted during the earnings call that some of Vista's key retailers had discussed the impact of poor weather conditions on earnings. According to Nolan, "we have to tell you that weather does contribute and did contribute to a slow back half of our second quarter and it could slow down the third quarter, which are in right now depending on how people respond and how the hunting season picks up." Nolan concluded: "***it has not been a favorable fall.***"

82. A year later, during the Class Period, analysts would still ask the Company, when

investors could "start to see the optics business [Bushnell] do better[.]"[31] Defendant DeYoung admitted that in November 2015, "***I said, I was concerned about optics and I was concerned about the innovation there" and "we've told you that we had some threats, competitive threats that were impacting our optic business" and "we're going to have to work on that***."[32] Again, a year later, DeYoung would blame, in part, the weather (a warm hunting season), as well as the Bushnell organization and its previous ownership who "had failed to discriminate, define, and distribute the optics portfolio properly."[33] All of these conditions were known by Defendants ***before the Class Period began*** and still existed at the start of the Class period.

83. During the February 11, 2016 Earnings Call held to discuss the Company's results in the Q3 2016 (quarter ended January 3, 2016), ***both DeYoung and Nolan repeatedly acknowledged the decline in the Outdoor Products segment, noting that organic sales were down 2% and organic gross profit was down a dramatic 14%.*** The decrease in organic sales in the Outdoor Products segment for the quarter was attributed in part to ***lower sales in tactical products, partially offset by increased promotional activity (or discounting). The 14% decline in organic gross profit in Outdoor Products was attributed to unfavorable foreign exchange impacts, decrease in revenue, and unfavorable product mix.*** Nolan also noted the impact of "overall weakness at retail and the warm fall weather, both of which lead to ***a higher level of promotional activity for certain products***, which is continuing into the fourth quarter."

84. On February 18, 2016, *The Financial Times* reported that Wal-Mart, Vista's largest customer, suffered its worst sales performance in 35 years.[34] Wal-Mart accounts for

---

[31] *See* Investor Day Presentation Tr. at 41, Nov. 17, 2016.

[32] *Id*.

[33] *Id*. at 42.

[34] *See* Lindsay Whip, *Wal-Mart Suffers Worst Sales Performance in 35 Years*, FINANCIAL TIMES (Feb.

roughly 11% of Vista's revenues; Vista even has offices in Bentonville, Arkansas (where Wal-Mart's headquarters are located) in order to support its customer relationship with Wal-Mart.[35] ***Wal-Mart reported its first annual sales decline since 1980, underlining the stiff retail challenges it faces***. ***Wal-Mart reduced its sales growth outlook for the fiscal year to flat from 3-4% growth, reflecting in part a loss of revenue from its 269 store closures.***

85. In Q4 2016 (quarter ended March 31, 2016), the Company announced several management changes, bringing several Vista outsiders into executive positions: Defendant Grindle to lead the Outdoor Products segment; Robert Keller to act as President of the Shooting Sports segment; and David Allen to serve as Senior Vice President of Sales. Mr. Keller replaced David White, who retired after 40 years with Vista and its predecessors.

86. On April 28, 2016, another of Vista's top 10 retail customers, ***Cabela's, posted weaker than expected sales in its latest quarter as same-store sales fell 4.3%***. Cabela's was founded in Sidney, Nebraska in 1961. Hunting equipment accounts for approximately 45% of Cabela's sales. According to Cabela's CEO Tommy Miller, "[r]evenue trends we experienced in the fourth quarter of 2015 continued into the first quarter of 2016."[36] Overall, Cabela's posted a profit of $22 million ($0.33 per share), down from $26.8 million ($0.37) a year earlier.

87. In April 2016, the reporting units within the Outdoor Products segment discussed the softening retail market with Defendant Grindle, then President of Outdoor Products. According to CW 2, a senior executive in the Outdoor Products segment, "It was expressed in vivid detail by channel about what the opportunities or lack of opportunities or the risk are, if you will across the globe and how as things continued to soften even more, ***we were going to***

---

18, 2016), https://www.ft.com/content/cbcb3f9e-d640-11e5-8887-98e7feb46f27.

[35] *See* Investor Day Tr. at 8.

[36] *See* Ezequiel Minaya, *Cabela's same-store sales slide*, MARKETWATCH (Apr. 28, 2016, 9:27 AM), http://www.marketwatch.com/story/cabelas-same-store-sales-slide-2016-04-28.

***struggle [to] hit any of the targets or the budget that was put in place for us*.” According to CW 2, when forecasted numbers for the year were created, Vista senior management raised them and ***"threw it all into Q4 (2016) which made the fourth quarter completely unattainable."*** Before CW 2 left in June 2016, CW 2 told Grindle that the plan numbers were ***"not achievable at all"*** as it was more than "doubling our business for that quarter" and we were ***"in trouble"*** in the marketplace in June 2016 "so there was no way we can do that." According to CW 2, Grindle acknowledged that it was a problem.

88. On the May 12, 2016 Earnings Call, Defendants DeYoung and Nolan discussed the Company's results for the 2016 fiscal year and for the fourth quarter ended March 31, 2016. In the Outdoor Products segment, organic sales were up slightly (2%) over the prior year quarter but essentially flat for the fiscal year 2016 (up 1%). ***According to Nolan, sales increased in shooting products offset by a decline in tactical products sales.*** However, organically, ***gross profit was flat over the prior year quarter and down 3% for the year. Any benefit from organic sales increase was offset by "unfavorable product mix and increased sales programs during the quarter."***

89. Shortly after the Company's May 12, 2016 Earnings Call, according to a May 19, 2016 *MarketWatch* report, Dick's Sporting Goods, another of Vista's top 10 retail customers, ***"offered a downbeat assessment for the remainder of the year as it contends with closeout sales from rivals*.**"[37] "With chief rival The Sports Authority, Inc. liquidating its stores through the summer, ***Dick's forecasts that earnings and same-store sales will decline in the coming months. It estimates that 20 million square feet of sporting goods will be liquated in the***

[37] In its November 17, 2016 Investor Day Presentation materials, Vista used Dick's as a case study in customer relationships and leveraging the relationship to increase distribution. *See* Investor Day Presentation Tr. at 30. Dick's selected Vista brands include Bushnell.

***coming months*** between Sports Authority and other channels."[38] Colorado-based Sports Authority filed for Chapter 11 bankruptcy in March 2016 and was liquidating more than 400 stores after plans to reorganize failed. According to Dick's Chief Executive Edward Stack, quoted in the *MarketWatch* report, ***"We just think there's a possibility that the market could be a little tired when we get toward the end of the year.[39] Dick's forecast also expected same-store sales to decline 4% to 1%.[40]***

90. According to the Company's 2016 Annual Report, filed with the SEC on May 27, 2016, under "Accounting for Goodwill," Vista tests goodwill "on the first day of our fourth fiscal quarter or upon of the occurrence of events or changes in circumstances that indicate that the asset might be impaired" and that the goodwill impairment review looks at operating segments or components of an operating segment and "based on this analysis, [Vista] identified four reporting units, as of the fiscal 2016 testing date."[41] The four reporting units are not identified. In calculating the discounted cash flow utilized in the goodwill assessment, the "assumptions about future revenues and expenses, capital expenditures, and changes in working capital" were based on the Company's "plan, as reviewed by the Board of Directors."[42] Incredibly, despite lower gross margins, decreased sales, competitive threats, a lack of innovative new products, and continual organizational changes in the Hunting & Shooting Accessories reporting unit (especially Bushnell) as discussed above in ¶¶ 79-88, according to the 2016 Annual Report, "the results [of the] fiscal year 2016 goodwill impairment test indicated that the estimated fair value

[38] *See* Sara Germano, *Dick's Sporting Goods' profit falls 10%*, MARKETWATCH (May 19, 2016, 3:35 PM), www.marketwatch.com/story/dicks-sporting-goods-profit-falls-10-2016-05-19-154853539.

[39] *Id.*

[40] *Id.*

[41] Vista Outdoor, Annual Report (Form 10-K) (May 27, 2016) at 50.

[42] *Id.*

of the reporting units tested exceeded their carrying value by more than 10%." [43]

91. The decline in the hunting and shooting accessory market continued throughout the summer of 2016. In 2016, Gander Mountain, whose hunting and shooting category made up 53.5% of its $1.32 billion in sales, had 160 store locations. In early 2017, Gander Mountain sought Chapter 11 bankruptcy protection but, according to an affidavit filed by Tim Becker, appointed the chief restructuring officer as of January 9, 2017, ***Gander Mountain had increased promotional activities in the summer of 2016 to clear slow moving inventory***.[44] Mr. Becker described the market challenges faced by Gander Mountain as "shifting sales from traditional brick and mortar retailers to a host of online retailers" as well as "competition from a combination of other sporting goods retailers." Mr. Becker further stated, "In response to these competitive pressures, ***many such retailers have adopted persistent and aggressive promotional selling strategies that deeply discount the prices for a wide range of products, forcing retailers to match such promotional activity in order to retain customer traffic, thus diluting the profitability of the debtor's sales***."[45]

92. By the fall of 2016, with conditions failing to improve, Bass Pro had entered into talks to acquire Cabela's, which had been under pressure from an activist investor to pursue a sale.[46] Acquiescing to that pressure, Cabela's began a strategic review of its businesses in December 2015, noting that "[r]evenue and profit growth had sputtered as a surge in gun sales

---

[43] *Id.* at 52.

[44] *See Gander Mountain Details Liquidity Crisis*, SGB MEDIA, https://sgbonline.com/gander-mountain-details-liquidity-crisis (last visited Sept. 14, 2017).

[45] *Id.*

[46] Ed Hammond, *Bass Pro Said to Win Auction for Outdoor-Gear Rival Cabela's*, Bloomberg (Oct. 2, 2016).

abated."[47] Although "Cabela's had been struggling in recent years with declines in same-store sales," the deal, which was ultimately announced on October 3, 2016, was ***valued at approximately $5.5 billion.***[48] Almost a year later, however, as the deal was nearly set to close, "[d]ismal quarterly results" at Cabela's "raised the risk that [] Bass Pro Shops [would] try to back out of [the] $5 billion takeover offer if it [didn't] get a dramatic discount on the deal."[49] Ultimately, due at least in part to continuing deceleration in sales and broader struggles in the retail industry, Bass Pro and Cabela's agreed to a lower sale price, announcing the completion of ***a $4.2 billion deal*** in September 2017.[50]

## VII. ACCOUNTING STANDARDS: TEST AND WRITE-DOWN IMPAIRED GOODWILL

93. At the heart of Defendants' fraud, but accompanied by other misconduct, is Defendants' failure to timely test and write-down impaired goodwill, which should have been written down no later than the quarter ended July 3, 2016, which was at least ***six months before there was even a partial write down of the impairment***. Specifically, Defendants materially overstated goodwill, which was accumulated from Bushnell and BLACKHAWK!. As described in more detail below, Defendants' scheme concealed the need to write off almost all of Bushnell's and BLACKHAWK!'s recorded goodwill and intangible assets, in the amount of $605 million.

94. A partial impairment was taken during the Class Period in January 2017 by

---

[47] *Id.*

[48] Leslie Picker, *Bass Pro Shops to Acquire Cabela's, a Rival Outdoor Retailer*, The New York Times (Oct. 3, 2016), https://www.nytimes.com/2016/10/04/business/dealbook/bass-pro-shops-cabelas.html.

[49] Josh Kosman, *Disappointing Cabela's results add risk to merger with Bass Pro*, New York Post (Aug. 3, 2017), https://nypost.com/2017/08/03/disappointing-cabelas-results-add-risk-to-merger-with-bass-pro/.

[50] Matthew Rocco, *Bas Pro, Cabela's complete merger*, FoxBusiness (Sept. 25, 2017), http://www.foxbusiness.com/markets/2017/09/25/bass-pro-cabelas-complete-merger.html.

recognizing a $449 million impairment to the Company's Hunting & Shooting Accessories reporting unit, which consisted of a $353.9 million impairment to goodwill and a $95.3 million impairment to identifiable intangible assets. These impairment charges should have been recognized no later than the beginning of the Class Period – August 11, 2016.

95. An additional impairment charge of $152.3 million, completing the ***total write-down of $605 million***, was announced at end of the Class Period on November 9, 2017. Again, this impairment should have been recognized no later than the beginning of the Class Period – August 11, 2016. The final $152.3 million impairment charge consisted of: (i) a $70 million goodwill impairment relating to the remaining goodwill associated with the Bushnell acquisition in the Hunting & Shooting Accessories reporting unit; (ii) a $7.2 million trade name impairment related to the Bushnell and Weaver trade names in the Hunting & Shooting Accessories reporting unit; and (iii) a $73.6 million impairment charge relating to Bushnell eyewear brands (Bolle/Sergenti/Cebe) in the Sports Protection reporting unit.

96. The accounting rules pertaining to goodwill impairment are outlined in Accounting Standards Codification Topic 350, Intangibles - Goodwill and Other ("Topic 350").[51] In general, goodwill shall not be amortized, but rather tested at least annually for impairment ***or as indicated by the occurrence of events or changes in circumstances that indicate assets might be impaired at the reporting unit level***. Under ASC 350, impairment of goodwill is "the condition that exists when the carrying amount of goodwill exceeds its implied fair value." In September 2011, the FASB released an update to goodwill impairment testing

[51] In January 2017, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update 2017-04 ("ASU 2017-04" or the "Update"), that sought to simplify the accounting for goodwill impairments by eliminating Step 2 (discussed above) from the goodwill impairment test. *See* Joseph C. Hassan, CFA, ASA, *Goodwill Impairment Testing: An Overview*, MPI BUSINESS VALUATION & ADVISORY.

standards (via Accounting Standards Update ("ASU") number 2011-08) whereby a qualitative assessment (*i.e.*, the "Step 0 Test") is now allowed as a precursor to the traditional two-step quantitative process. The Step 0 Test effectively modifies Accounting Standards Codification ("ASC") 350-20-35, Goodwill – Subsequent Measurement. In general, the Step 0 Test allows an entity to first assess qualitative factors to determine whether it is more likely than not (*i.e.*, more than 50% chance) that the fair value of a reporting unit is less than its carrying value. In order to make this evaluation, the FASB outlines relevant examples and circumstances to consider, including, but not limited to:

- ***General macroeconomic conditions such as a deterioration in general economic conditions***; limitations on accessing capital; ***fluctuations in foreign exchange rates;*** or other developments in equity and credit markets

- ***Industry and market conditions such as a deterioration in the environment in which an entity operates; an increased competitive environment***; a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers); ***a change in the market for an entity's products or services***; or a regulatory or political development

- ***Changes in cost factors*** such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows

- ***Overall financial performance*** (for both actual and expected performance)

- Entity and reporting unit specific events such as ***changes in management, key personnel***, strategy, or customers; contemplation of bankruptcy; litigation; or a ***change in the composition or carrying amount of net assets;*** and

- If applicable, a sustained decrease in share price (in both absolute terms and relative to peers).

97. As discussed above in Section IV. (changes in management) and Section VI. (changes in macroeconomic condition, financial performance and market conditions) above, all of these circumstances existed at the beginning of the Class Period and warranted a determination that it was more likely than not that the fair value of the Hunting & Shooting Accessories and Sport Protection reporting units was less than its carrying amount, which meant

that Vista should have undertaken a goodwill test no later than at the end of Q1 2017 (quarter ended July 3, 2016).

## VIII. SUBSTANTIVE ALLEGATIONS[52]

### A. False and Misleading Statements: First Quarter Results for the 2017 Fiscal Year

98. The Class Period begins on August 11, 2016, when the Company issued a press release entitled "Vista Outdoor Announces FY17 First Quarter Operating Results." Therein, the Company, in relevant part, stated:

> **Farmington, Utah, August 11, 2016** -Vista Outdoor Inc. (NYSE: VSTO) today reported operating results for the first quarter of its Fiscal Year 2017 (FY17), which ended on July 3, 2016.
>
> "Vista Outdoor continues to execute on its growth strategy," said Vista Outdoor Chairman and Chief Executive Officer Mark DeYoung. "Early in the quarter, Vista Outdoor completed the acquisition of Action Sports, which has enhanced our market offerings in cycling, snow sports and power sports, and the integration is on track. Including recent acquisitions, both sales and gross profit increased 23 percent over the prior-year period. We, like other consumer products companies, experienced a soft retail environment in the first quarter. Additionally, we were impacted by a shift in consumer spending from accessories to firearms platforms outside our portfolio, and the timing of international orders from the first quarter to later in our fiscal year. ***We expect a recovery in the second half of the fiscal year due to sell through of new products, increased international sales the continued improvement in the retail environment, and seasonal upside in the shooting sports market.***"
>
> **For the First Quarter Ended July 3, 2016:**
>
> - Sales were $630 million, up 23 percent from the prior-year quarter, including $134 million from the recent acquisitions, and ***down 4 percent on an organic basis***.
> - **Gross profit was $171 million, up 23 percent from the prior -year quarter**. The increase includes $42 million of gross profit from the recent acquisitions, ***partially offset by a 7 percent decrease in organic gross profit***.
> - ***Fully diluted earnings per share (EPS) were $0.48, compared to $0.53 in the prior-year quarter. Adjusted EPS was $0.48, compared to $0.54 in the prior-year quarter***.

[52] Annexed hereto as Exhibit A is a chart setting forth the false and/or misleading statements alleged below.

- Cash flow use for operating activities was $22 million compared to a use of $42 million in the prior-year period. Year-to-date free cash flow use was $4 1 million, compared to a use of $52 million in the prior-year period.

"***With expected improved performance in the second half of the year, the company reaffirms its financial guidance in fiscal year 2017, as we anticipate an improved retail landscape and a return to spending on hunting and shooting accessories to complement the growing firearms installed base***," said Vista Outdoor Chief Financial Officer Stephen Nolan. "We will also continue to leverage the strength of our portfolio, including new capabilities and talent from recent acquisitions, to improve performance and achieve execution excellence."

**Reaffirmed Outlook for Fiscal Year 2017**

***Vista Outdoor reaffirms FY 17 financial guidance:***

- Sales in a range of $2.72 billion to $2.78 billion.
- Interest expense of approximately $45 million.
- Tax rate of approximately 37 percent.
- ***Adjusted EPS in a range of $2.65 to $2.85.***
- Capital expenditures of approximately $90 million.
- ***Free cash flow in a range of $130 million to $160 million.***

99. On August 12, 2016, the Company filed its Quarterly Report on Form 10-Q with the SEC for the quarterly period ended July 3, 2016 ("Q1 FY 2017 Quarter Report"). The Q1 FY 2017 Quarter Report was signed by Defendant Nolan and reaffirmed the financial results announced in the press release published on August 11, 2016. In the condensed consolidated balance sheets, under assets, for March 31, 2016, goodwill was $1.023 billion and net intangible assets was $650 million and **for July 3, 2016, goodwill was $1.2 billion and net intangible assets were $794 million.**[53] **In the Outdoor Products segment alone, the Q1 FY 2017 Quarter Report listed goodwill** as $818 million as of March 31, 2016 and **$999 million as of July 3, 2016.**[54] **The value of trade names was $186 million as of July 3, 2016** and $185 million as of March 31, 2016.[55] As of July 3, 2016, ***goodwill represented over 35% of Vista's***

[53] Vista Outdoor, Quarterly Report (Form 10-Q) (Aug. 12, 2016) at 3.

[54] *Id*. at 13.

[55] *Id*.

***total assets of $3.4 billion***. In the Notes to the Condensed Consolidated Financial Statements, the Basis of Presentation states that ***"[m]anagement is responsible for the condensed consolidated financial statements included in this document, which are unaudited but, in the opinion of management, include all adjustments necessary for a fair presentation of our financial position as of July 3, 2016…"***[56]

100. The Q1 FY 2017 Quarter Report also reviewed the acquisitions of Action Sports (April 2016), CamelBak Products (August 2015) and Jimmy Stykes (July 2015). With regard to the acquisition of Jimmy Stykes (a business in the Outdoor Products segment), the Q1 FY 2017 Quarter Report noted that additional contingent consideration was payable if incremental profitability milestones were met. However, as of July 3, 2016, ***the future contingent consideration was reduced as a result of not achieving the first growth milestone***. In discussing the Outdoor Products sales, the Company noted that increased sales were driven by the aforementioned acquisitions ($134 million) ***and offset by decreases in shooting accessories, optics and tactical products*** (all products in the Hunting & Shooting Accessories reporting unit). The increase in gross profit for the Outdoor Products segment was primarily driven by the aforementioned acquisitions and ***partially offset by the decrease in sales volumes and lower product mix across the remaining product lines (again, the products in the Hunting & Shooting Accessories reporting unit).***

101. In the Outdoor Products segment, the Q1 FY 2017 Quarter Report reported that Goodwill and Net Intangible Assets in Outdoor Products increased by $183 million, attributable to the Action Sports acquisition, from $818 million (as of March 31, 2016). ***Goodwill as of July 3, 2016 was reported as $999 million (which included a $2.4 million offset for unfavorable***

[56] *See* Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Aug. 12, 2016).

***foreign exchange rates).*** The Notes also discuss ***critical accounting policies***, which include "***accounting for goodwill and indefinite lived intangibles," noting "[t]he accounting policies used in preparing our interim fiscal 2017 consolidated financial statements are the same as those described in our Annual Report on Form 10-K***."[57]

102. On August 11, 2016, Defendants DeYoung and Nolan held an Earnings Conference Call with analysts to discuss Vista's First Quarter results. DeYoung described the first quarter results as ***"a little bit of a perfect storm" in the Outdoor Products segment based on "liquidations from retailers that carried a lot of outdoor products, a soft retail environment, and an overshadowed focus on share of wallet going to guns."*** This "perfect storm" resulted in ***organic sales in Outdoor Products being down 16% from the same quarter in the previous year*** and ***gross margin being down 27% from the same quarter in the prior year***. In this context, "organic" refers to results excluding the recent acquisitions described above and describes Bushnell and BLACKHAWK! in the Hunting & Shooting Accessories reporting unit.

103. As to the impact of bankruptcies, Nolan conceded that "several of the bankruptcies which occurred in the last six months in the outdoor rec space were prominently featured," that some of the Company's organic business ***"participated in" such bankruptcies, and "it's certainly relevant" where there is a significant destocking in retail as the inventory of those retailers was liquidated and "that certain[ly] placed significant downward pressure in several categories throughout the first quarter."*** DeYoung also noted that destocking was not behind the Company and would continue through the second quarter.

104. Despite this "perfect storm" of disastrous results for the Hunting & Shooting Accessories reporting unit, DeYoung and Nolan nonetheless ***reaffirmed their guidance for FY***

---

[57] *See* Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Aug. 12, 2016).

***2017 based on an expected recovery later in the year driven by an improving retail environment.*** According to DeYoung, "I believe the future is bright for Vista Outdoor. We're excited about delivering against our vision for the portfolio and the company." DeYoung stated, "In conclusion, I must tell you ***I'm confident in our company's strategy and the initiatives that we put in place to deliver long-term shareholder value***."

105. Not surprisingly, market reaction to Vista's "perfect storm" was mixed. Analyst Gautam Khanna with Cowen and Company still rated the stock as "Market Perform." In an August 11, 2016 analyst report entitled "Very Slow Start" Mr. Khanna noted: "Q1 sales/EPS were a big miss, ***reflecting retail channel softness***. Investors may/should be skeptical of VSTO's FY17 reiterated guidance, which requires a steep H2 ramp."[58] According to Mr. Khanna, Vista "now guides to a 'recovery' in H2 driven by new products, catch-ups of international sales and improvement in the retail environment."[59]

106. Analyst Dave King, CFA, for Roth Capital Partners, however, reiterated his "BUY" guidance based on Vista's "***strong management team***" and "prospects for increased spending on related ammunition" but noted the Company's acknowledgement of ***negative "shorter-term changes in optical market share.***"[60] Jeffries analyst, Greg Konrad, CFA, also reiterated his "BUY" rating, but noted the 16% sales decline on an organic basis due to lower volumes for shooting accessories, optics and tactical products. The Jeffries "Company Note" pointed out that "guidance implies a steep sequential revenue rise for the rest of the year" and

---

[58] *See* Gautam Khanna, *Very Slow Start*, COWEN AND COMPANY, Aug. 11, 2016.

[59] *Id.*

[60] *See* Dave King, CFA, *VSTO: A Meaningful 1Q17 Miss*, ROTH CAPITAL PARTNERS COMPANY NOTE, Aug. 11, 2017.

expressed the belief that "topline weakness is temporary and growth should improve."[61]

107. Concurrent with the Q1 FY 2017 Quarter Report, the Company also filed a Current Report on SEC Form 8-K (dated August 11, 2016) (the "August 11, 2016 8-K") in order to provide "Supplemental Guarantor Information."[62] ***<u>This supplemental financial information updated the audited and combined financial statements in the 2016 Annual Report to include guarantor information in Note 19, Condensed Consolidated Financial Statements</u>***. This supplemental guarantor information included Bushnell's audited Financial Statements from the acquisition. "Due to the significance of the acquisition the audited consolidated statements of operations, comprehensive loss and cash flows of Bushnell Group Holdings, Inc. for the ten months ended October 31, 2013, and the notes thereto, are filed as Exhibit 99.2 hereto and are incorporated herein by reference."[63]

108. After the Supplemental Guarantor Information was filed with the SEC (supplementing the Company's consolidated financial statements), on the same date (August 11, 2016), in connection with the previously discussed Note Indenture Agreement and pursuant to the Registration Rights Agreement, Vista filed a Registration Statement on Form S-4 ("S-4") with the SEC to exchange the outstanding unregistered notes (the "Notes") for new notes (the "Exchange Notes").[64] The Notes and the Exchange Notes were fully and unconditionally guaranteed by certain 100% owned subsidiaries of Vista Outdoor ("Subsidiary Guarantors"). ***<u>The Subsidiary Guarantors included, among others, all of the Bushnell entities (Bushnell Group Holdings, Inc., Bushnell Holdings, Inc. and Bushnell, Inc.). The S-4</u>***

---

[61] *See* Greg Konrad, CFA, *Vista Outdoor Inc.: Weak Quarter, but Positive Outlook Unchanged*, JEFFRIES COMPANY NOTE, Aug. 11, 2016.

[62] *See* Vista Outdoor Inc., Current Report (Form 8-K) (Aug. 11, 2016).

[63] *Id*. at 2.

[64] *See* Vista Outdoor Inc., Registration Statement (Form S-4) (Aug. 11, 2016).

***incorporated by reference the 2016 Annual Report for its Consolidated Financial Information, which included the updated Current Report referenced above.***

109. The ability of Vista to satisfy the covenants and restrictions in the Note Indenture Agreement and to comply with the related Registration Rights Agreement by filing the aforementioned S-4 ***before November 8, 2016*** were substantially dependent on the value of Vista's total assets – specifically, the $524 million in goodwill from the Bushnell acquisition. Having supplemented and updated its 2016 Annual Report, specifically with respect to the Guarantor Information, and knowing that, since Bushnell's acquisition, ***changes in circumstances in the reporting unit indicated that the asset might be impaired,*** Defendants had a duty to review and update this information. Defendants also had the same duty to review and update the financial information contained in the S-4

### B. Reasons Why Defendants' Statements Regarding the First Quarter of 2017 Were False and Misleading

110. The above underlined statements identified in ¶¶ 98-109 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects because:

(a) Defendants overstated the financial condition of Vista in Q1 FY 2017 (quarter ended July 3, 2016) by failing to disclose and recognize the goodwill impairment;

(b) Vista's goodwill values were overstated, which permitted Defendants to portray Vista's financial condition as stronger than it actually was;

(c) Vista's internal plans were unattainable and Vista was not demonstrating improvement in sales and gross margins within the Hunting & Shooting Accessories reporting unit;

(d) Defendants omitted material information about Vista's true financial

condition in its SEC filings (Q1 FY 2017 Quarter Report and August 11, 2016 8-K);

(e) the Company failed to timely write down impaired goodwill in its Hunting & Shooting Accessories reporting unit during Q1 2017, resulting in materially inflated financial statements in its SEC filings;

(f) the underlying assumptions used by Defendants, including expected sales and gross profit margins, were over-inflated, had no reasonable basis, and were not the best information available;

(g) the estimates used in the annual goodwill impairment as test "assumptions" were not reasonable in light of the underlying softening of the retail environment, bankruptcies, on-going promotional activities, Vista's decreasing revenue and gross margins in early 2016, and the Company's top 10 retailers anticipating declining sales in 2016;

(h) Defendants' statements concerning revenue growth and earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

(i) due to material problems with excess inventory in the Hunting & Shooting Accessories reporting unit, for some of which Vista had no ready market, Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

(j) Defendants falsely certified that Vista had adequate internal controls.

111. Each of the positive statements alleged above about Vista's business made during the Class Period was false and misleading when made and failed to disclose, *inter alia*, the following adverse information, which was then known only to Defendants due to their access to internal operational and financial data:

(a) The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $600 million from the beginning of the Class Period;

(b) Defendants' gross margin assumptions were artificially inflated in the goodwill impairment based on actual results prior to and during Q1 2017 (quarter ended July 3, 2016);

(c) Because purported increased sales and higher gross margins were part of the assumptions necessary to test goodwill impairment, the test was distorted;

(d) Defendants were not improving the actual performance of the Hunting & Shooting Accessories reporting unit;

(e) The forecasts and guidance created and utilized by Vista's management were unreliable and known to be unreliable; and

(f) The Company's underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the annual goodwill impairment test to be materially distorted.

112. Moreover, as set forth above, beginning in FY 2016 and dramatically increasing in Q1 2017 (quarter ended July 3, 2016) (highlighted below), there was a clear indication of exactly the impairments Defendants described in the 2015 Annual Report.

**ORGANIC RESULTS FOR VISTA'S OUTDOOR PRODUCT SEGMENT**
**(Hunting & Shooting Accessory Reporting Unit)**

| Period | Organic Sales | % Change Prior Period | Organic Gross Profit | % Change Prior Period |
|---|---|---|---|---|
| Q2 2016 | $189M | 3% increase | $48M | ***Down 2%*** |
| Q3 2016 | $195M | ***Down 2%*** | $47M | ***Down 14%*** |
| Q4 2016 | $174M | 2% increase | $47M | Flat |
| FY 2016 | $742M | 1% increase | $195M | ***Down 3%*** |
| **Q1 2017** | **$153M** | ***Down 16%*** | **$38.5M** | ***Down 27%*** |

These deteriorating conditions, especially in the Hunting & Shooting Accessories reporting unit (which, during the first quarter of the 2017 fiscal year, still included the Bushnell eyewear brands), were evident to Defendants throughout the 2016 fiscal year – before the Class Period began – and persisted at the beginning of the Class Period.

113. To investors, Defendants made it appear that Vista's strategy was a success. Vista was engaging in one acquisition after another, showing growth, and a seemingly strategic advantage in the outdoor products market. What investors did not know was the high volume of unsold inventory, slowing demand, and increasing promotional activities were eroding Vista's profitability in its Outdoor Product segment, and more specifically in the Hunting & Shooting Accessories reporting unit. Thus, the Company's financial results were artificially inflated.

114. Within the Company, both Bushnell and BLACKHAWK! were below the plan numbers throughout calendar year 2016. CW 6 worked with the BLACKHAWK! line within the Hunting & Shooting Accessories reporting unit from July 2015 until January 2017 and stated that its apparel line was struggling and had not met its numbers since its launch date in July 2016.

115. CW 7 worked for Vista (and formerly Bushnell) from August 2010 until November 2017, and reported directly to Defendant Grindle from February 2016 until Grindle left in January 2017. According to CW 7, the Bushnell business under Vista management struggled and was left without any kind of direction or management team; the team that had managed Bushnell for so many years had been let go. Moreover, all of the management was in Utah and the business was in Kansas.

116. No later than the quarter ended July 3, 2016, the Company and the Individual Defendants knew or should have known that a triggering event had occurred with respect to its Outdoor Products sales and gross margins in its Hunting & Shooting Accessories reporting unit,

which should have led to an impairment test.

117. According to the Q1 FY 2017 Quarter Report, Outdoor Products sales were $287 million for the quarter ended July 3, 2016 and $182 million for the quarter ended July 5, 2015, which resulted in a $104 million (or 57.4%) increase in sales. However, $134 million was attributable to acquisitions of Action Sports, CamelBak and Jimmy Stykes. ***Thus, there was actually a 16% drop in organic sales in the Hunting & Shooting Accessories reporting unit due to liquidations, bankruptcies, and a softening retail environment, which should have been a triggering event for the Company, resulting in an impairment test after five prior quarters of "softness" in its hunting and shooting accessories businesses, increasing brand pressure from Bushnell's competitors, and multiple years of no innovation and mismanagement.***

118. Accordingly, the Company should have performed the impairment test no later than the end of the quarter ended July 3, 2016, and the impairment loss should have been reported no later than when the first quarter results were released to the market in August 2016.

**C. Acknowledged Change in the Market for Vista's Products**

119. On August 17, 2016, Target, a top retail outlet for Vista's Outdoor Products segment, announced that its second quarter earnings fell 9.7% to $680 million, and lowered its sales estimates for the rest of the year, citing "a difficult retail environment."[65] Sales were down 7.2% to $16.2 billion and sales at stores open at least one year, a key metric for retailers, fell 1.1%. Target expected that year-over-year same-store sales would decline in the range of -2% to 0%, which would include fall and holiday shopping seasons – after forecasting growth of 1.5% and 2.5%.

120. On October 26, 2016, Cabela's announced its first earnings report since

[65] *See* Roger Yu, *Target tumbles 6.4% as sales drop, outlook cut*, USA TODAY (Oct. 26, 2016, 7:23 AM), https://www.usatoday.com/story/money/2016/08/17/target-second-quarter-earnings/88611818/.

announcing plans to merge with Bass Pro, and said that heightened markdowns caused earnings in its third quarter ended October 1, 2016 to fall by 26.8 percent. "During the third quarter, we successfully drove sales growth in several of our key merchandise categories through an aggressive promotional and markdown cadence; however, these promotional activities also resulted in a decrease in merchandise gross margins and were the primary contributor to the profitability shortfall."[66] Merchandise gross margins decreased by 420 basis points in the quarter to 31.4% compared to 35.6% in the same quarter a year prior; the decrease was attributed to more aggressive pricing, increased discounts, merchandise mix, and efforts to right size the inventory levels.

**D. False and Misleading Statements: Second Quarter Results**

121. On November 10, 2016, the Company issued a press release entitled "Vista Outdoor Announces FY17 Second Quarter Operating Results." Therein, the Company, in relevant part, stated:

> **Farmington, Utah, November 10, 2016** - Vista Outdoor Inc. (NYSE: VSTO) today reported operating results for the second quarter of its Fiscal Year 2017 (FY 17), which ended on October 2, 2016.
>
> "Vista Outdoor delivered solid second quarter results, including an increase of 24 percent in both sales and gross profit over the prior-year period as a result of acquisitions and strong performance in our Shooting Sports segment," said Vista Outdoor Chairman and Chief Executive Officer Mark DeYoung. "Year over year, our Outdoor Products and Shooting Sports segments delivered organic sales growth for the quarter. During the quarter, we also welcomed Camp Chef to the Vista Outdoor family of brands. Camp Chef is a leading provider of outdoor cooking solutions and provides Vista Outdoor with a foothold in one of the camping market's most attractive categories."
>
> **<u>For the second quarter ended October 2, 2016:</u>**
>
> - Sales were $684 million, up 24 percent from the prior-year quarter, including $106 million from the recent acquisitions, and up 5 percent on an organic basis.

[66] *See Cabela's Q3 Earnings Slump*, SGB MEDIA, https://sgbonline.com/cabelas-q3-earnings-slump/ (last visited Sept. 14, 2017).

- ***Gross profit was $185 million, up 24 percent from the prior-year quarter. The increase includes $32 million of gross profit from the recent acquisitions, and a 3 percent increase in organic gross profit.***
- **Operating expenses were $81 million, compared to $88 million** in the prior-year quarter. The decrease primarily reflects an acquisition claim settlement gain related to the Bushnell acquisition, partially offset by additional expenses generated by the acquisitions, as well as previously announced ongoing investments in selling, marketing and R&D activities.
- ***Fully diluted earnings per share (EPS) were $1.22, compared to $0.52 in the prior-year quarter. Adjusted EPS was $0.74, compared to $0.63 in the prior-year quarter.***
- ***Cash flow provided by operating activities was $10 million compared to $17 million in the prior-year period. Year-to-date free cash flow use was $48 million, compared to free cash flow generation of $5 million in the prior-year period.***

"***We remain confident in our strategy, and we are reaffirming our FY17 guidance***," said Vista Outdoor Chief Financial Officer Stephen Nolan. "Our second quarter results have improved over our reported first-quarter levels. ***We saw increased promotional activity in the Outdoor Products segment and, due to the ongoing challenging retail environment, this will likely continue in the second half of the fiscal year. The promotional activity also resulted in some acceleration of revenue from the third quarter into the second quarter***."

**Reaffirmed Outlook for Fiscal Year 2017**

***Vista Outdoor reaffirms FY financial guidance:***

- Sales in a range of $2.72 billion to $2.78 billion.
- Interest expense of approximately $45 million.
- Tax rate of approximately 37 percent.
- Adjusted EPS in a range of $2.65 to $2.85.
- Capital expenditures of approximately $90 million.
- ***Free cash flow in a range of $130 million to $160 million***.

122. On the same day, November 10, 2016, the Company filed its Quarterly Report on Form l0-Q with the SEC for the quarterly period ended October 2, 2016 ("Q2 FY 2017 Quarter Report"). The Q2 FY 2017 Quarter Report was signed by Defendant Nolan, and reaffirmed the financial results announced in the press release published the same day. **The Q2 FY 2017 Quarter Report reported goodwill as $1.2 billion as of October 2, 2016 and $1 billion as of March 31, 2016 and, in the Outdoor Products segment alone, reported $818 million in**

**goodwill as of March 31, 2016, and $1 billion as of October 2, 2016.**[67] **The value of trade names was $200 million as of October 2, 2016** and $185 million as of March 31, 2016.[68] The Q2 FY 2017 Quarter Report disclosed ***the increased carrying amount of goodwill for the Outdoor Products segment by $192 million to $1 billion,*** which was related to the acquisitions of Action Sports and Camp Chef, and noted nominal accumulated impairment losses of $47 million and $41 million within the Outdoor Products and Shooting Sports segments respectively.

123. The Q2 FY 2017 Quarter Report also stated the "Basis of Presentation" for the interim financial statements: "Our accounting policies are described in the notes to the consolidated and combined financial statements in our Annual Report on Form 10-K for the fiscal year ended March 31, 2016…"[69] The Q2 FY 2017 Quarter Report noted that "***[m]anagement is responsible for the condensed consolidated financial statements included in this document, which are unaudited but, in the opinion of management, include all adjustments necessary for a fair presentation of our financial position as of October 2, 2016 and March 31, 2016, our results of operations for the quarters and six month periods ended October 2, 2016 and October 4, 2015 and our cash flows for the six months ended October 2, 2016 and October 4, 2015***."[70]

124. On the same date, November 10, 2016, Defendants DeYoung and Nolan held a Q2 2017 (quarter ended October 2, 2016) Earnings Call for market analysts. Mr. DeYoung noted that "we expect the soft retail environment to continue now for the balance of the fiscal year and therefore anticipate ***continuing with focused promotional incentives*** . . ." in the second half of

---

[67] *See* Vista Outdoor, Quarterly Report (Form 10-Q) (Nov.10, 2016) at 14.

[68] *Id*.

[69] *See* Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2016).

[70] *Id*.

the fiscal year. He also commented that ***"we have attracted and hired several new and extremely talented leaders to focus on our supply chain, our procurement processes, IT solutions, and more."***

125. Also, on the November 10, 2016 Earnings Call, Defendant Nolan discussed the Company's financial results for the quarter and noted that the 24% increase in gross profit for the second quarter compared to the same quarter in the prior year was due to "our acquisitions as well as increased gross profit in the Shooting Sports segment," but that this ***"increase was partially offset by a decline in the organic Outdoor Products segment."*** Organically, according to Nolan, second quarter sales in the Outdoor Products segment were essentially flat (up 1%) from the prior year quarter. The slight increase in organic sales was driven by increased sales in several products "***partially offset by a decrease in optics and increased promotional activities across the segment.***" ***However, organic gross profit in the segment was down 10% primarily as a result of increased promotional activity***.

126. Defendant Nolan also noted that the ***second quarter included $20 million of sales (approximately 6% of the total sales) pulled forward from the third quarter***. Without this pull-through of sales from the third quarter to the second quarter, sales would have been down approximately 5% from the prior year quarter. According to Nolan, the Company did "still see a ***challenging retail environment in the second half***, including continued elevated promotional activity, which will result in margin performance for both our segments in the back half of fiscal 2017 at a level similar to what we delivered in the second quarter." With organic gross profit down by 10% in the second quarter in the Outdoor Products segment, Vista now anticipated, at a minimum, ***that organic gross profit would be down by 10% for the rest of 2016***.

127. Nonetheless, at the Company level, according to Defendant Nolan, "***[w]e remain***

***confident in our ongoing strategy and we have reaffirmed our fiscal 2017 guidance range*.” In discussing the “promotional environment,” Defendant DeYoung assured analysts that the Company had “a strategy and approach to continue to fight in that [retail] market, to maintain and grow market share, and deliver our back half of the year.”

128. Shortly after the November 10, 2016 Earnings Call, Vista held its first “Investor Day” on November 17, 2016. Defendant DeYoung introduced Mr. Sexton as “awesome” and “does such a fantastic job in our financial organization.”[71] DeYoung explained that Vista had ***also “added talent in terms of just our analysis and capability to do proper budgeting and planning and analytical work”*** to work with Mr. Sexton.[72] DeYoung assured investors that “***the fundamentals of the business are awesome and our growth perspective is going to be great and our share price, I believe, is undervalued.***”[73] As to financial performance, Defendant Nolan noted that “***we always see a strong back-half of the year” and “we're certainly on track to deliver guidance for the year as we said last week.”***[74] ***Nolan also noted “we're still guiding for very strong cash flow generation this year***” which is “a testament to the underlying strength of our business.”[75]

129. Market reaction to the Company's public statements was positive. Although Cowen Analyst Gautam Khanna noted the 9% drop in organic gross profit due to increased promotional activity and lower optic sales as reported by Vista, on November 10, 2016, Cowen reiterated its “Market Perform” rating in reliance on management-affirmed “loaded” guidance

---

[71] November 10, 2016 Investor Day Presentation Tr. at 4.

[72] *Id*.

[73] *Id*. at 31.

[74] *Id*. at 25.

[75] *Id*. at 26.

for the FY 2017.[76]

130. Similarly, on November 18, 2016, Roth Capital Partners, noting no change in guidance by the Company's management, reiterated its "BUY" rating. Jeffries analyst Greg Konrad, CFA issued a November 10, 2016 "Flash Note" which reiterated its "BUY" recommendation, noting that Vista reaffirmed guidance for FY 2017. Nonetheless, the Jeffries Flash Note noted a decline in the Outdoor Products organic gross margins due to promotional activities. "Organically, Outdoor products margins contracted 250 basis points to 24.2%."[77]

131. At the November 17, 2016, Investor Day presentation by senior management, in addressing the Outdoor Products segment, Defendant Grindle noted that "I would emphasize ***growth opportunity in the optics side of the business where we've invested and we're focused on growing that business as well as BLACKHAWK! as a brand, which I highlighted some of the opportunities there, but I think there's really growth across the portfolio and I just highlight those***."[78]

132. In discussing the Outdoor Products segment, DeYoung noted: "***bankruptcies and other macro issues that are happening in the external market which are impacting our ability to do the kind of things we think we could do organically.***"[79] DeYoung was asked: "is there "data out there that kind of supports that there is a bit of a tail to some of your core businesses?" DeYoung responded: "so as consumers were buying handguns and MSRs with their disposable income, it was negatively impacting accessories in Kelly's group" but "you may see that begin to shift where people get a little more comfortable on the firearm side, ***which should free up an***

---

[76] *See* Gautam Khanna, *Catching Up In Q2*, COWEN AND COMPANY, Nov. 10, 2016.

[77] *See* Greg Konrad, CFA, *Vista Outdoor Inc., Quicktake: Solid Execution and Growth in a Promotional Environment*, JEFFRIES COMPANY FLASH NOTE, Nov. 10, 2016.

[78] Investor Day Presentation Tr. at 31.

[79] *Id*. at 32.

***opportunity from share of wallet to come back to the optics and the accessories and some of the other products that we sell" with a potential lag of six to 12 months to shift to accessories***.[80]

133. In the November 17, 2016 Investor Day presentation, the Outdoor Products segment used Dick's Sporting Goods as a case study for the Company's customer relationships and noted that Bushnell is a "selected brand presence" for Dick's. At the question and answer session with Vista senior management, one questioner noted that Dick's was cautious for the next quarter due to warm weather and a delayed hunting season and asked DeYoung "can you just give us the sense of confidence that your quarter is not going to be a complete, not a disaster?"[81] ***DeYoung responded that the Company was "aware of DICK'S concern" and "not worried" and that Vista paid "a little bit in margins" in the Outdoor Products segment "to be able to drive some the volume that we drove, and drive some of the revenue through."*** DeYoung assured investors that the Company "would be able to still ***pull product through those channels*** in the face of the warm hunting season" and that "***we feel that the guidance ranges we've established are achievable.***"[82]

134. Market optimism increased after the Company's Investor Day presentation. On November 17, 2016, Jefferies' analyst, Greg Konrad, CFA, reiterated his "BUY" rating because "***[h]eadwinds that the company has faced over the past several quarters should abate***."[83] Mr. Konrad also noted that, "[W]e believe [Vista] has laid out a compelling strategy to drive topline growth, which includes a stepped-up focus on product development, capitalizing on expanding

---

[80] *Id*. at 35.

[81] Investor Day Presentation Tr. at 39.

[82] *Id*.

[83] *See* Greg Konrad, CFA, *Vista Outdoor Inc., Analyst Day Takeaways: Innovating Back to Mid-Single Digit Organic Growth*, JEFFRIES COMPANY NOTE, Nov. 17, 2016.

relationships with key retailers, and leveraging cross-selling opportunities."[84] A day later, on November 18, 2016, reviewing Investor Day Highlights, Roth Capital Partners reiterated its "BUY" rating "to reflect Vista's leading market share and strong management team."[85] Roth Capital Partners also noted future "***[g]rowth should stem from a revamped Optics strategy and organization.***"[86]

135. On November 30, 2016, ***after the so-called triggering event for the impairment test in the Hunting & Shooting Accessories reporting unit***, Defendant Nolan still spoke at the Bank of America Merrill Lynch America Leveraged Finance Conference. Defendant Nolan surprisingly reiterated the Company's guidance for FY 2017 and noted that "***the current quarter in which we are sitting, is typically a high quarter for the Company, driven partly by the hunting season, which leads to increased sales of accessories . . .***" According to Nolan, "On the outdoor products side, ***we are in a relatively heavy promotional environment, which has impacted gross margin a little bit for that segment of the business***, but the gross margin in shooting sports remains quite strong."[87]

### E. Reasons Why Defendants' Statements Throughout the Second Quarter of FY 2017 Were False and Misleading

136. Beginning in FY 2016 and dramatically increasing in Q1 2017 (quarter ended July 3, 2016), there was a clear indication of the exact impairments described in the 2015 Annual Report. The chart below tracks the decreases in the organic results in the Outdoor Products segment (which contains the Hunting & Shooting Accessories and Sports Protection reporting

---

[84] *Id.*

[85] *See* Dave King, CFA, *VSTO: Investor Day Highlights*, ROTH CAPITAL PARTNERS COMPANY NOTE, Nov. 18, 2016.

[86] *Id.*

[87] *See* Thomson Reuters Street Events Tr. at 5, Nov. 30, 2016.

units during the Class Period) beginning as early as Q2 2016 (quarter ended October 4, 2015) and increasing through Q2 2017.

**ORGANIC RESULTS FOR VISTA'S OUTDOOR PRODUCT SEGMENT (HUNTING & SHOOTING ACCESSORY REPORT UNIT)**

| Period | Organic Sales | % Change Prior Period | Organic Gross Profit | % Change Prior Period |
|---|---|---|---|---|
| Q2 2016 | $189M | 3% increase | $48M | ***Down 2%*** |
| Q3 2016 | $195M | ***Down 2%*** | $47M | ***Down 14%*** |
| Q4 2016 | $174M | 2% increase | $47M | Flat |
| FY 2016 | $742M | 1% increase | $195M | ***Down 3%*** |
| **Q1 2017** | **$153M** | ***Down 16%*** | **$38.5M** | ***Down 27%*** |
| Q2 2017 | $214M | Flat | $51.8M | ***Down 9.6%*** |
| 6 Months Ended 10/2/2016 | $367.7M | ***Down 7%*** | $90.3M | ***Down 18%*** |

137. The above underlined statements identified in ¶¶ 121-35 were materially false and/or misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects because:

(a) Defendants overstated the financial condition of Vista by failing to disclose and recognize the goodwill impairment;

(b) Gross margins were not improving or performing according to the Company's unattainable and baseless assumptions;

(c) Vista's goodwill was overstated, which permitted Defendants to portray Vista's financial condition as stronger than it actually was;

(d) Vista was not "on track" to achieve the quarter or fiscal year guidance provided to investors;

(e) Future near-term growth in optics was not attainable;

(f) Material promotions and pulling inventory through the Company's distribution channels were not improving overall sales, gross margins, or product performance;

(g) the Company failed to timely write down impaired goodwill in its Hunting & Shooting Accessories and Sports Protection reporting units during this quarter, resulting in materially inflated financial statements during the Class Period;

(h) the underlying assumptions used by Defendants, including expected sales and gross profit margins, were over-inflated and had no reasonable basis after six quarters of softness in the Company's hunting and shooting accessories businesses, extremely warm autumn weather for two years, increasing brand pressure from Bushnell's competitors, and multiple years of no innovation and mismanagement;

(i) the estimates used in the goodwill impairment as test "assumptions" were not reasonable in light of the following: underlying softening of the retail environment; bankruptcies; acknowledged on-going and increasing promotional activities; need to pull later quarter sales into earlier quarters; the Company's unreasonable over-dependency on later quarter sales; decreasing Company revenue and gross margins in early 2016; and Vista's top 10 retail customers predicting declining sales at the end of 2016;

(j) Defendants' statements concerning revenue growth, gross margins and earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

(k) due to material problems with excess inventory in the Hunting & Shooting Accessories reporting unit, for some of which Vista had no ready market, Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

(l) Defendants falsely certified that Vista had adequate internal controls.

138. Each of the positive statements alleged above about Vista's business made during

the Class Period was false and misleading when made and failed to disclose, *inter alia*, the following adverse information, which was known only to Defendants due to their access to internal operational and financial data:

(a) The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $600 million from the beginning of the Class Period;

(b) The assumed increased sales and gross margin assumptions used to test goodwill impairment were distorted;

(c) Defendants knew that both Hunting & Shooting Accessories and Bushnell brands in the Sports Protection reporting unit were experiencing higher channel inventories;

(d) Defendants knew that the softening retail environment in the outdoor recreation industry, evidenced by bankruptcies, consolidation, and announced lower earnings and sales by key customers, was not improving but, to the contrary, demand remained sluggish;

(e) Defendants knew, as a result of the retail environment, that demand had not been strengthened in the Hunting & Shooting Accessories or Sports Protection reporting units but created the appearance of sales by pulling in orders from future quarters and deeply discounting inventory to move it;

(f) The forecasts and guidance created and utilized by Vista's management were unreliable and known to be unreliable;

(g) The Company's underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the annual goodwill impairment test to be materially distorted; and

(h) Macroeconomic and industry issues such as bankruptcies, softening retail

market, reduced consumer spending on hunting and shooting accessories, and industry consolidation impacted both Bushnell and BLACKHAWK! products in the Hunting & Shooting Accessories reporting unit.

139. To investors, Defendants made it appear that Vista's strategy was a "success" and "awesome." Vista was engaging in one acquisition after another, showing growth, and a seemingly strategic advantage in the outdoor products market. What investors did not know was that the high volume of unsold hunting accessories inventory, lack of demand, lack of innovative or new products, continual management changes and mismanagement, consolidation, liquidation, and bankruptcies in the retail market were eroding Vista's profitability in its Outdoor Product segment, specifically in the Hunting & Shooting Accessories and Sports Protection reporting units. Thus, the Company's financial results were artificially inflated.

### F. The Partial Truth Emerges: False and Misleading Statements

140. On January 11, 2017, the Company issued a press release entitled "Vista Outdoor Announces Expected Non-Cash Intangible Asset Impairment Charge." Therein, the Company disclosed:

> In accordance with Accounting Standards Codification (ASC) 350 "Intangibles Goodwill and Other," the Company is required to test its goodwill and other indefinite-lived intangible assets for impairment annually or when a triggering event has occurred that would indicate that it is more likely than not that the fair value of the reporting unit is less than the book value, including goodwill and intangibles. ***In Vista Outdoor's assessment, a triggering event for the Company's Outdoor Products segment occurred during the third quarter of FY17 due to an acceleration of the trends seen during the first and second quarters, which included a softening retail environment and increased promotional activity***. ***These factors required the Company to begin the impairment assessment for that segment's reporting units at that time, rather than waiting for the normal process that would ordinarily be completed in conjunction with the preparation of the Company's FY17 annual financial statements***. Vista Outdoor's Shooting Sports segment will be tested during the normal process and management is confident there will not be an impairment in the segment's Ammunition and Firearms reporting units.

> ***<u>Based on the initial assessment conducted using a measurement date of November 28, 2016, there was no indication of any impairment of Vista Outdoor's intangible assets associated with</u>*** either the Company's Outdoor Recreation (camping, hydration, and watersports**<u>) or Sports Protection (cycling and winter sports accessories) reporting units;</u>** ***however, the assessment did indicate that the above mentioned impairment may have occurred in the Company's Hunting and Shooting Accessories reporting unit***. While the analysis to finalize the actual amount of the impairment charge has not yet been completed, ***Vista Outdoor believes that there is sufficient evidence for the Company to conclude that this impairment occurred***.
>
> During the Company's FY17 second quarter earnings call and its subsequent 2016 Investor Day, Vista Outdoor disclosed it has experienced both revenue and gross margin declines that were driven by a variety of factors. ***These factors include a challenging retail environment that resulted in a deeper discounting of its accessories products, as well as a shift in the consumers' share of wallet from hunting and shooting accessories products to certain firearms platforms outside the Company's firearms offerings. These sales and gross margin trends accelerate during the Company's recently completed third quarter to the point where this impairment charge is necessary to comply with accounting standards.*** Although Vista Outdoor is in the process of finalizing the actual amount of the impairment, ***<u>the Company's preliminary analysis indicates the impairment charge will be in the range of $400 million to $450 million.</u>*** The Company expects that the analysis supporting the impairment will be completed in time to allow for its recording in the third quarter of FYI7.
>
> "We believe this non-cash impairment charge is a result of challenging market conditions, which worsened as the third quarter progressed, and required discounting of product for Vista Outdoor to remain competitive," said Vista Outdoor Chief Financial Officer Stephen Nolan. ***<u>"We still expect long-term growth in all of our reporting units, including Hunting and Shooting Accessories. We remain committed to, and confident in, our growth strategy and we are optimistic about our businesses and our future opportunities."</u>***

141. On this news, shares of Vista fell $8.21 per share, or 21.7%, to close at $29.58 per share on January 12, 2017, on unusually high trading volume (11.4 million shares traded). The Company lost approximately $464 million in market capitalization in one day of trading.

142. Concurrent with the announcement, on January 12, 2016, Roth Capital Partners downgraded its rating to "Neutral" from "BUY."

143. Shortly thereafter, on January 18, 2017, David King of Roth Capital Partners published a follow-up Company Note, and continued his "neutral" rating for Vista. In the

Company Note, David King discussed the announced impairment related to hunting and shooting accessories, but noted that "***management found no indications of impairments in its other Outdoor categories***." According to the Company Note, Vista management was "Working To Address Outdoor Weakness" and "addressing the underperformance through a change in segment leadership, better-incentivizing sales, and transitioning Bushnell product design in-house." Though guarded in his analysis, David King only lowered his price target from $35 to $26.

144. On February 5, 2017, Scott Hamann of KeyBanc Capital Markets also published a "Company Update," continued his "overweigh" rating (stock to outperform the analyst's coverage sector over coming 6-12 months), and only lowered his price target from $39.00 to $31.00. The Company Update recognized Vista's "several challenges during the past several quarters" but ***viewed the longer term outlook as "positive" because once "transitory challenges in outdoor products lapse," Vista should benefit "from a strong stable of brands across a broad spectrum of consumer industries that have solid underlying growth characteristics and should be poised for market share gains."***

**G. <u>Reasons Why the Statements Regarding the January 2017 Impairment Were False and Misleading</u>**

145. Although the aforementioned January 11, 2017 Company press release stated that "a triggering event for the Company's Outdoor Products segment occurred during the third quarter of FY17," Defendant Nolan indicated otherwise at the March 14, 2017 Roth Capital Partner Conference. First, Defendant Nolan noted a "retail malaise in the Outdoor Products channel that has been exacerbated by some events ***in the last 12 months, such as the Sports Authority liquidation sale***," where consumers would buy products at a 50% discount from

another retailer.[88] However, the Sports Authority liquidation started in March 2016, and continued through the summer of 2016, so this event was not a triggering event in November 2016 but a pre-existing and ongoing problem that went undisclosed.

146. Defendant Nolan then conceded that the sudden triggering event in November 2016 occurred in the Shooting Sports segment, and not Outdoor Products as had been stated in the January 11, 2017 press release (*e.g.*, ¶ 140):

> So, we had ***a challenging year on a lot of our Outdoor Products segment over the last year,*** but Shooting Sports was doing very well, and even after the election, Shooting Sports continued to do well right up and ***around Thanksgiving when we hit a bump in the road, and we and all of our competitors in Shooting Sports saw a significant decline in the market at that point in time***.

147. The Company's January 11, 2017 statement of a November 28, 2016 triggering event resulting in the impairment test in Hunting & Shooting Accessories was false and misleading as the "sudden decline" actually occurred in the Shooting Sports segment, not the Outdoor Products segment. Instead, the Bushnell products were already in decline since July 2016, not only having recently suffered a problem. Indeed, both segments were suffering for substantial, undisclosed periods of time. *See* ¶¶ 56-57, 77.

148. As to the Bushnell brands such as Serengeti and Bolle in the Sports Protection reporting unit, a clear indication of impairment existed as early as July 2016 based on high inventory levels of dated older product, lack of demand, lack of new products, and a continual failure to meet plan numbers.

149. For example, CW 4 confirms that the inventory levels with regard to Bushnell eyewear brands (*i.e.*, Serengeti and Bolle) were very high, with millions of dollars of inventory which was "no good." CW 4 further confirmed that senior management knew about the

---

[88] *See* Roth Capital Partners Conference (Bloomberg) Tr. at 4, Mar. 14, 2017.

inventory issues well in advance of the first impairment disclosure.

150. CW 5 was also familiar with inventory levels and confirmed a very high level of older product inventory with regard to all Bushnell eyewear brands throughout FY 2016 and 2017. According to CW 5, Vista was "sitting on inventory" and trying to get rid of it at "liquidation prices" just to get it off the books but unable to do so.

151. CW 5 confirmed that Vanderbrink, Senior Vice President of Sales, was aware of the high inventory problems and attempts to get rid of the product since Q4 2016. According to CW4, Vista senior management received run reports from Vista analysts containing inventory levels and sales data, knew that Bushnell eyewear brands had not been doing well "for a really long time," and had missed their plan numbers since at least Q4 2016 (quarter ended March 31, 2016), including the first, second, and third quarters of FY 2017. CW 5 confirmed that Bushnell's eyewear brands missed their plan numbers since Q4 FY 2016, noting it "was always a struggle." According to CW 4, Vista had unsuccessfully changed the Bushnell logo twice in FY 2017 in order to attract new customers and still planned to change the logo yet a third time. According to CW 5, in August 2016, Vista had even unsuccessfully tried to sell the Serengeti brand.

152. These events (described above) should have resulted in an assessment that Bushnell eyewear brand assets in the Sports Protection reporting unit were also significantly and materially impaired. Thus, Defendants' statement on January 11, 2017 that no assessment was necessary was false and misleading when made.

153. The preliminary analysis of the impairment charge in the range of $400 to $450 million was materially false and/or misleading when made because the Bushnell and BLACKHAWK! products and trade names had substantially no remaining goodwill value and

Defendants failed to disclose the following adverse information, which was known only to Defendants due to their access to internal operational and financial data:

(a) The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $600 million from the beginning of the Class Period;

(b) The preliminary sales and gross margin assumptions used to test goodwill impairment were distorted;

(c) Defendants knew that both Hunting & Shooting Accessories and Bushnell brands in the Sports Protection reporting unit were experiencing higher channel inventories with substantial discounting and less demand, resulting in a substantially reduced cash flow;

(d) Defendants knew that the retail environment in the outdoor recreation industry, evidenced by bankruptcies, consolidation, and announced lower earnings and sales by key customers, was not improving; to the contrary, demand due to the lack of innovative new products was declining;

(e) Forecasts and guidance created and utilized by Vista's continually changing management team were unreliable and known to be unreliable;

(f) Even the Company's revised underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the interim goodwill impairment test to be materially distorted; and

(g) Macroeconomic and industry issues such as bankruptcies, softening retail market, reduced consumer spending on hunting and shooting accessories, lack of new products or innovation, and industry consolidation impacted both Bushnell and

BLACKHAWK! products in the Hunting & Shooting Accessories and Sports Protection reporting units to the extent that their operating results resulted in a near complete write-down of their goodwill value.

**H. Change in Outdoor Products Management**

154. Then, on January 13, 2017, Vista disclosed that Kelly Grindle was being replaced by Dave Allen as President of the Company's Outdoor Products segment:

> **Farmington, Utah, January 13, 2017** - Vista Outdoor Inc. (NYSE: VSTO), a leading global designer, manufacturer and marketer of consumer products in the outdoor sports and recreation markets, has named ***Dave Allen as President of its Outdoor Products segment, which includes Hunting and Shooting Accessories, Outdoor Recreation, and Sports Protection. As segment president, Allen will have responsibility for segment-level financial performance, strategic planning, innovation and new products, brand management and marketing, product line management, sourcing and supply chain management, capital expenditures and R&D investment and returns, and talent management.***
>
> ***Allen joined Vista Outdoor as Senior Vice President (SVP), Sales in 2016***.
>
> * * *
>
> Allen replaces Kelly Grindle, who has left Vista Outdoor to pursue other opportunities.

155. On this news, shares of Vista fell $0.88, to close at $28.70 per share on January 13, 2017, on high trading volume.

**I. False Statements: Third Quarter FY 17 Announcement**

156. On February 9, 2017, the Company issued a press release announcing FY 17 Third Quarter results, quantifying the partial impairment charge in the Hunting & Shooting Accessories reporting unit only and updating FY 17 Financial Guidelines. The Vista press release advised the market:

> "**Vista Outdoor is committed to delivering long-term growth through the execution of our strategy and a focus on new product development**, operational efficiencies and execution excellence," said Vista Outdoor Chairman

and Chief Executive Office Mark DeYoung. "The challenging retail environment we experienced in our first and second quarters worsened in our third quarter following a slow hunting season and national elections. ***This resulted in the need for increased promotional activity to support sales and maintain market shares. We have also seen increased inventory in our retail and whole channels. As a result of these market factors, we announce a non-cash intangible impairment charge. Although we are disappointed in the impairment unit within the Hunting and Shooting Accessories reporting unit, we continue to drive improvements in our execution and innovation in our product lines. The company launched more than 150 new products during the winter show season. We have created market leading positions in numerous outdoor product categories, and we are committed to delivering long-term value from our portfolio of top brands***."

For the third quarter ended January 1, 2017:

- Sales were $654 million, up 10 percent from the prior-year quarter, including $92 million from the recent acquisitions. ***Sales were down 5 percent on an organic basis.***

- Gross profit was $169 million, relatively flat to the prior-year quarter. This includes $24 million of gross profit from the recent acquisitions, offset by ***a 14 percent decrease in organic gross profit***.

- Operating expenses were $553 million, compared to $92 million in the prior-year quarter. ***The increase primarily reflects a pre-tax, non-cash goodwill and intangible impairment charge of $449 million.***

* * *

- ***Fully diluted earnings per share (EPS) was $(6.44), compared to $0.70 in the prior-year quarter. Adjusted EPS was $0.62, compared to $0.70 in the prior-year quarter.***

- Cash flow provided by operating activities was $58 million compared to $71 million in the prior-year period. ***Year-to-date free cash flow use was $18 million, compared to free cash flow generation of $51 million in the prior-year period.***

- ***The company repurchased approximately 1,560,000 shares for $60 million***. On January 23, 2017, Vista Outdoor completed its $100 million share repurchase program. The total number of shares repurchased under this plan was approximately 2,737,000.

"The acceleration of current market challenges has led the company to update FY17 financial guidance," said Vista Outdoor Chief Financial Officer Stephen Nolan. "For the full year, we expect gross margins to be roughly in line with the third quarter results. ***While we will release formal guidance for FY18 during our May earnings call, we do expect the revenue and margin pressures we are experiencing in the back half of FY17 to continue into next year***. Despite the pressures this year and next, the company is committed to a value-creating capital

> deployment strategy, long-term sales growth and margin improvement, and delivering long-term value to our shareholders."
>
> **Updated Outlook for Fiscal Year 2017**
>
> Vista Outdoor update FY 17 financial guidance:
>
> - Sales in the range of $2.50 billion to $2.54 billion.
>
>   *     *     *
>
> - EPS in a range of $(4.57) to $(4.42), with ***adjusted EPS in a range of $1.95 to $2.10.***
>
>   *     *     *
>
> - Free cash flow in a range of $25 million to $40 million.

157. On the Q3 2017 Earnings Call with market analysts, held on February 9, 2017, DeYoung noted that the Company "***faced a very challenging retail environment" with a "weak hunting season due to weather conditions," "[r]educed indoor in-store retail traffic, expanding channel inventories"*** as well as consumers buying guns that Vista does not offer.[89] According to the DeYoung, "***sluggish market conditions" resulted in "increased competitive pressures that drove deep discounting" which forced Vista to engage in promotional activity that pressured margins and near-term cash flow***.[90] **<u>DeYoung attributed the $450 million impairment charge in the Hunting & Shooting Accessories reporting unit to these market dynamics</u>**. According to DeYoung, "organic growth, cash generation and margin improvement" are Vista's "best near-term opportunities for value creation." Noting the "unprecedented acceleration of market pressures during the third quarter," DeYoung advised analysts that financial guidance for FY 2017 would be revised.[91]

158. DeYoung also announced ***another "leadership change***" appointing a new President of the Outdoor Product segment (who had been with Vista less a year) in order "to

---

[89] Bloomberg Tr. (2/9/2017) at 2.

[90] Bloomberg Tr. (2/9/2017) at 2.

[91] *Id*. at 3.

drive growth in our sales and margins, address increasing market pressures and further accelerate our innovation engine" and Jason Vanderbrink was appointed to lead the worldwide sales organization.[92] DeYoung also announced a complete restructuring of Bushnell's optic business ("rebuilt the team," "new lines," and "new capabilities"), now headed by a newly appointed segment President.[93]

159. As part of the Q3 2017 Earnings Call, **Nolan broke down the $449 million impairment charge as $354 million as an impairment to goodwill and $95 million to identifiable intangible assets and "primarily related to the assets acquired as a part of the Bushnell and BLACKHAWK! transactions."[94]** **When asked by David King from Roth Capital Partners, if any other impairments were found, Nolan responded that "no, the impairment we recognize is purely within our hunting and shooting reporting unit" but "no impairment [was] recognized in a quarter [to] either of the other two reporting units" which included Sports Protection**.[95] A follow up question was asked by Scott Stember from C.L. King relating to the impairment charge, "given the sales trends that you see right now, [would you feel] relatively confident that we will not see any other impairment charges…?"[96] **Nolan responded that "during the quarter, . . . we declared a [triggering] event for the whole of the Outdoor Products segment which cause[d] us to evaluate all three reporting units" and undertook a Step 1 analysis under ASC 350 with only "an**

---

[92] Bloomberg Tr. (2/9/2017) at 3.

[93] *Id*. at 8.

[94] Bloomberg Tr. (2/29/2017) at 3.

[95] *Id*. at 7.

[96] *Id*.

**indication or impairment in one of the three."[97] Nolan concluded that "we are not sitting right on the edge of impairment."**

160. Concurrent with the Q3 FY 2017 Earnings Conference Call, on February 9, 2017, the Company filed its Quarterly Report (10-Q) for quarter ended January 1, 2017 ("Q3 FY 2017 Quarter Report"). **According to the Q3 FY 2017 Quarter Report, goodwill as of January 1, 2017 was $855 million and as of March 31, 2016 was $1 billion.[98]** Goodwill in the Outdoor Products segment was $818 million as of March 31, 2016 and **$650 million as of January 1, 2017. The goodwill recorded in the Outdoor Products segment noted an impairment of $353 million.**[99] The impairment was attributed to deeper discounting which caused a reduction in cash flow in the Hunting and Shooting Accessories reporting unit combined with "a challenging retail environment."[100]

161. The Company also evaluated the fair value of the trade names associated with the Bushnell and BLACKHAWK! acquisitions. According to Q3 FY 2017 Quarter Report, this analysis resulted in a $34 million impairment related to the Bushnell trade name and a $61 million impairment charge relating to the Bushnell acquisition and BLACKHAWK! trade name.[101] **The total trade name intangible assets was reported as $106 million as of January 1, 2017** and as $185 million as of March 31, 2016.[102]

162. The Q3 FY 2017 Quarter Report also stated the "Basis of Presentation" for the interim financial statements. "Our accounting policies are described in notes to the consolidated

---

[97] *Id*. at 8.

[98] *See* Vista Outdoor, Quarterly Report (10-Q) (Feb. 9, 2017) at 3, 21, 23, 25.

[99] *Id*. at 14.

[100] *Id*.

[101] Vista Outdoor, Quarterly Report (10-Q) (Feb. 9, 2017) at 14.

[102] *Id*.

and combined financial statements in our Annual Report on Form 10-K for the fiscal year ended March 31, 2016."[103] The Q3 FY 2017 Quarter Report noted that "***[m]anagement is responsible for the condensed consolidated financial statements included in this document, which are unaudited but, in the opinion of management, include all adjustments necessary for a fair presentation of our financial position as of January 1, 2017 and March 31, 2016, our results of operations for the quarters and nine month periods ended January 1, 2017 and January 3, 2016 and our cash flows for the nine months ended January 1, 2017 and January 3, 2016***."[104]

163. According to the Q3 FY 2017 Quarter Report, during the nine months ended January 1, 2017, Vista repurchased approximately 3 million shares of Vista common stock for $126 million and completed its $100 million share repurchase program on January 23, 2017.[105]

164. Under "Acquisitions," the Q3 FY 2017 Quarter Report noted that the Company recorded $180 million in goodwill for the Action Sports purchase price allocation.[106]

165. According to the Q3 FY 2017 Quarter Report, as of January 1, 2017, "**there were no changes in our internal control over financial reporting…that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**."[107] The Q3 FY 2017 Quarter Report was signed by Nolan as CFO pursuant to the requirements of the 1934 Act.[108]

166. After the Company announced its Third Quarter FY 2017 results on February 9, 2017, market analysts immediately reacted. For example, on the same day, Jefferies analyst Greg

---

[103] Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Feb. 9, 2017).

[104] *Id.*

[105] Vista Outdoor, Quarterly Report (10-Q) (Feb. 9, 2017) at 31, 41.

[106] *Id*. at 10.

[107] *Id*. at 43.

[108] *Id*. at 48.

Konrad in a "Company Note" immediately reiterated his "BUY" rating (expect to provide a total return of 15% or more within 12 month period), setting a new price target of $30.00 for Vista stock. The Jeffries' Company Note stated that Vista's third quarter performance "largely met our expectations, but volume declines appear to have accelerated in Q4 due to lower consumer demand coupled with some destocking at retailers and wholesalers." Konrad noted that Vista's near-term revenue decline in shooting accessories was "largely cyclical" following the ammunition and firearms market trend "with new products driving a recovery." Also, on February 9, 2017, Cowen and Company issued a "quick take: earnings update," maintained its "market perform" rating and set a target price of $30.00 per share.

### J. Defendants' Statements Regarding the Third Quarter of 2017 and the Partial Impairment Were False and Misleading

167. Beginning in FY 2016 and dramatically increasing in Q1 2017 (quarter ended July 3, 2016), there was a clear indication of the exact impairments described in the 2015 Annual Report. The chart below tracks the decreases in the organic results in the Outdoor Products segment (which contains the Hunting & Shooting Accessories reporting unit during the Class Period) beginning as early as Q2 2016 (quarter ended October 4, 2015).

**ORGANIC RESULTS FOR VISTA'S OUTDOOR PRODUCT SEGMENT**

**(Hunting & Shooting Accessories Reporting Unit)**

| Period | Organic Sales | % Change Prior Period | Organic Gross Profit | % Change Prior Period |
|---|---|---|---|---|
| Q2 2016 | $189M | 3% increase | $48M | ***Down 2%*** |
| Q3 2016 | $195M | ***Down 2%*** | $47M | ***Down 14%*** |
| Q4 2016 | $174M | 2% increase | $47M | Flat |
| FY 2016 | $742M | 1% increase | $195M | ***Down 3%*** |
| **Q1 2017** | **$153M** | ***Down 16%*** | **$38.5M** | ***Down 27%*** |
| Q2 2017 | $214M | Flat | $51.8M | ***Down 9.6%*** |
| 6 Months Ended 10/2/2016 | $367.7M | ***Down 7%*** | $90.3M | ***Down 18%*** |

| | | | | |
|---|---|---|---|---|
| Q3 2017 | $200.6M | ***Down 15%*** | $46M | ***Down 26.1%*** |
| 9 Months Ended 1/1/2017 | $568M | ***Down 10%*** | $137M | ***Down 21%*** |

168. In January 2017, according to CW 4, Vista's new Senior Vice President of Sales, Vanderbrink, who reported to DeYoung, told its marketing managers to "sell anything" with regard to Bushnell and BLACKHAWK! products and Bushnell eyewear and that "price did not matter." The marketing managers were trying to sell everything that they could and "it really didn't matter the price." CW 8, who worked as a Sales Coordinator from January 2013 until January 2017, mostly selling BLACKHAWK! products, stated that we "pretty much knew that we would not make our numbers."

169. At the same time, according to CW 5, Vanderbrink would continue to pressure the Bushnell eyewear sales team to get rid of the high inventory of product that the Company was sitting on. According to CW 5, there was simply no demand for the product and they couldn't sell it.

170. The above underlined statements identified in ¶¶ 156-66 were materially false and/or misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects because:

a. Defendants continued to overstate the financial condition of Vista by failing to disclose and recognize the entire goodwill impairment of $600 million;

b. Gross margins were not performing even according to the Company's reduced assumptions, which remained baseless and unattainable;

c. Vista's goodwill was overstated by $155 million, which permitted Defendants to portray Vista's financial condition as stronger than it actually was;

d. Vista was not "on track" to achieve the quarter or fiscal year guidance

provided to investors;

e. Future benefits for innovative new products were not attainable;

f. Material promotions and pulling inventory through the Company's distribution channels were not improving overall sales, gross margins, or product performance;

g. the Company failed to timely and fully write down impaired goodwill in its Hunting & Shooting Accessories and Sports Protection reporting units during this quarter, resulting in materially inflated financial statements during the Class Period;

h. the underlying assumptions used by Defendants, including expected sales and gross profit margins, were over-inflated and had no reasonable basis after six quarters of softness in the Company's Bushnell and BLACKHAWK! products and brands, extremely warm autumn weather for two years, increasing brand pressure from Bushnell's and BLACKHAWK!'s competitors, and multiple years of no innovation and mismanagement;

i. the revised estimates used in the goodwill impairment as test "assumptions" were not reasonable in light of the following: underlying softening of the retail environment; bankruptcies; acknowledged on-going and increasing promotional activities; need to pull later quarter sales into earlier quarters; the Company's unreasonable over-dependency on later quarter sales; decreasing company revenue and gross margins in early 2017; and Vista's top 10 retail customers predicting declining sales in 2017;

j. Defendants' statements concerning revenue, gross margins and earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

k. due to material problems with excess inventory in the Hunting & Shooting Accessories and Sports Protection reporting units, for some of which Vista had no ready market,

Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

l. Defendants falsely certified that Vista had adequate internal controls.

171. The analysis of the impairment charge of $450 million was materially false and/or misleading when made because the Bushnell and BLACKHAWK! products and trade names had substantially no remaining goodwill value and Defendants failed to disclose the following adverse information, which was known only to Defendants due to their access to internal operational and financial data:

(a) The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $600 million from the beginning of the Class Period;

(b) The preliminary sales and gross margin assumptions used to test goodwill impairment were distorted;

(c) Defendants knew that both Hunting & Shooting Accessories and Bushnell brands in the Sports Protection reporting unit were experiencing higher channel inventories with substantial discounting and less demand, resulting in a substantially reduced cash flow;

(d) Defendants knew that the retail environment in the outdoor recreation industry, evidenced by bankruptcies, consolidation, and announced lower earnings and sales by key customers, was not improving; to the contrary, demand due to the lack of innovative new products was declining;

(e) Forecasts and guidance created and utilized by Vista's continually changing management team were unreliable and known to be unreliable;

(f) Even the Company's revised underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the interim goodwill impairment test to be materially distorted; and

(g) Macroeconomic and industry issues such as bankruptcies, softening retail market, reduced consumer spending on hunting and shooting accessories, lack of new products or innovation, and industry consolidation impacted both Bushnell and BLACKHAWK! products in the Hunting & Shooting Accessories and Sports Protection reporting units to the extent that their operating results resulted in a near complete write down of their goodwill value.

## K. The Market Reaction

172. On February 9, 2017, with a high trading volume (10 million shares), Vista stock dropped another $4.79 per share, or 19%, when the Company disclosed that the impairment charge was at the high end of the range at $449 million. As a result of active trading on the day, Vista lost approximately $271 million in market capitalization.

173. According CW 6, in order to reduce costs, Vista starting laying off personnel starting in January 2017. In March 2017, there was a layoff of approximately 200 customer service and warehouse pickers in Anoka, Minnesota and Overland Park, Kansas. In June/July 2017, there was another layoff, affecting another 200 people focused on customer service and warehousing. Again in September 2017, there was another layoff of customer service, product, sales and warehouse personnel.

## L. False and Misleading Statements: Fourth Quarter and Fiscal Year End Announcement

174. On May 11, 2017, Vista issued a press release announcing FY Fourth Quarter and Full Year Operating Results and established guidance for FY 18:

"***We remain confident in our ability to compete and win with a brand portfolio of exciting brands and products, and in our ability to deliver growth and value over the long term***," said DeYoung.

**For the fourth quarter ended March 31, 2017:**

- Sales were $579 million, down 5 percent from the prior-year quarter and ***down 21 percent organically***.
- **Gross profit was $144 million, down 12 percent from the prior-year quarter and *down 27 percent organically***.
- Operating expenses were $130 million. Adjusted operating expenses were $129 million, compared to $93 million in the prior-year quarter. The increase include operating expenses from acquired businesses and ***a $17 million write off of a receivable due to a customer's bankruptcy.***
- Fully diluted earnings per share (EPS) was $0.02. Adjusted EPS was $0.03, compared to $0.63 in the prior-year quarter. The decrease was caused by the items noted above, partially offset by lower share count due to share repurchases. Both fully diluted and adjusted EPS results include ($0.18) for the write off of the receivable mentioned above.

**For the fiscal year ended March 31, 2017:**

- Sales were $2.55 billion, up to 12 percent from the prior year and ***down 7 percent organically.***
- Gross profit was $669 million, up 8 percent from the prior year and ***down 12 percent organically.***
- 

* * *

.

- EPS was $(4.66). Adjusted EPS was $1.90, compared to $2.50 in the prior year. Both GAAP and adjusted EPS results include ($0.18) for the write off mentioned above.
- Free cash flow was $38 million, compared to $163 million in the prior-year period.
- Total year shares repurchased were approximately 3,876,000 shares for $151 million.
- 

**Outlook for Fiscal Year 2018:**

Vista Outdoor is establishing initial FY18 financial guidance. The company expects:

- Sales in a range of $2.36 billion to $2.42 billion.
- Interest expense of approximately $50 million.
- Tax rate of approximately 37 percent.
- EPS in a range of $1.10 to $1.30.
- Capital expenditures of approximately $70 million.
- Free cash flow in a range of $175 million to $200 million.

* * *

> "Our FY18 financial guideline reflects ***a continuation of the weakness in the shooting sports market through FY 18,"*** said Vista Outdoor Chief Financial Officer Stephen Nolan. "While we still see indications that inventories in the channel will stabilize by the middle of the fiscal year, ***we expect the period of market correction will extend beyond that point.*** For FY18, we anticipate EBITDA margins of approximately 11 percent. Near term, the first quarter will reflect ***a continuation of the particularly weak market conditions we saw in the fourth quarter of FY17. We expect to generate approximately 22 to 24 percent of our annual revenue guidance in the first quarter. We also expect to generate approximately 10 percent of our annual EPS guidance during the first quarter, as a result of increased promotional activity, which is driven by continued weak market conditions and bankruptcy liquidations***.
>
> "Additionally, in partnership with our lenders, ***we amended the financial covenants in our credit agreement to give us improved financial flexibility over the current period of market softness."***

175. Concurrent with the May 11, 2017 Press Release, the Company held a Q4 2017 Earnings Call to discuss Vista's results with market analysts. DeYoung advised analysts that "[a]lthough current retail challenges exist, ***we're seeing participating growth***."[109] According to DeYoung, the Company was working to "reduce working capital, primarily through inventory reductions" in efforts to "deliver strong cash flow and achieve long term organic growth" and ***"[w]e anticipate channel inventories will stabilize by mid FY'18..***."[110] According to Nolan, operating expenses included a $17 million receivable write down from Gander Mountain due to its bankruptcy.[111]

176. At the Q4 FY 2017 Earnings Call, Nolan reported that organically, sales in the Outdoor Products segment was ***down 23% year to year***, caused by a decrease in all product lines, and, organically, gross profit ***decreased 52% compared to the prior year quarter***, "caused by

[109] Bloomberg Tr. (5/11/2017) at 2.

[110] *Id.*

[111] *Id.* at 3.

lower organic sales, unfavorable product mix and the inventory rationalization."[112] According to Nolan, for the year, organically, ***gross profit was down 30%*** for the same reasons.[113] For the year ended March 31, 2017, free cash flow (cash provided by operating activities less capital expenditures) was $37 million, compared to $162 million in the prior year.

177. Nolan also admitted that the Company's leverage ratio will "***exceed the 3.5 level reflected in our existing credit agreement covenants" and will likely "exceed 4.0 near the middle of the year" and as a result, the Company was forced to execute the Credit Amendment, relaxing the ratio covenant to 4.75 for calendar years 2017 and 2018, with increased interest rates above 3.5 and 4.25***.[114] The Credit Amendment includes a new secured leveraged ratio covenant established initially at 3.5% with a step down to 3.0% at the end of 2018.[115] The Credit Amendment was necessary during this period of "market weakness." Interest expense almost doubled to $44 million for FY 2017, compared to the prior year of $24 million, due to an increase in the debt balance.

178. At the Q4 FY 2017 Earnings Call, DeYoung also announced ***yet another strategic change*** within the Company with the appointment of a new dedicated Corporate Vice President for e-commerce to drive growth across direct to consumer channels.[116] During Q4 2017, DeYoung advised analysts that the Company also "reduced [its] headcount to align with demand" and was working to reduce "working capital, primarily through inventory reductions" in efforts to "deliver strong cash flow and achieve long-term organic growth" and ***"[w]e***

---

[112] Bloomberg Tr. (5/11/2017) at 4.

[113] *Id.*

[114] Bloomberg Tr. (5/11/2017) at 5.

[115] *Id.* at 5.

[116] Bloomberg Tr. (5/11/2017) at 2.

***anticipate channel inventories will stabilize by mid FY'18***."[117]

179. On May 15, 2017, the Company filed its 2017 Annual Report. The 2017 Annual Report noted the "***challenging retail environment*** as evidenced by recent bankruptcies and consolidation of certain of our customers" and "[b]ased on the current economic conditions and the ***sluggish retail environment*** in our market," ***Vista expected "these conditions to continue into fiscal 2018***."[118]

180. In the Company's 2017 Annual Report, the Company again reported goodwill by segment and noted the following changes in the carry amount of goodwill by segment from March 31, 2015 to March 31, 2017 as follows:

| | Shooting Sports | Outdoor Products | Total |
|---|---|---|---|
| Balance at March 31, 2015 | $ 204,520 | $ 577,643 | $ 782,163 |
| Acquisitions | — | 238,824 | 238,824 |
| Effect of foreign currency exchange rates | 371 | 2,093 | 2,464 |
| Balance at March 31, 2016 | 204,891 | 818,560 | 1,023,451 |
| Acquisitions | — | 192,098 | 192,098 |
| **Impairment** | — | **(353,915)** | **(353,915)** |
| Effect of foreign currency exchange rates | (156) | (3,847) | (4,003) |
| **Balance at March 31, 2017** | $ 204,735 | **$ 652,896** | **$ 857,631** |

181. According the Company's 2017 Annual Report, Vista undertook testing for goodwill impairment as follows:

> ***We test goodwill and indefinite lived intangible assets for impairment on the first day of our fourth fiscal quarter or upon the occurrence of events or changes in circumstances that indicate that the asset might be impaired.*** We have determined that the reporting units on a standalone basis for our goodwill impairment review are our operating segments, ***or components of an operating segment, that constitute a business for which discrete financial information is available, and for which segment management regularly reviews the operating results. We then evaluate these***

[117] *Id.*

[118] See Vista Outdoor, Annual Report (10-K) (May 26, 2017) at 2.

***components to determine if they are similar and should be aggregated into one reporting unit for testing purposes. Based on this analysis, we have identified five reporting units, as of the fiscal 2017 testing date.***

***For goodwill impairment tests performed prior to January 1, 2017 we used a two-step process.*** In the first step, we determine the estimated fair value of each reporting unit and compare it to the carrying value of the reporting unit, including goodwill. If the carrying amount of a reporting unit is higher than its estimated fair value, an indication of impairment exists and the second step must be performed in order to determine the amount of the impairment. In the second step, we determine the implied fair value of the reporting unit's goodwill, which is determined by allocating the fair value of the reporting unit in a manner similar to a purchase price allocation. The implied fair value is compared to the carrying amount and if the carrying amount of the reporting unit's goodwill exceeds the implied fair value of its goodwill, an impairment loss must be recognized for the excess.

***For goodwill impairment tests performed subsequent to January 1, 2017, we have elected to early adopt Accounting Standards Update No. 2017-04, Simplifying the Test for Goodwill Impairment. As a result of this election, we now perform only one step in performing our impairment analysis, which is to determine the estimated fair value of each reporting unit and compare it to the carrying value of the reporting unit, including goodwill. If the carrying amount of a reporting unit is higher than its estimated fair value, an impairment loss must be recognized for the excess.***

The fair value of each reporting unit is determined using both an income and market approach. The value estimated using a discounted cash flow model is weighted equally against the estimated value derived from the guideline company market approach method. This market approach method estimates the price reasonably expected to be realized from the sale of the reporting unit based on comparable companies.[119]

182. The 2017 Annual Report also reported the interim testing which was announced in January 2017:

As a result of a challenging retail environment, as well as other market pressures that resulted in a deeper discounting of our accessories products, both of which accelerated during our quarter ended January 1, 2017, ***there was a reduction in the projected cash flows of the Hunting and Shooting Accessories, Outdoor Recreation, and Sports Protection reporting units. <u>Given this drop in projected cash flows and the overall retail environment, we determined that a triggering event had occurred as of November 28, 2016,</u> which indicated it was more likely than not that the fair value of the reporting units were less than the book value***.

[119] *See* Vista Outdoor Inc., Annual Report (SEC Form 10-K) (May 26, 2017) at 35.

> During the quarter ended January 1, 2017, Vista Outdoor recorded a $353,915 impairment of goodwill related to the Hunting and Shooting Accessories reporting unit.
>
> During the quarter ended January 1, 2017, we performed an interim test for indefinite lived tradename impairment and ***we recorded a $34,230 impairment related to indefinite lived tradenames within the Hunting and Shooting Accessories reporting unit, predominantly the Bushnell tradename*****.** We determined the fair value of the indefinite lived tradenames using a royalty rate of 2% for the Bushnell tradename and 0.5% for all other indefinite lived tradenames based on public guideline royalty-based transactions and a discount rate of 9.5%.[120]

183. After the interim impairment test, described above, including the partial goodwill impairment recorded in the Hunting and Shooting Accessories reporting unit, ***according to the 2017 Annual Report, the Hunting and Shooting Accessories reporting unit had approximately $106,000 of goodwill recorded at March 31, 2017.***[121] According to Vista, ***"[s]hould the challenging retail environment last longer or be deeper than expected or if new product developments do not succeed, or if the discount rate were to increase by more than 150 basis points, it is possible that the estimated fair value of this reporting unit could fall below its carrying value, which could necessitate impairment of the goodwill in this reporting unit."***[122]

184. As a result of the Company's annual fiscal 2017 impairment test, done as of January 2, 2017, the $106 million in recorded goodwill remained unchanged in the Hunting & Shooting Accessories reporting unit. **As to the Sports Protection reporting unit, this reporting unit had approximately $295 million of goodwill recorded at March 31, 2017** with ***no significant excess value.***[123] Vista again noted that "[s]hould the challenging retail environment last longer or be deeper than expected or if new product developments do not

---

[120] *See* Vista Outdoor Inc., Annual Report (SEC Form 10-K) (May 26, 2017) at 36.

[121] *Id*. at 36.

[122] *Id*.

[123] *Id*. at 37.

succeed, or if the discount rate were to increase by more than 100 basis points, it is possible that the estimated fair value of this reporting unit could fall below its carrying value, which could necessitate impairment of the goodwill in this reporting unit."[124] ***The Company further disclosed that certain tradenames within the Hunting and Shooting Accessories "had an estimated fair value that exceeded their carrying value by less than 1%." In contrast, other trade names exceeded their carrying value by over 15%.***[125]

185. According to the 2017 Annual Report, the value calculations undertaken as part of the interim (as of January 1, 2017) and fiscal 2017 impairment testing (as of January 2, 2017) were all based on the Company's plan "as reviewed by the Board of Directors."[126] For the fiscal 2017 tradenames assessment performed as of January 2, 2017, Vista utilized "estimated revenues from our plan."[127]

186. Both DeYoung and Nolan signed the 2017 Annual Report and represented that the Company's disclosure controls and procedures are effective as required by Section 404 of the Sarbanes-Oxley Act of 2002.[128] Of note, Vista management "excluded from its assessment the internal control over financial reporting at Action Sports" which the Company acquired in April 2016, constituting 13% of net revenues and 8% of total assets (excluding goodwill and intangible assets).[129] Nolan also signed the 2017 Annual Report under the requirements of Section 13 or 15(d) of the Exchange Act of 1934, followed by DeYoung's signature as Chairman and CEO,

---

[124] *Id.*

[125] *Id.*

[126] 2017 Annual Report at 36.

[127] *Id.*

[128] 2017 Annual Report at 92.

[129] *Id.*

Nolan as CFO, Sexton as Controller, and Vista' Board of Directors.[130]

187. On June 21, 2017, CFO Nolan spoke at the Jeffries Global Consumer Conference. CFO Nolan noted that Vista's focus was "improving the organic business, getting our leverage ratio back under control."[131] The CFO also noted that Vista's "cash flow conversion route to net income is normally well north of 100%" but ***March was "an incredible disappointment from cash flow perspective" and was driven by "increase in inventory" where "the speed of decline" was a problem.*** *Id.*

### M. Reasons Why Defendants' Statements Regarding the Fourth Quarter and 2017 Fiscal Year Were False and Misleading

188. Beginning in FY 2016 and dramatically increasing in FY 2017, there was a clear indication of the exact impairments described in the 2015 Annual Report. The chart below tracks the decreases in the organic results in the Outdoor Products segment (which contains the Hunting & Shooting Accessories reporting unit during the Class Period) beginning as early as Q2 2016 (quarter ended October 4, 2015).

**ORGANIC RESULTS FOR VISTA'S OUTDOOR PRODUCT SEGMENT**

**(Hunting & Shooting Accessories Reporting Unit)**

| Period | Organic Sales | % Change Prior Period | Organic Gross Profit | % Change Prior Period |
|---|---|---|---|---|
| Q2 2016 | $189M | 3% increase | $48M | ***Down 2%*** |
| Q3 2016 | $195M | ***Down 2%*** | $47M | ***Down 14%*** |
| Q4 2016 | $174M | 2% increase | $47M | Flat |
| FY 2016 | $742M | 1% increase | $195M | ***Down 3%*** |
| **Q1 2017** | **$153M** | ***Down 16%*** | **$38.5M** | ***Down 27%*** |
| Q2 2017 | $214M | Flat | $51.8M | ***Down 9.6%*** |
| 6 Months Ended 10/2/2016 | $367.7M | ***Down 7%*** | $90.3M | ***Down 18%*** |

[130] 2017 Annual Report at 97.

[131] Bloomberg Tr. (6/21/17) at 4.

| | | | | |
|---|---|---|---|---|
| Q3 2017 | $200.6M | ***Down 15%*** | $46M | ***Down 26.1%*** |
| 9 Months Ended 1/1/2017 | $568M | ***Down 10%*** | $137M | ***Down 21%*** |
| Q4 2017 | ---- | ***Down 23%*** | ---- | ***Down 52%*** |

189. The above underlined statements identified in ¶¶ 174-87 were materially false and/or misleading when made and failed to disclose material adverse facts about the Company's business, operations, and prospects because:

a. Defendants continued to overstate the financial condition of Vista by failing to disclose and recognize the entire goodwill impairment of $600 million;

b. Gross margins were not performing even according to the Company's reduced assumptions, which remained baseless and unattainable;

c. Vista's goodwill was overstated by $155 million, which permitted Defendants to portray Vista's financial condition as stronger than it actually was;

d. Vista was not "on track" to achieve the quarter or fiscal year guidance provided to investors;

e. Future benefits for innovative new products were not attainable;

f. Material promotions and pulling inventory through the Company's distribution channels were not improving overall sales, gross margins, or product performance;

g. the Company failed to timely and fully write down impaired goodwill in its Hunting & Shooting Accessories and Sports Protection reporting unit during this quarter, resulting in materially inflated financial statements during the Class Period;

h. the underlying assumptions used by Defendants, including expected sales and gross profit margins, were over-inflated and had no reasonable basis after six quarters

of softness in the Company's Bushnell and BLACKHAWK! products and brands, extremely warm autumn weather for two years, increasing brand pressure from Bushnell's and BLACKHAWK!'s competitors, and multiple years of no innovation and mismanagement;

i. the revised estimates used in the goodwill impairment as test "assumptions" were not reasonable in light of the following: underlying softening of the retail environment; bankruptcies; acknowledged on-going and increasing promotional activities; need to pull later quarter sales into earlier quarters; the Company's unreasonable over-dependency on later quarter sales; decreasing company revenue and gross margins in early 2017; and Vista's top 10 retail customers predicting declining sales in 2017;

j. Defendants' statements concerning revenue, gross margins and earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

k. due to material problems with excess inventory in the Hunting & Shooting Accessories and Sports Protection reporting units, for some of which Vista had no ready market, Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

l. Defendants falsely certified that Vista had adequate internal controls.

190. The analysis of the impairment charge of $450 million was materially false and/or misleading when made because the Bushnell and BLACKHAWK! products and trade names had substantially no remaining goodwill value and Defendants failed to disclose the following adverse information, which was known only to Defendants due to their access to internal

operational and financial data:

(a) The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $600 million from the beginning of the Class Period;

(b) The preliminary sales and gross margin assumptions used to test goodwill impairment were distorted;

(c) Defendants knew that both Hunting & Shooting Accessories and Bushnell brands in the Sports Protection reporting unit were experiencing higher channel inventories with substantial discounting and less demand, resulting in a substantial reduced cash flow;

(d) Defendants knew that the retail environment in the outdoor recreation industry, evidenced by bankruptcies, consolidation, and announced lower earnings and sales by key customers, was not improving; to the contrary, demand due to the lack of innovative new products was declining;

(e) Forecasts and guidance created and utilized by Vista's continually changing management team were unreliable and known to be unreliable;

(f) Even the Company's revised underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the interim goodwill impairment test to be materially distorted; and

(g) Macroeconomic and industry issues such as bankruptcies, softening retail market, reduced consumer spending on hunting and shooting accessories, lack of new products or innovation, and industry consolidation impacted both Bushnell and BLACKHAWK! products in the Hunting & Shooting Accessories and Sports Protection

reporting units to the extent that their operating results resulted in a near complete write down of their goodwill value.

**N. <u>DeYoung Resigns</u>**

191. According to the Company's SEC filings, DeYoung resigned from his positions as Chairman and CEO, effectively July 11, 2017.[132] The Board elected Michael Callahan, the Company's Lead Independent Director and member of the Board's Audit and Compensation committees to serve as interim CEO and Chairman.[133] Following DeYoung's abrupt resignation, Board membership was reduced from seven members to six.[134] Callahan's compensation included: (i) annualized salary of $800,000; (ii) annual cash bonus in the amount of $400,000 (paid following the date that the new CEO begins employment); and (iii) restricted stock units equal to $110,000, subject to his continued service on the Board.[135]

192. According to a July 11, 2017, Cowen "Quick Take: Company Update," entitled "CEO DeYoung Retires; Q1 Indicated To Be 'Strong'", analyst Gautuam Khanna noted that investors "are apt to view the CEO change as a positive given [Vista's] recent challenges" and "Q1 began the year strong enough for Mr. Callahan to affirm FY18's backend loaded guidance."

193. Indeed, during a conference call held by the Company that same day, Mr. Callahan, on behalf of Vista, assured analysts that "***<u>the company had a strong quarter that positions us well to deliver on our full year financial guidance</u>***."[136] Moreover, speaking for the Company, Mr. Callahan stated that Vista was "***<u>well positioned to capitalize on the significant growth opportunities in the outdoor recreation industry</u>***" and that the Company was "***<u>really</u>***

[132] *See* July 14, 2017 Supplement to Vista Proxy Statement.

[133] *Id.*

[134] *Id.*

[135] *See* Form 8-K/A dated July 19, 2017.

[136] July 11, 2017 Thomson Reuters Conference Call Transcript at 3.

***excited about [its] future***."[137]

**O. False Statements: First Quarter FY18 Announcement**

194. On August 10, 2017, Vista announced its FY18 First Quarter Results and FY18 Financial Guidance:

> "***We delivered a solid start to Fiscal Year 2018*** in the face of a challenging retail environment," said Vista Outdoor Interim Chairman and Chief Executive Officer Michael Callahan. "The company continues its focus on new product development, improved operational performance, and cost savings."
>
> **For the first quarter ended July 2017:**
>
> - Sales were $569 million, ***down 10 percent*** from the prior-year quarter, including $21 million of additional sales from the acquisition of Camp Chef. ***Sales were down 13 percent on an organic basis.***
> - Gross profit was $147 million, ***down 14 percent*** from the prior-year quarter. This includes $7 million of gross profit from the Camp Chef acquisition, offset by an ***18 percent decrease in organic gross profit***.
> - Operating expenses were $107 million, compared to $112 million in the prior-year quarter.
> - Fully diluted earnings per share (EPS) was $0.29, compared to $0.48 in the prior-year quarter. Adjusted EPS was $0.24, compared to $0.48 in the prior-year quarter.
> - Cash flow provided by operating activities was $39 million, compared to a use of $22 million for operating activities in the prior-year period. Year-to-date free cash flow generation was $23 million, compared to free cash flow use of $41 million in the prior-year period.
>
> **Outlook for Fiscal Year 2018:**
>
> "***We are pleased with our performance in the quarter***," said Vista Outdoor Chief Financial Officer Stephen Nolan. "Our working capital reduction efforts are delivering results, with strong cash performance in a quarter when traditionally the company has had a net cash use. Margins were helped by the timing of some general overhead spending and by a late introduction in the quarter of ammunition promotional programs. This late introduction pushed the impact of those programs into later quarters***. Our sales programs also resulted in the company pulling ahead some revenue from the second quarter into the latter part of our first quarter.*** Nonetheless, we are reaffirming previously issued guidance for the full year."

[137] *Id.*

Vista Outdoor reaffirmed its FY18 financial guidance. The company expects:

- Sales in a range of $2.36 billion to $2.42 billion.
- Interest expense of approximately $50 million.
- Adjusted tax rate of approximately 37 percent.
- Adjusted EPS in a range of $1.10 to $1.30.
- Capital expenditures of approximately $70 million.
- Free cash flow in a range of $175 million to $200 million.

195. After DeYoung's abrupt departure in July 2017, the quarterly results were presented by Vista's new interim Chairman and CEO, Michael Callahan, speaking on behalf of the Company. On the Q1 2018 Earnings Call with analysts held on August 10, 2018, Callahan stated that "[d]espite current market conditions, the Board and I are confident that our diversified portfolio of iconic brands, coupled with Vista Outdoor's world-class operations, and strong customer relationships position the company for long-term success."[138] Callahan stated that "I'm very pleased with the company's solid performance in the first quarter."[139] ***Callahan also noted that Bushnell's optics line had been completely "refreshed" with new products to be available in 2018.***[140]

196. At the Q1 FY 2018 Earnings Call, Nolan noted that the Company's organic gross profit was ***down 18%,*** with an operating profit of $34, ***a decrease of 41% from the prior year quarter***.[141] According to Nolan, in the Outdoor Products segment, organically sales ***were down 6%*** from the prior year quarter (lower sales with increased promotional activity) and organically gross profit was ***down 13%*** as a result of lower organic sales, increased promotional activity, and

---

[138] Bloomberg Tr. (8/10/2017) at 2.

[139] *Id.*

[140] *Id. at 3.*

[141] Bloomberg Tr. (8/10/2017) at 4.

unfavorable product mix, partially offset by cost reductions.[142] Across both segments, "***the impact of promotional programs accelerated in the back end of first quarter.***"[143]

197. Concurrent with the Q1 FY 2018 Earnings Conference Call, on August 10, 2017, the Company filed its Quarterly Report (10-Q) for quarter ended July 2, 2017 ("Q1 FY 2018 Quarter Report"). **According to the Q1 FY 2018 Quarter Report, goodwill as of July 2, 2017 was $861 million and as of March 31, 2017 was $857 million.**[144] Goodwill in the Outdoor Products segment was $652 million as of March 31, 2017 and $656 million as of July 2, 2017. **The goodwill recorded in the Outdoor Products segment was presented net of the $353 million recorded in fiscal 2017 and the total trade name intangible assets was reported as $106 million as of July 2, 2017 and March 31, 2017** and was presented net of a $61 million impairment charge recorded in the Outdoor Products segment in fiscal 2017.[145]

198. The Q1 FY 2018 Quarter Report also stated the "Basis of Presentation" for the interim financial statements. "Our accounting policies are described in notes to the consolidated and combined financial statements in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."[146] The Q1 FY 2018 Quarter Report noted that "***[m]anagement is responsible for the condensed consolidated financial statements included in this document, which are unaudited but, in the opinion of management, include all adjustments necessary for a fair presentation of our financial position as of July 2, 2017 and March 31, 2017, our results of operations and cash flows for the quarters ended July 2, 2017 and July 3, 2016***."[147]

---

[142] *Id*.

[143] *Id*.

[144] *See* Vista Outdoor, Quarterly Report (10-Q) (Aug. 10, 2017) at 3, 19, 20.

[145] *Id*. at 11.

[146] Vista Outdoor Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2017) at 4.

[147] *Id*.

199. According to the Q1 FY 2018 Quarter Report, as of July 2, 2017, Walmart represented 17%, of the total trade receivables balance and contributed 15% of the sales.[148] The Q1 FY 2018 Quarter Report also noted that long inventories (not expected to be sold within one year) had increased over 20% to $30 million as of July 2, 2017, from $23.5 million as of March 31, 2017.[149]

200. According to the Q1 FY 2018 Quarter Report, as of July 2, 2017, "**there were no changes in our internal control over financial reporting…that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**."[150] The Q1 FY 2018 Quarter Report was signed by Nolan as CFO pursuant to the requirements of the 1934 Act.[151]

201. Based on the Company's positive comments, Vista stock increased $1.51 from $21.86 on August 10, 2017 to $23.47 on August 11, 2017 on higher than usual trading volume of 5.5 million. Market analysts also reacted positively to the Company's false financial statements. Jeffries' analyst Konrad reiterated his "Buy" rating in his August 10, 2017 "Flash Note" noting that "better than expected volume for Outdoor Products drove the beat." According to Konrad, "we believe that Q1 sets a strong foundation for improving volumes and cash in the back half of the year."

### P. Reasons Why Defendants' Statements Regarding the First Quarter of FY2018 Were False and Misleading

202. The above underlined statements identified in ¶¶ 194-201 were materially false and/or misleading when made and failed to disclose material adverse facts about the Company's

[148] *Id*. at 9.

[149] *Id*.

[150] *Id*. at 34.

[151] *Id*. at 38.

business, operations, and prospects because:

a. Defendants continued to overstate the financial condition of Vista by failing to disclose and recognize the entire goodwill impairment of $600 million;

b. Gross margins were not performing, even according to the Company's reduced assumptions, which remained baseless and unattainable;

c. Vista's goodwill was overstated by $155 million, which permitted Defendants to portray Vista's financial condition as stronger than it actually was;

d. Vista was not "on track" to achieve the quarter or fiscal year guidance provided to investors;

e. Future benefits for innovative new products were not attainable;

f. Material promotions and pulling inventory through the Company's distribution channels were not improving overall sales, gross margins, or product performance;

g. the Company failed to timely and fully write down impaired goodwill in its Hunting & Shooting Accessories and Sports Protection reporting unit during this quarter, resulting in materially inflated financial statements during the Class Period;

h. the underlying assumptions used by Defendants, including expected sales and gross profit margins, were over-inflated and had no reasonable basis after six quarters of softness in the Company's Bushnell and BLACKHAWK! products and brands, extremely warm autumn weather for two years, increasing brand pressure from Bushnell's and BLACKHAWK!'s competitors, and multiple years of no innovation and mismanagement;

i. the revised estimates used in the goodwill impairment as test

"assumptions" were not reasonable in light of the following: underlying softening of the retail environment; bankruptcies; acknowledged on-going and increasing promotional activities; need to pull later quarter sales into earlier quarters; the Company's unreasonable over-dependency on later quarter sales; decreasing company revenue and gross margins in early 2017; and Vista's top 10 retail customers predicting declining sales in 2017;

j. Defendants' statements concerning revenue, gross margins and earnings guidance were materially false because Defendants failed to disclose the unreasonable assumptions that inflated these figures;

k. due to material problems with excess inventory in the Hunting & Shooting Accessories and Sports Protection reporting units, for some of which Vista had no ready market, Defendants misrepresented the Company's reported financial and accounting results during the Class Period; and

l. Defendants falsely certified that Vista had adequate internal controls.

203. The analysis of the impairment charge of $450 million was materially false and/or misleading when made because the Bushnell and BLACKHAWK! products and trade names had substantially no remaining goodwill value and Defendants failed to disclose the following adverse information, which was known only to Defendants due to their access to internal operational and financial data:

(a) The Company's goodwill related to certain acquisitions (Bushnell and BLACKHAWK!) was overstated by as much as $600 million from the beginning of the Class Period;

(b) The preliminary sales and gross margin assumptions used to test goodwill

impairment were distorted;

(c) Defendants knew that both Hunting & Shooting Accessories and Bushnell brands in the Sports Protection reporting unit were experiencing higher channel inventories with substantial discounting and less demand, resulting in a substantial reduced cash flow;

(d) Defendants knew that the retail environment in the outdoor recreation industry, evidenced by bankruptcies, consolidation, and announced lower earnings and sales by key customers, was not improving; to the contrary, demand due to the lack of innovative new products was declining;

(e) Forecasts and guidance created and utilized by Vista's continually changing management team were unreliable and known to be unreliable;

(f) Even the Company's revised underlying assumptions about sales and gross margins no longer had a reasonable basis in fact and therefore caused the interim goodwill impairment test to be materially distorted; and

(g) Macroeconomic and industry issues such as bankruptcies, softening retail market, reduced consumer spending on hunting and shooting accessories, lack of new products or innovation, and industry consolidation impacted both Bushnell and BLACKHAWK! products in the Hunting & Shooting Accessories and Sports Protection reporting units to the extent that their operating results resulted in a near complete write-down of their goodwill value.

**Q. The Truth Finally Emerges As Defendants Can No Longer Hide the Full Extent of the Required Impairment**

204. On November 9, 2017, the Company announced yet another impairment charge as follows:

> "During the quarter we recorded an impairment of intangible assets of $152 million in our Outdoor Products segment, with $75 million related to our Sports Protection business and $77 million related to our Hunting and Shooting Accessories business," said Noland. "The impairment was triggered by increased downward pressure on sales and margins as a result of challenging marketing conditions that have persisted longer than previously expected. These challenging market conditions have been exacerbated by additional customer bankruptcies and consolidations. We continue to see high channel inventories for our Hunting and Shooting Accessories business. We expect these inventory levels will take the remainder of the fiscal year to work through, and will continue to put pressure on sales and margins. Our Sports Protection business has been impacted by the ongoing challenges facing the cycling industry broadly and by reduced retail space for our products.
>
> "The market contraction and competitive environment I mentioned earlier will have more of an impact in the second half of the year than it did in the first half, including the full impact of the ammunition pricing action, which we took in the first and second quarters. While we have taken actions to reduce costs, these initiatives have been more than offset by persisting market conditions. As a result, we are revising our FY 18 financial guidance for the year."

205. Combined with the $155 million impairment charge, Vista reported disappointing results including operating profit of $34 million for Q2 2018, ***a decrease of 56% from the prior year quarter due to lower gross profit***. Interest expense was higher for the quarter was $13 million compared to $10 million in the prior year quarter, resulting from higher borrowing rate, partially offset by a lower debt balance. Vista recorded net income of only $20 million for the quarter, down 56% from the $44 million in the prior year quarter.

206. As to the Outdoor Products segment, the Company's Results for Q2 2018 (quarter ended October 1, 2017) continued the decline in organic results in recognized throughout the Class Period. For the quarter, organically, Outdoor Product sales were down 13% from the prior year quarter due to lower sales across all product lines and gross profit for the segment was down 14%, primarily as a result of lower sales.

207. Vista also revisited its FY18 guidance. According to CFO Nolan, the results continued to be attributable to "on-going promotional activity combined with high inventory

trends "which resulted in additional workforce reductions. Vista cut its "adjusted earnings per share" by over 50% going forward.[152]

208. Not surprisingly, analyst raised liquidity concerns both in the Q2 2018 Earnings Call with Messieurs Nolan and Metz and in their follow up reports based on the fact that the Company's earnings levels were falling faster than the Company's debt repayment and based on the Company's acknowledgment that covenant ratio has risen in the past quarter and that current 3.95 ratio calculation "would crest over 4."[153] In the Roth Capital Partners report dated November 9, 2017, analyst David King noted this "Neutral" rating raises concerns about "rising liquidity concerns."

209. On November 9, when the market was again shocked by the Company's announcement of yet another $152 million impairment charge in its Hunting & Shooting Accessories and Sport Protection reporting units, the market reacted even more swiftly. Before the market even opened, Vista stock had already dropped by 23%, from $18.23 to $13.25, dropping a staggering 41% from a recent high of $22.39, just three weeks earlier on October 25, 2017. While some of the underlying financial information may have been public prior to this disclosure, ***the deficiencies with those assumptions were not disclosed. When they were, the market reacted swiftly***.

210. After the November 9, 2017 plunge of another 23% before the market opened, Vista's stock price never price never recovered and currently trades, as of December 29, 2017, at $14.57. The November 9, 2017 impairment charge translated to an adjusted net loss of $139 million or $2.01 per share. The total impairment charge of just over $600 million amounted to a staggering net loss of $516 million or an earnings loss per share of $7.45.

[152] Vista Press Release (11/9/2017).

[153] Bloomberg Tr. (11/9/2017) at 8.

211. Defendants filed regular reports with the SEC. Defendants certified pursuant to the Sarbanes-Oxley Act of 2002 that these financial reports were reviewed by them and did not contain any material misrepresentations or omissions. These certifications that Vista's financial reporting was accurate and that the Company's internal controls were adequate, were knowingly or recklessly false when filed. As discussed below, Vista's financial statements were not accurate.

212. As a result of Defendants' positive (but false) statements about Vista, investors, including Lead Plaintiff, purchased Vista stock at artificially inflated levels and were damaged when the truth was revealed and the artificial inflation was removed from the stock price causing the stock price to decline.

## IX. POST-CLASS PERIOD EVENTS

213. On December 7, 2017, based on a negative outlook for Vista, Moody's ***downgraded*** Vista's Corporate Family Rating ("CFR") (B1 from Ba3), the Company's Probability of Default Rating (same), the rating of the Notes (B3 from B2), and its Speculative Grade Liquidity Rating. According to Moody's, the CFR downgrade reflects "Vista's weak operating performance and deteriorating credit metrics and Moody's view that they will remain weak for an extended period." According to Moody's Senior Credit Officer, Moody's put the debt to EBITDA currently around 4.5 times, and "expects leverage to increase to 5 times through March 2018 as revenue and earnings continue to decline." Moreover, "[i]n the negative outlook, Moody's also considers the uncertainty over Vista's ability to comply with leverage covenants." As to the Notes, the "B3" rating is two notches below the B1 CFR because of their subordination to the credit facilities.

214. Following in the steps of Messrs. Grindle and DeYoung, on December 19, 2017,

Mr. Nolan and the Company announced that they had agreed that Mr. Nolan will be leaving the Company, effective February 1, 2018 "to pursue other opportunities." In connection with Mr. Nolan's departure, the Company stated it "expects to enter into a waiver and general release agreement with Mr. Nolan. In exchange for his waiver of claims against the Company, the Company will pay Mr. Nolan certain benefits, including: (1) a lump-sum cash severance payment equal to one year of Mr. Nolan's current base salary ($515,000); (2) a pro-rata portion of his annual bonus (based on the Company's actual performance for the entire fiscal year); (3) accelerated vesting of his outstanding time-based restricted stock, restricted stock units, and stock option awards that would have vested had he remained employed by the Company for 12 months following his Departure Date; (4) a pro-rata portion of his performance-based long-term incentive awards that would have vested on the next vesting date based on actual performance; and (5) an additional lump sum of $15,000 to defray health care costs. Mr. Nolan's service as CFO will be rewarded with generous severance even though the Company suffered ***approximately $1.6 billion in lost market capitalization*** resulting from a fraud concerning, among other things, goodwill accounting.

## X. CLASS ACTION ALLEGATIONS

215. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Vista's securities between August 11, 2016 and November 9, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants , the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

216. Because Vista has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable. As of November 7, 2016, Vista had 58,809,385 shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class that are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Vista or its transfer agent and may be notified of the pendency of this action by mail or electronic mail, using the form of notice similar to that customarily used in securities class actions.

217. Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

218. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it seeks to represent.

219. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

220. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated federal securities laws as a result of Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and misrepresented material facts about the business, operations, and prospects of Vista;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether the market prices of Vista's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(e) whether the members of the Class have sustained damages as a result of the decline in the value of Vista's stock when the truth was revealed and the artificial inflation was removed, and, if so, what is the appropriate measure of damages.

## XI. UNDISCLOSED ADVERSE FACTS

221. The market for Vista's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Vista's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired Vista's securities relying upon the integrity of the market price of the Company's securities and market

information relating to Vista, and have been damaged thereby.

222. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Vista's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Vista's business, operations, and prospects, as alleged herein.

223. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Vista's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XII. LOSS CAUSATION

224. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

225. During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Vista securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

226. At all times, the material misrepresentations and omissions particularized in this Complaint, directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of false and misleading statements about Vista's business, revenues, earnings, goodwill value, and the success of various acquisitions. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vista and its business and financial statements, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Among other things, Defendants led the market to believe that there was a prospect of achieving growth rates utilized in the goodwill impairment tests. When Defendants disclosed at the end of the Class Period that they would have to take over a $150 million impairment charge, for a cumulative impairment charge of over $600 million, revealing that the assumptions used in the goodwill impairment tests were baseless and not achievable, the stock dropped immediately by almost 50%. Neither the assumptions nor the deficiencies with those assumptions were disclosed until that time. When they were finally disclosed, the market reacted quickly and the stock dropped as a result. In other words, when the truth about Defendants' wrongful acts, including their delayed announcement of a material goodwill impairment charge, were revealed, the artificial inflation of the stock price, which Defendants caused during the

Class Period, was removed. Thus, Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thereby causing the damages complained of herein.

227. During the Class Period, Lead Plaintiff and the Class purchased Vista's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XIII. SCIENTER ALLEGATIONS

228. As Lead Plaintiff alleges, Defendants acted with scienter in that Defendants knew that the public documents and statements issued and disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly or substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth herein, in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Vista, their control over and/or receipt and/or modification of Vista's allegedly materially misleading misstatements, and/or their association with the Company making them privy to confidential proprietary information concerning Vista, participated in the fraudulent scheme alleged herein.

229. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in the Complaint could not have been perpetrated over the alleged

period of time, as occurred here, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

230. In the Hunting & Shooting Accessories reporting unit and the Sports Protection reporting unit, Defendants knew and reported to the public that inventory was being pulled through the distribution channels with substantial promotional discounts; however, only the Defendants knew the impact of such conduct and discounts on the future sales, revenue and gross margins and the related goodwill impairment. Defendants were also well aware that the retail environment was softening and that key clients were putting substantial pressure on the Company for continued and increasing discounts, materially impacting gross margins with regard to hunting and shooting accessories. Within these reporting units, Defendants were also aware of the following: (i) lack of innovative new products; (ii) repeated changes in senior management within the reporting unit and segment; (iii) mismanagement difficulties prior to and after the Bushnell acquisition; and (iv) reduced sales and lower gross margins going forward.

231. Defendants DeYoung and Nolan were well aware of the issues associated with the Bushnell acquisition. Both Defendants worked at ATK (before the Vista Spin-off) in management positions at the time of the acquisition. DeYoung observed that "the Bushnell organization before we acquired it, with its previous ownership had failed to discriminate, define, and distribute the optics portfolio properly" so Vista "rationalized the brands into channels of distribution where they belong."[154] Defendant Nolan noted that "some of the companies [that] we'd acquired several years ago from private equity [referring to Bushnell] had let certain of their innovation capabilities atrophy."[155]

232. Lead Plaintiff's allegations herein concerning Defendants' materially false and

---

[154] *See* Investor Day Presentation Tr. at 42.

[155] *See* Roth Capital Partner Conference (Bloomberg) Tr. at 4.

misleading statements and omissions and Defendants' scienter are based upon, in part, interviews with numerous witnesses, including former employees of Vista. These witnesses provided information regarding various methods employed by Defendants in furtherance of their scheme to defraud Vista investors. These witnesses[156] include:

(a) CW 1 was a senior executive at ATK Sporting Group from February 2013 to February 2015 and was responsible for business management, including participating in the preparation of a valuation model for Bushnell prior to the acquisition and knowledge of Bushnell's performance after its acquisition by ATK.

(b) CW 2 was an interim senior executive in Vista's Outdoor Products segment from April 2016 until June 2016, and reported directly to Defendant Grindle. Based on this position, CW 2 had personal knowledge with regard to the sales and marketing of certain products within the Outdoor Products segment, the forecast, budget and plan for certain products, and the softening marketplace with retailers such as Sports Authority going out of business.

(c) CW 3 was based in Norfolk, Virginia and worked as a Vista Outdoor/ATK/BLACKHAWK! Accounts Receivable/Credit Manager from 2006 to March 2015. CW 3 reported to the Credit Director, was part of a team that integrated the inventory of ammunitions and accessories into one common operating system, and handled pricing until June 2014.

(d) CW 4 was based in Overland Park, Kansas and worked as a Vista Marketing Manager from April 2016 until the end of May 2017. CW 4 reported to a Senior Sales Manager in Vista Outdoor. CW 4 had knowledge of a directive from Jason Vanderbrink,

[156] To protect their identities, each confidential witness is identified in the masculine regardless of his or her actual gender.

Senior Vice President of Sales "to sell anything" and that "price does not matter." At that time, Mr. Vanderbrink reported to Mr. DeYoung.

(e) CW 5 was based in Overland Park, Kansas and worked as a Vista Outdoor Eyewear Marketing Manager for Bushnell eyewear brands from June 2015 until late March 2017 and oversaw marketing initiatives for Bolle, Serengeti and Cebe brands in the United States. CW 5 reported to the Company's Director of Sales and Marketing for North America. CW 5 had knowledge with regard to inventory issues and the inability of the eyewear business to achieve its plan numbers from the fourth quarter of 2016 until March 2017.

(f) CW 6 was based in Overland Park, Kansas and worked as a Vista Outdoor BLACKHAWK! Assistant Product Manager from July 2015 until January 2017 and then as a Vista Outdoor Sales Service Specialists for Bushnell eyewear from January 2017 until August 2017. CW 6 is knowledgeable with regard to the performance of BLACKHAWK! and its failure to meet plan numbers during the Class Period and is knowledgeable about lay-offs that occurred in March, June/July and September 2017.

(g) CW 7 was based in Overland Park, Kansas and worked as a Vista Outdoor Executive Assistant and reported to Grindle, President, Outdoor Products, until he left in January 2017. CW 7 then reported to Allen, as the new President, Outdoor Products, until October 2017. CW 7 is familiar with changes in leadership and lack of leadership structure within the Hunting & Shooting Accessories reporting unit.

(h) CW 8 was based in Kansas City, Missouri and worked as a Vista Outdoor Sales Specialist between January 2017 and June 2017. Prior to January 2017, CW 8 was based in Overland Park, Kansas and worked as a Vista Outdoor Military and Law Enforcement Sales

Coordinator from January 2013 until January 2017. CW 8 is familiar with the market for BLACKHAWK! products during the Class Period.

233. The Individual Defendants' compensation consisted of cash (salary and bonus), stock awards, options awards and other incentive plan compensation, which nearly doubled if the Company reached specific financial goals. The Individual Defendants, by making unrealistic and unachievable plans and deliberately overstating Vista's goodwill during the Class Period, entered into a New Credit Agreement, an expanded credit facility, and exchanged senior notes under the Notes Registration Agreement – all with the intent to maintain their aggressive acquisition strategy and to acquire Camp Chef in order reach these financial goals for their own personal benefit.

234. During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Vista were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Director meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts had not been disclosed to, and were being concealed from, the investing public.

235. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, marketing and present and future business prospects and access to internal corporate documents (including the Company's operating plans, budgets,

forecasts and reports of actual operations). The Individual Defendants also had access to conversations and connections with other corporate officers and employees, attended management and Board of Director meetings, and were provided with reports and other information.

236. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false and misleading and incomplete information conveyed in the Company's public filings, press releases and other publications alleged are the collective actions of the Individual Defendants identified above. Each of the officers of Vista, by virtue of their high-level positions with the Company (named CEO, CFO and President) directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition. These Defendants were involved in drafting, producing and reviewing and/or disseminating the false and misleading statements and information alleged, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

237. As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of

the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

238. The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications complained of and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom. Because of their Board membership and/or executive and managerial positions with Vista, each of the Individual Defendants had access to adverse undisclosed information about Vista's financial condition and performance and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about Vista and its business issued by the Company materially false and misleading.

239. The Individual Defendants, because of their positions of control and authority, as officers and/or directors of the Company, were able to and did control the contents of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases issued and is, therefore, primarily liable for the representations contained therein. Each of the Defendants is liable as a participant in the fraudulent scheme and course of business that operated as a fraud or deceit on the purchasers of Vista securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Vista's business, operations, management, and the

intrinsic value of Vista; and (b) caused Lead Plaintiff and other members of the Class to purchase Vista securities at artificially inflated prices.

## XIV. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

240. The market for Vista's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Vista's securities traded at artificially inflated prices during the Class Period. On August 11, 2016, the Company's stock price closed at a Class Period high of $42.75 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Vista's securities and market information relating to Vista, and have been damaged thereby.

241. During the Class Period, the artificial inflation of Vista's stock was caused by the material misrepresentations and/or omissions detailed in this Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Vista's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Vista and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company's stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

242. At all relevant times, the market for Vista's securities was an efficient market for the following reasons, among others:

(a) Vista stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Vista filed periodic public reports with the SEC and/or the NYSE;

(c) Vista regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Vista was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly-available and entered the public marketplace.

243. As a result of the foregoing, the market for Vista's securities promptly digested current information regarding Vista from all publicly-available sources and reflected such information in Vista's stock price. Under these circumstances, all purchasers of Vista's securities during the Class Period suffered similar injury through their purchase of Vista's securities at artificially inflated prices and a presumption of reliance applies.

244. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial

prospects - information that Defendants were obligated to disclose - positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XV. NO SAFE HARBOR

245. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vista who knew that the statement was false when made.

## XVI. CAUSES OF ACTION

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and Rule l0b-5 Promulgated Thereunder Against All Defendants**

246. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

247. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Vista's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

248. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vista's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

249. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Vista's financial well-being and prospects, as specified herein.

250. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vista's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Vista and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

251. Each Individual Defendant's primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

252. Defendants had actual knowledge of the misrepresentations and/or omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about Vista's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

253. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Vista's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Vista's securities during the Class Period at artificially high prices and were damaged thereby.

254. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the

problems that Vista was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Vista securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

255. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

## Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

257. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

258. Individual Defendants acted as controlling persons of Vista within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

259. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

260. As set forth above, Vista and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: January 12, 2018

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

*/s/ Betsy C. Manifold*

Betsy C. Manifold
Gregory M. Nespole
Regina M. Calcaterra
Correy A. Kamin
Anita B. Kartalopoulos

**ANDERSON & KARRENBERG, P.C.**
Heather M. Sneddon
Jared D. Scott

**PITTA LLP**
Vincent F. Pitta

*Attorneys for The New York Hotel Trades Council and Hotel Association of New York City, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 12, 2018, I electronically filed the foregoing and all related documents with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ *Jared D. Scott*
Jared D. Scott